IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

```
* * * * * * * * * * * * * * * *
                            *
UNITED STATES OF AMERICA    *
                            *    Case No. 2:18-cr-780
vs.                         *
                            *    March 2, 2020
QUENTIN JOHN FISHBURNE      *
                            *
* * * * * * * * * * * * * * * *
```

REPORTER'S OFFICIAL TRANSCRIPT OF THE
JURY TRIAL - DAY 1 HELD BEFORE
THE HONORABLE DAVID C. NORTON
UNITED STATES DISTRICT JUDGE
MARCH 2, 2020


APPEARANCES:


FOR THE GOVERNMENT:

    Christopher Braden Schoen
    Janet Carra Henderson
    US Attorney's Office (Chas)
    151 Meeting Street
    Suite 200
    Charleston, SC  29401
    843.727.4381


FOR DEFENDANT FISHBURNE:

    Albert Peter Shahid Jr.
    Shahid Law Office
    89 Broad Street
    Charleston, SC  29401
    843.853.4500

1  Official Court Reporter:        Tana J. Hess, CRR, FCRR, RMR
2                                  U.S. District Court Reporter
                                   Middle District of Florida
3                                  Tampa Division
                                   801 N. Florida Avenue
4                                  Tampa, FL  33602
                                   813.301.5207
5                                  tana_hess@flmd.uscourts.gov

6  Proceedings recorded by mechanical stenography using
   computer-aided transcription software.

7

8

9                              **INDEX**

10  <u>NAME</u>                                              <u>PAGE</u>

11  Delanty Langenfeld

12      Direct Examination by Ms. Henderson         45

13      Cross-Examination by Mr. Shahid             58

14      Redirect Examination by Ms. Henderson       65

15  Richard Riney

16      Direct Examination by Ms. Henderson         68

17      Cross-Examination by Mr.  Shahid            72

18  James Davis

19      Direct Examination by Ms. Henderson         75

20      Cross-Examination by Mr. Shahid             79

21      Redirect Examination by Ms. Henderson       87

22      Recross-Examination by Mr. Shahid           88

23  Robert Cook

24      Direct Examination by Mr. Schoen            88

25      Cross-Examination by Mr. Shahid             98

**INDEX**

| NAME | PAGE |
|---|---|
| Brandon Duboise | |
|     Direct Examination by Mr. Schoen | 103 |
|     Cross-Examination by Mr. Shahid | 113 |
|     Redirect Examination by Mr. Schoen | 130 |
|     Recross-Examination by Mr. Shahid | 131 |
| Bobby Callahan | |
|     Direct Examination by Mr. Schoen | 149 |
|     Cross-Examination by Mr. Shadid | 175 |
|     Redirect Examination by Mr. Schoen | 184 |
|     Recross-Examination by Mr. Shahid | 185 |
| Chad Smith | |
|     Direct Examination by Mr. Schoen | 186 |
|     Cross-Examination by Mr. Shahid | 197 |

**EXHIBITS**

NUMBER                                              PAGE

Government's Exhibit Number 1                        44

Government's Exhibit Number 2                        50

Government's Exhibit Number 3                        44

Government's Exhibit Number 4                        97

Government's Exhibit Number 5                        92

Government's Exhibit Number 6                       109

Government's Exhibit Number 7                       111

Government's Exhibit Number 9                        44

Government's Exhibit Number 10                       44

Government's Exhibit Number 11                      163

Government's Exhibit Number 12                      163

Government's Exhibit Number 13                      163

Government's Exhibit Number 14                       44

Government's Exhibit Number 15                      196


Defendant's Exhibit Number 2                        125

Defendant's Exhibit Number 3                        128


Court's Exhibit Number 1                            143

|       |    |                                                            |
|-------|----|------------------------------------------------------------|
| 9:41AM | 1 | (Call to order of the Court.) |
| 9:41AM | 2 | **THE COURT:**  Take your seats.  Thanks.  Y'all said you |
| 9:41AM | 3 | had something you wanted to talk about before we brought the |
| 9:41AM | 4 | jury in later on.  Yes, sir? |
| 9:41AM | 5 | **MR. SCHOEN:**  Good morning, Your Honor. |
| 9:41AM | 6 | **THE COURT:**  Good morning. |
| 9:42AM | 7 | **MR. SCHOEN:**  We do have at least one matter to bring |
| 9:42AM | 8 | up with the Court -- |
| 9:42AM | 9 | **THE COURT:**  Okay. |
| 9:42AM | 10 | **MR. SCHOEN:**  -- prior to getting started.  We did |
| 9:42AM | 11 | some research this weekend, and it appears to us from our |
| 9:42AM | 12 | review of the law that it is improper for either side to call a |
| 9:42AM | 13 | witness to the stand knowing that that witness will invoke his |
| 9:42AM | 14 | or her Fifth Amendment right for the sole purpose of having the |
| 9:42AM | 15 | jury watch that witness invoke that right.  Based on my |
| 9:42AM | 16 | conversations with Mr. Geel, my understanding is that is |
| 9:42AM | 17 | essentially what Ms. Ellison intends to do, and he's present, |
| 9:42AM | 18 | and he can correct me if I'm misspeaking, but my understanding |
| 9:42AM | 19 | is that she plans to invoke her right under the Fifth Amendment |
| 9:42AM | 20 | to virtually -- in response to virtually any question beyond |
| 9:42AM | 21 | her name. |
| 9:42AM | 22 | So I don't think -- the Government certainly |
| 9:42AM | 23 | doesn't feel comfortable calling her, and we would argue that |
| 9:42AM | 24 | the defense shouldn't be able to either, and in that instance, |
| 9:43AM | 25 | we would ask that, you know, the Court deal with that before |

the jury comes in here and we not have her up and being shown

things just to invoke her Fifth Amendment right.

            THE COURT:  Yes, sir, Mr. Shahid?  Mr. Geel?

            MR. GEEL:  Your Honor, if I may, one other thing I'd

like to bring to the Court's attention is I concur with

Mr. Schoen's representation.  There's also a broader issue

which is to say that Ms. Ellison is here, so we're not trying

to be cute, but it's our position that we're not subject to

subpoena by either of the parties in this case.  We're going to

move to quash the subpoenas entirely at this time.  I don't

think the Government has the authority to subpoena her either

to this hearing or this trial, nor does Mr. Shahid.

            THE COURT:  That's an interesting position.  What do

you base that on?

            MR. GEEL:  Well, Your Honor, respectfully I think the

rules contemplate subpoenaing witnesses.  Ms. Ellison is a

Defendant in this case.  I mean, she's in a pretrial diversion

program, but she's still a Defendant here.  If, God forbid, she

fails to comply with the diversion program, she's going to be

right back here on trial herself in a posture where she's been

compelled to testify in this matter or at least compelled to

take the stand.

            So the Fifth Amendment privilege I think is --

it's a little bit clearer as to what that covers, but we think

there's a broader problem, that she's simply beyond compulsory

| | | |
|---|---|---|
| 9:44AM | 1 | process from both of these parties. |
| 9:44AM | 2 | **THE COURT:** Okay. Anybody disagree with that? |
| 9:44AM | 3 | **MR. SHAHID:** Sir? |
| 9:44AM | 4 | **THE COURT:** Do you disagree with that? |
| 9:44AM | 5 | **MR. SHAHID:** I think he has a valid point. I think |
| 9:44AM | 6 | it creates a whole new can of worms for everybody, Judge. This |
| 9:44AM | 7 | is the problem. She's not just a witness. She's a witness |
| 9:44AM | 8 | that's given an affidavit, a sworn statement in which her |
| 9:44AM | 9 | testimony, if believed, will aid this Defendant in being found |
| 9:44AM | 10 | not guilty. This was suppletory information about her |
| 9:44AM | 11 | statement that was first brought up at a detention hearing back |
| 9:44AM | 12 | in 2018, and I've given a copy of her statement to the |
| 9:44AM | 13 | Government. What she says, if she's believed, can exonerate |
| 9:44AM | 14 | this Defendant from Count 1 of the Indictment. |
| 9:45AM | 15 | And so she is now -- if Mr. Geel is correct, she |
| 9:45AM | 16 | is now unavailable, and because she's unavailable, then the |
| 9:45AM | 17 | statements should come in because she is unavailable. There's |
| 9:45AM | 18 | no other way for me to get this information in. She becomes |
| 9:45AM | 19 | available under this theory that she's not subject to |
| 9:45AM | 20 | compulsory process when her case is over. She's then free, and |
| 9:45AM | 21 | she's going to be required to testify. Now the Government -- |
| 9:45AM | 22 | even if the Government had decided to proceed -- and this is |
| 9:45AM | 23 | why I made the motion earlier on a Motion for Severance in case |
| 9:45AM | 24 | her case would go forward and this would be resolved. The |
| 9:45AM | 25 | severance motion got changed because she's been put in the |

9:45AM 1    pretrial diversion program, and now Mr. Fishburne is going

9:45AM 2    first on this trial, but this evidence, her testimony is

9:46AM 3    critical in his defense, if he was unaware, that he did not

9:46AM 4    know -- knowingly possess the gun in the car on March of 2018.

9:46AM 5    That statement in and of itself is prejudicial to him if it

9:46AM 6    does not come in somehow.  So either the statement comes in,

9:46AM 7    and I can proffer the statement to the Court, or we continue

9:46AM 8    this trial until her charges are resolved.  It's one or the

9:46AM 9    other, but I've got to get her -- I got to get her testimony

9:46AM 10   in.  I expected, and we talked about this on Friday, that while

9:46AM 11   she may have taken the Fifth, I was going to at least be able

9:46AM 12   to somehow proffer her statement into evidence to get it in

9:46AM 13   through a back door process.  Now what I'm told is she has no

9:46AM 14   right to be here -- she has no --

9:46AM 15            THE COURT:  Duty.

9:46AM 16            MR. SHAHID:  Duty, not right, duty to be here at all.

9:46AM 17            THE COURT:  But -- so you agree with Mr. Geel's

9:47AM 18   position that since she's still a Defendant and still facing

9:47AM 19   criminal charges, that she's beyond the subpoena power of the

9:47AM 20   Court to have either side testify?

9:47AM 21            MR. SHAHID:  I don't have a counterargument to that.

9:47AM 22   I don't want to necessarily agree to that and put him in

9:47AM 23   opposition, but I think that is where we are quite frankly.

9:47AM 24            THE COURT:  How about you, Mr. Schoen?

9:47AM 25            MR. SCHOEN:  I didn't research that, Judge.  I didn't

| | | |
|---|---|---|
| 9:47AM | 1 | know that that argument was coming. |
| 9:47AM | 2 | **THE COURT:** Sounds like a pretty good one. |
| 9:47AM | 3 | **MR. SCHOEN:** You know, I don't know -- I think that |
| 9:47AM | 4 | the cleaner, easier way to do it if she can't say anything |
| 9:47AM | 5 | other than, "I take the Fifth," there's lots of law -- |
| 9:47AM | 6 | **THE COURT:** I understand that, but if she is |
| 9:47AM | 7 | quote-unquote unavailable as a witness, then under the Federal |
| 9:47AM | 8 | Rules of Evidence, a statement of an unavailable witness comes |
| 9:47AM | 9 | in. |
| 9:47AM | 10 | **MR. SCHOEN:** Your Honor, I think that -- I guess I |
| 9:47AM | 11 | would want to get into the details of that unavailability -- |
| 9:47AM | 12 | **THE COURT:** Okay. |
| 9:47AM | 13 | **MR. SCHOEN:** -- argument because the -- a sworn |
| 9:48AM | 14 | statement, as I understand the rule, comes in if the -- if the |
| 9:48AM | 15 | declarant was subject to both the penalties of perjury and |
| 9:48AM | 16 | was -- was -- there was an opportunity for cross-examination. |
| 9:48AM | 17 | So when we had this bond hearing, I specifically had quite an |
| 9:48AM | 18 | extended discussion with the magistrate judge about the fact |
| 9:48AM | 19 | that I did not want the statement to be even mentioned if she |
| 9:48AM | 20 | wasn't going to be put on the stand and cross-examined, and the |
| 9:48AM | 21 | magistrate judge was concerned about her rights and so would |
| 9:48AM | 22 | not allow me to call her and cross-examine her, and so we've |
| 9:48AM | 23 | been denied the opportunity to subject her testimony to cross |
| 9:48AM | 24 | examination. As Your Honor knows, there's quite -- |
| 9:48AM | 25 | **THE COURT:** I don't know whether you've been denied |

or you voluntarily denied yourself the opportunity by objecting to it.

**MR. SCHOEN:** No, we've not had an opportunity to put her up and cross-examine her. I would say if she had taken the stand to testify at that bond hearing and we had been able to cross-examine her, then she's unavailable and this is prior testimony, but we didn't get that chance, and as you know, there's a lot of very -- a lot of evidence that impeaches what she -- what she's claiming in that letter, and furthermore, you know, she's represented to the agent -- she's said, "Hey, can I recant this statement?" So the notion that -- the notion that somehow Mr. Fishburne is being prejudiced by this, seems like the Government would be highly prejudiced. They can admit a statement we haven't been able to cross-examine.

**MR. SHAHID:** Judge, I tried to remedy this by taking her deposition.

**THE COURT:** Well, she would have taken the same position.

**MR. SHAHID:** Well, she may have.

**THE COURT:** If she's not going to testify at trial, she's certainly not going to testify at a deposition. If she's not available to be subpoenaed to testify at trial, she certainly couldn't be available to be subpoenaed to testify at a deposition.

**MR. SHAHID:** Let me just go another step with this,

9:49AM 1 Judge.  The Government has created this problem, not the

2 Defendant, because they had the right to do this.  They

3 indicted her.  They indicted her, and because they indicted her

4 and she is a criminal defendant with charges pending, because

5 the motion has been to continue her prosecution until the

6 pretrial diversion issue has been resolved -- and they have a

7 right to do that.  I'm not fussing at the Government, but

8 because they have indicted her, they have created a situation

9 that they are now complaining about that they knew existed

10 prior to the Indictment.  At the hearing that they had on --

11 the detention hearing back in 2018 --

12        THE COURT:  That would be a post-Indictment; wouldn't

13 it?

14        MR. SHAHID:  I think that was prior to her being

15 indicted.  She was not a Defendant at the time.

16        MR. SCHOEN:  She was not a Defendant at the time.  It

17 was a supervised release hearing.

18        THE COURT:  Okay.  Gotcha.

19        MR. SHAHID:  So they knew about the existence of this

20 statement that was pend -- brought to the magistrate judge's

21 attention in that she was going to take responsibility for the

22 gun.  So prior to that, prior to that, they were aware of her

23 position.  They then elected to indict her, which they had a

24 right to do.  I'm not fussing at the Government for doing that,

25 but because they took that stance, they have now created this

| | |
|---|---|
| 9:51AM | 1 |
| 9:51AM | 2 |
| 9:51AM | 3 |
| 9:51AM | 4 |
| 9:51AM | 5 |
| 9:51AM | 6 |
| 9:51AM | 7 |
| 9:51AM | 8 |

dilemma in which my critical witness that goes to the heart of Count 1 of this Indictment, that witness has now become unavailable, and they even take the position now this morning that we can't call her knowing that she may take the Fifth Amendment. So I can't even ask her questions under their theory about her giving a statement and whether or not a statement is inconsistent with what she's going to say at trial.

THE COURT: Well, I think you can call her as a witness, but she has to do more than just take the Fifth Amendment. Mr. Schoen's point is you can't call her, put her under oath and ask her questions. She takes the Fifth Amendment right out of the box after her name, right?

MR. SHAHID: So I can't even present to the jury a potential witness who may have information to exonerate my client, which is even far worse than her taking the stand and not being able to testify.

THE COURT: So -- but you agree that you can't call a witness that you know -- bring her into court, swear her, sit her in the witness stand -- that you know is going to take the Fifth Amendment? You'd agree that can't do that just for show? I guess you could say yes or no and then explain.

MR. SHAHID: I'm going to say no, for this reason: Because she may answer some questions that I'm able to ask her about that she may not take the Fifth Amendment on.

|           |    |                                                              |
|-----------|----|--------------------------------------------------------------|
| 9:52AM    | 1  | **MR. SCHOEN:** We would just ask that we figure that |
| 9:52AM    | 2  | out now before the jury is in here rather than waiting until |
| 9:52AM    | 3  | the jury arrives and having that show affect their |
| 9:52AM    | 4  | deliberations. |
| 9:52AM    | 5  | **THE COURT:** So you just want to bring her up and see |
| 9:52AM    | 6  | what she's going to do?  Okay. |
| 9:52AM    | 7  | **MR. GEEL:** Your Honor, if I could briefly. |
| 9:52AM    | 8  | **THE COURT:** Sure. |
| 9:52AM    | 9  | **MR. GEEL:** I'll just note my objection if that's what |
| 9:52AM    | 10 | the Court intends to do.  I don't think anyone has the |
| 9:52AM    | 11 | authority to do that.  I just don't think either party has the |
| 9:52AM    | 12 | right to ask that. |
| 9:52AM    | 13 | **THE COURT:** All right.  Well, I'm going to do some |
| 9:52AM    | 14 | research.  We may do that, we may do it at lunch, we do it |
| 9:52AM    | 15 | tomorrow morning or something like that, but you got some |
| 9:52AM    | 16 | pretty interesting evidentiary questions.  Number 1, can she be |
| 9:53AM    | 17 | compelled to do anything as a Defendant?  Number 2, is she |
| 9:53AM    | 18 | unavailable?  And, therefore, number 3, I mean, the Government |
| 9:53AM    | 19 | could resolve it by dismissing the charges with prejudice, and |
| 9:53AM    | 20 | then she's full game for anybody, and number 4 -- I don't know |
| 9:53AM    | 21 | what number 4 is, but -- so we'll take a look at -- we'll do |
| 9:53AM    | 22 | some research on that during the first part of the trial, but |
| 9:53AM    | 23 | do not mention her name, either one of you, in the opening. |
| 9:53AM    | 24 | She may or may not come as a witness. |
| 9:53AM    | 25 | **MR. SCHOEN:** As a witness, yes, Your Honor. |

9:53AM 1      **MR. SHAHID:**  We cannot mention anything about her

9:53AM 2  name as witness?

9:53AM 3      **THE COURT:**  She's not a witness yet.  You can't go up

9:53AM 4  and say, "Ms. Ellison is going to come and testify" --

9:53AM 5      **MR. SHAHID:**  Right.  Right.

9:53AM 6      **THE COURT:**  Okay.  You may mention that she's a

9:53AM 7  witness, whether she's called or not.  There's a lot of people

9:53AM 8  who are witnesses who are not called, okay?  So anything else?

9:53AM 9      **MR. SHAHID:**  Something you want to say?  Say it.  If

9:54AM 10  you got something you want to tell the Judge, it's your chance

9:54AM 11  to do it.  No.

9:54AM 12      **THE COURT:**  Okay.  Anything else, Mr. Schoen?

9:54AM 13      **MR. SHAHID:**  Judge, the other issue that I think we

9:54AM 14  brought out, and I think we got it cleared up, there was a

9:54AM 15  video on the 2014 stop, and the Government had made

9:54AM 16  representations on Friday about playing part of it, but I think

9:54AM 17  we got that straightened out.  They will stop the tape at the

9:54AM 18  time of his in custody.

9:54AM 19      **MS. HENDERSON:**  Your Honor, I just wanted to make

9:54AM 20  sure there's no witnesses in here that need to be sequestered.

9:54AM 21  I'm not sure who all of these people are in the back.

9:54AM 22      **THE COURT:**  Do you have any witnesses back there,

9:54AM 23  Mr. Shahid?

9:54AM 24      **MR. SHAHID:**  I don't see any.  No, sir.

9:54AM 25      **THE COURT:**  If they're witnesses, they got to stay

| | |
|---|---|
| 9:54AM | 1 |
outside.  I guess that's kind of a motion to sequester the

| 9:54AM | 2 |
witnesses?

| 9:54AM | 3 |
     **MS. HENDERSON:**  Well, yes, Your Honor.  Before we

| 9:54AM | 4 |
start talking about the 2014 incident, there is a witness in

| 9:54AM | 5 |
the 2014 incident that was subpoenaed, so I don't know if he's

| 9:54AM | 6 |
in the courtroom, and so I just want to -- if he is, we're

| 9:54AM | 7 |
moving to sequester.

| 9:55AM | 8 |
     **THE COURT:**  Okay.  Who is that?

| 9:55AM | 9 |
     **MS. HENDERSON:**  Maurice White.

| 9:55AM | 10 |
     **THE COURT:**  Maurice White in the courtroom?  Nobody.

| 9:55AM | 11 |
Good.  Good.

| 9:55AM | 12 |
     **MS. HENDERSON:**  But, yes, Your Honor.  Mr. Shahid is

| 9:55AM | 13 |
correct.  I had given him some time stamps that we might play,

| 9:55AM | 14 |
but we do not intend to go beyond his being placed in custody

| 9:55AM | 15 |
in the back of the patrol car, because there's several

| 9:55AM | 16 |
references from dispatch about him being wanted for murder and

| 9:55AM | 17 |
stuff like that, so out of an abundance of caution, we're not

| 9:55AM | 18 |
going to play that.

| 9:55AM | 19 |
     **THE COURT:**  Okay.  And that's agreeable with you,

| 9:55AM | 20 |
right, Mr. Shahid?

| 9:55AM | 21 |
     **MR. SHAHID:**  That's -- yes.

| 9:55AM | 22 |
     **THE COURT:**  That's what you wanted?

| 9:55AM | 23 |
     **MR. SHAHID:**  That was sort of my concern.

| 9:55AM | 24 |
     **THE COURT:**  Okay.

| 9:55AM | 25 |
     **MR. SHAHID:**  When I went back and reviewed the tape

again, about some of the comments being made that are outside

of I think their intent.

        THE COURT:  So you're all right with that?

        MS. HENDERSON:  Are you still going objecting to that

exhibit with that in mind?

        MR. SHAHID:  The tape itself?

        MS. HENDERSON:  Yeah.

        MR. SHAHID:  Yeah.  I just wanted to make sure --

        MS. HENDERSON:  I'm with you.

        MR. SHAHID:  Sorry, Judge.  Just making sure we're on

the same page.

        THE COURT:  No problem.  Anything else?

        MR. SHAHID:  I think that's it right now.

        THE COURT:  All right.  Mr. Geel, why don't you and

your client leave, but be able -- we may need to get in touch

with you.  She may need to come back, okay?

        MR. GEEL:  Just -- it'll be -- we'll accommodate

whatever the Court needs to do.  We can be available tomorrow

morning at 9:00, Wednesday morning at 9:00.  My client's

schedule, that's the easiest.

        THE COURT:  All right.  Why don't you plan on coming

tomorrow morning at 9:00 unless we tell you not to.

        MR. GEEL:  Okay.

        THE COURT:  Great.

        MR. GEEL:  Thank you.

|        |    |                                                                       |
|--------|----|-----------------------------------------------------------------------|
| 9:56AM | 1  | **MR. SCHOEN:** That may necessitate us breaking early,               |
| 9:56AM | 2  | which we don't object to, but I don't know that our evidence is       |
| 9:56AM | 3  | going to take more than a day.                                        |
| 9:56AM | 4  | **THE COURT:** Okay. That means there's another day for               |
| 9:56AM | 5  | the defense evidence, and so she'll be here at 9:30 in the            |
| 9:56AM | 6  | morning, okay? All right.                                             |
| 9:56AM | 7  | Anything else? How many jurors we got, Catina?                        |
| 9:56AM | 8  | **COURTROOM DEPUTY:** We're still waiting on two.                     |
| 9:56AM | 9  | **THE COURT:** We're still waiting on two jurors, so                  |
| 9:57AM | 10 | we'll be at ease until they show up.                                  |
|        | 11 | (Recess from 9:57 a.m. to 10:10 a.m.)                                 |
| 10:10AM | 12 | **THE COURT:** Take your seats. Thank you. Okay.                     |
| 10:10AM | 13 | Anything before we bring the jury in? Anything before we bring       |
| 10:10AM | 14 | the jury in?                                                          |
| 10:10AM | 15 | **MR. SCHOEN:** No, Your Honor.                                      |
| 10:10AM | 16 | **THE COURT:** Y'all ready to go, Mr. Shahid? Anything?              |
| 10:12AM | 17 | You want to bring the jury?                                           |
| 10:12AM | 18 | **MR. SHAHID:** Yes, sir, bring the jury in.                         |
| 10:12AM | 19 | **MR. SCHOEN:** You want to put that on the record?                  |
| 10:12AM | 20 | **THE COURT:** Yeah.                                                 |
| 10:12AM | 21 | **MR. SCHOEN:** Judge, and he indicated he wanted to                |
| 10:12AM | 22 | plead, and I told him he could plead to Counts 1 and 2 at this      |
| 10:12AM | 23 | point. That's the conspiracy and the first gun count, and my       |
| 10:12AM | 24 | understanding is he's declined that offer.                           |
| 10:12AM | 25 | **MR. SHAHID:** My understanding, Judge, was the new               |

10:12AM 1  offer was a plea to Count 1 and 2, and the Government was still

10:13AM 2  going to seek the maximum penalty which would expose him to 15

10:13AM 3  years.  He is willing to plead guilty to Count 1 right now.

10:13AM 4          THE COURT:  Okay.  So it's my understanding that

10:13AM 5  there's been a -- more plea negotiations, and the Government

10:13AM 6  has offered the Defendant -- allow the Defendant to plead

10:13AM 7  guilty to Counts 1 and 2 and were going to ask for a 15-year

10:13AM 8  sentence.  Whatever the guidelines are, the guidelines are.

10:13AM 9  Would they be less than 15?

10:13AM 10         MR. SCHOEN:  Probably -- it depends on a lot of

10:13AM 11 different things.

10:13AM 12         THE COURT:  All right.  And that you've discussed

10:13AM 13 that with Mr. Fishburne, and Mr. Fishburne has declined that

10:13AM 14 offer; is that correct?

10:13AM 15         THE DEFENDANT:  Yes, sir.

10:13AM 16         THE COURT:  Okay.  Thank you.  All right.  Bring them

10:13AM 17 in.

      18         (Jury in at 10:15 a.m.)

10:15AM 19         THE COURT:  Good morning, ladies and gentlemen of the

10:15AM 20 jury.  Welcome back.  We're going to commerce the trial of the

10:16AM 21 United States of America v. Quentin John Fishburne at this

10:16AM 22 time, so I would ask the clerk to -- y'all can pass out those

10:16AM 23 pads and pencils.  If you want to take notes, you're welcome to

10:16AM 24 do so.  If you don't want to, you don't have to, but I'll ask

10:16AM 25 the clerk to go ahead and swear you as jurors in this case, if

10:16AM 1   you don't mind.

10:16AM 2           **COURTROOM DEPUTY:**  Ladies and gentlemen, raise your

10:16AM 3   right hand and be sworn, please.

10:16AM 4                           (Jury sworn.)

10:16AM 5           **COURTROOM DEPUTY:**  Thank you.

10:16AM 6           **THE COURT:**  Y'all in the back row may want to switch,

10:16AM 7   because this is where the witness stand is, so just move one

10:16AM 8   this way.  That's good.  You can see the action better from

10:16AM 9   there.  Okay.  Y'all can take your seats now.

10:17AM 10          Okay.  Members of the jury, I'm now going to

10:17AM 11  give you some preliminary instructions to guide your

10:17AM 12  participation in this trial.  As jurors it will be your duty to

10:17AM 13  find the facts from the evidence that will be presented to you.

10:17AM 14  You and you alone are the -- will decide the disputed issues of

10:17AM 15  fact in this case.  I'll decide all questions of law that arise

10:17AM 16  during the trial.  You will then have to apply those facts to

10:17AM 17  the law as I will give it to you at the conclusion of the

10:17AM 18  trial, and you must follow that law whether you agree with it

10:17AM 19  or not, and you must not be influenced by any personal likes or

10:17AM 20  dislikes, opinions, prejudices or sympathy.  This means that

10:17AM 21  you must decide this case solely on the evidence before you

10:17AM 22  according to the law.

10:17AM 23          Because you'll be called upon to decide the

10:17AM 24  facts of the case, you should give careful attention to the

10:18AM 25  testimony and evidence presented for your consideration during

this trial, but you should keep an open mind and should not
form or state any opinion about this case one way or the other
until you've heard all the evidence and had the benefit of the
closing arguments of the lawyers as well as my final
instructions on the applicable law.

Now, during the trial you must not discuss the
case in any manner among yourselves or with anyone else, and
you must not permit anyone to attempt to discuss it with you or
in your presence.  The reason for these cautions, of course,
lies in the fact that it will be your duty to decide this case
only on the basis of the testimony and the evidence presented
during this trial without consideration of any other matters
whatsoever.

Now, from time to time during the trial, I may
be called upon to make rulings of law on motions or objections
made by the lawyers.  You should not infer or conclude from any
ruling that I might make that I have any opinions on the merits
of the case favoring one side or the other.  If I sustain an
objection to a question that goes unanswered, you should not
speculate on what answer might have been given, nor should you
draw any inferences or conclusions from the question itself.
Also during the trial, it may be necessary for me to confer
with the lawyers out of your hearing concerning questions of
law, procedure, or evidence.  On some of these occasions, you
may be excused from the courtroom for your convenience, but

everybody is going to try to limit such interruptions as much as possible, but you should remember at all times the importance of the matter you're here to determine and should be patient, even though the case may seem to be going slowly.

In that regard, we expect the case to take approximately two to three days. Everybody is going to make every effort to expedite the trial whenever possible. Schedule, y'all came in at 10:00 this morning, so you know how to get down here and where to park. If it's -- if you want to, we'll start at 9:30 tomorrow morning rather than 10:00. We will have a mid-morning break. We'll have a mid-afternoon break. We'll have a lunch break, and we'll quit about 6:00, and the reason we don't quit at 5:00 is because you'll be caught in Charleston traffic for an hour, so you might as well be here and listen to testimony, and then you'll skip the rush hour, okay?

Now, in order that you might better understand the nature of the decisions you'll be asked to make and how you should go about making them, I'm going to give you some preliminary instructions at this time concerning some of the rules of law that will apply. The preliminary instructions that I'm giving you now will not cover all the rules of law applicable to this case.

As I stated before, I'll instruct you fully at the end of the trial just before you're asked to determine your

verdict.  We'll probably restate at that time some of the rules I'm going to tell you about now, but please note these instructions are intended to be considered as a whole and not singled out apart from the rest.  At the close of the trial, you each will have a copy of my final charge on the law.  You can read along with me, okay?

I first want to caution you that an indictment in a criminal case is merely an accusatory paper that states the charges to be determined at the trial, but it is not evidence against Mr. Fishburne.  Indeed, Mr. Fishburne has entered a plea of not guilty and is presumed by the law to be innocent of these charges.  The Government has the burden of proving him, Mr. Fishburne, guilty beyond a reasonable doubt, and if it fails to do so, you must acquit him.

Now, the Indictment in this case contains three counts against Mr. Fishburne.  Counts 1 and 5 are -- charge him with a felon in possession of a firearm.  Title 18 USC Section 922(g)(1) provides in relevant part that, "It shall be unlawful for any person who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year to possess a firearm or ammunition."

Counts 1 and 5 charge Mr. Fishburne with violating Section 922(g) of Title 18 on two separate occasions, March 31st, 2018 and May 2nd, 2014, respectively.

In order for you to find Mr. Fishburne guilty of

this charge, the Government must prove the following elements
beyond a reasonable doubt as to each count:

Number 1, that Mr. Fishburne had previously been
convicted of a crime punishable by a term of imprisonment
exceeding one year; number 2, that Mr. Fishburne possessed the
firearm or ammunition; number 3, that the firearm or ammunition
had traveled in interstate or foreign commerce at some point
during its existence; and Number 4, that Mr. Fishburne did so
knowingly; that is, Mr. Fishburne must know that the item was a
firearm or ammunition, and its possession must be voluntary and
intentional.

Now, the parties have stipulated to the
existence of the first and third elements, meaning the
Government has satisfied its burden of proving those elements
beyond a reasonable doubt.  However, the Government still must
prove elements 2 and 4 beyond a reasonable doubt.

If you find from your consideration of all the
evidence that the Government has proven each of these elements
beyond a reasonable doubt as to each count, then you should
find Mr. Fishburne guilty of Counts 1 and 5.  On the other
hand, if you find from your consideration of all the evidence
that the Government has not proven each and every one of those
elements beyond a reasonable doubt, then you should find
Mr. Fishburne not guilty of Counts 1 and 5.

Count 2 is conspiracy to sell or transfer

firearms to a felon or make false statements in furtherance of
the conspiracy.

        Title 18 USC Section 922(d) provides in relevant
part that, "It shall be unlawful for a person to conspire to
sell or otherwise transfer a firearm or ammunition to a person
who has been convicted in any court of a crime punishable by
imprisonment for a term exceeding one year."  Title 18 USC
Section 922(a)(6) provides in relevant part that, "It shall
unlawful for a person to conspire to make a false statement to
a licensed firearms dealer in connection with the acquisition
of a firearm."

        Count 2 charges that beginning at a time unknown
and continuing through August 15th, 2018, Mr. Fishburne
unlawfully, knowingly and willfully did conspire, combine,
confederate and agree together with other persons, known and
unknown, to execute a scheme to knowingly and willfully possess
with intent -- firearm -- willfully, excuse me -- sell or
otherwise transfer firearms and ammunition to persons who have
been convicted of a crime punishable by imprisonment for a term
of one year, make false -- and make false statements to
licensed firearm dealers in connection with the acquisition of
the firearms.

        In order for you to find Mr. Fishburne guilty of
this charge, the Government must prove each of the following
elements beyond a reasonable doubt:  Number 1, that two or more

persons entered into an unlawful agreement starting at a time
unknown and continuing through August 18th -- August 15th, 2018
to either number -- A, commit the crime of selling firearms and
ammunition to persons who have been convicted of a crime
punishable by imprisonment for a term exceeding one year; or B,
commit the crime of making false statements to licensed
firearms dealers in connection with the acquisition of
firearms; and Number 2, that Mr. Fishburne knew of the
conspiracy; and Number 3, that Mr. Fishburne knowingly and
voluntary became a part of that conspiracy.

If you find from your consideration of all of the
evidence that the Government has proven each of these elements
beyond a reasonable doubt, then you should find Mr. Fishburne
guilty of Count 2.  If, on the other hand, you find from your
consideration of all the evidence that the Government has
failed to prove any one of the elements beyond a reasonable
doubt, then you should find Mr. Fishburne not guilty of
Count 2.

Now, what is conspiracy?  Under the law,
conspiracy is a kind of partnership in criminal purposes.
Willful participation in such a scheme is sufficient to
complete the offense of conspiracy, even though it's not
been -- even though the ultimate criminal object or objects of
the conspiracy are not accomplished or carried out.  In order
to establish a conspiracy offense, it is not necessary for the

| | |
|---|---|
| 10:25AM | 1 |
| 10:25AM | 2 |
| 10:25AM | 3 |
| 10:25AM | 4 |
| 10:25AM | 5 |

Government to prove that the members of the conspiracy had
entered into any formal type of agreement.  The existence of a
conspiratorial agreement need not be proved by direct evidence,
but may be inferred from the facts and circumstances of the
case.

In your consideration of the evidence, you
should determine whether or not Mr. Fishburne knowingly took
part in a conspiracy to sell firearms and ammunition to persons
who have been convicted of a crime punishable by imprisonment
for a term exceeding one year existed, and whether
Mr. Fishburne knowingly took part in a conspiracy to make false
statements to licensed firearm dealers in connection with the
acquisition of firearms.

If the Government proves the necessary elements
with respect to either conspiracy, you should find
Mr. Fishburne guilty of Count 2.

Now, what's the evidence in the case?  In
determining the facts of the case, you should consider the
following elements:  The sworn testimony of the witnesses both
on direct and cross-examination regardless of who called the
witness; any exhibits that have been received into evidence and
that you'll have back in your jury room when you deliberate;
and number 3, any facts which all the lawyers have agreed or
stipulated.

Certain things are not evidence, and you may not

consider them when deciding what the facts are. I'll list them for you now. The arguments and the statements by the lawyers are not evidence. The lawyers are not witnesses. What they've said in their opening statements, closing arguments and at other times is intended to help you interpret the evidence, but it is not evidence. If the facts as y'all remember them are different from the way the lawyers have stated them, your memory of them controls.

Questions and objections by lawyers are not evidence. Attorneys have a duty to their clients and to the Court to object when they believe a question is improper under our rules of evidence. You should not be influenced by the objection or by my ruling on it. If the objection is sustained, you should disregard the question. If it was overruled, treat the answer as any other.

Testimony that might be excluded or stricken or that you've been asked to disregard is not evidence and must not be considered.

In addition, if that testimony or exhibits have been received only for a limited purpose, you must follow the limiting instructions that I will give you, and, of course, anything you may have seen or heard when court is not in session is not evidence. You are to decide this case solely on the evidence received at this trial.

Now, because the Government has the burden of

proof, it will go forward and present its testimony and
evidence first.  After the Government finishes or rests what we
call its case in chief, Mr. Fishburne may call witnesses and
present evidence if he wishes to do so.  However, you will
remember that the Constitution and the laws of the United
States do not require a defendant to prove his innocence or
produce any evidence at all, and no inference whatsoever may be
drawn from the decisions of Mr. Fishburne not to testify if he
so choses.

Now, as you listen to the testimony, you should
remember that you all are the sole judges of the credibility or
believability of each witness and the weight to be given to his
or her testimony.  You may believe or not believe all or any
part of any witness's testimony.  In making that decision,
whether you believe or disbelieve any witness, you should
consider his or her relationship to the Government or to
Mr. Fishburne; his or her interest, if any, in the outcome of
the case; his or her manner of testifying; his or her
opportunity to observe or acquire knowledge concerning the
facts about which the witness testified; his or her candor,
fairness and intelligence; and the extent to which the witness
has been supported or contradicted by other credible evidence.

Now, I've provided each of you with notepads and
pencils, and you are permitted to take notes during the trial.
If you weren't, why would I give you notepads and pencils?  If

you'd like to take notes, you may.  On the other hand, the
courts do not require you to take notes if you don't want to,
and that will be left up to each of you individually.  If you
do decide to take notes, be careful not to get so involved in
your note-taking that you become distracted from the ongoing
proceedings.  Also your notes should be used only as aids to
your memory, and if your memory should later differ from your
notes, you should rely upon your memory and not your notes.  If
you don't take notes, you should rely on your own independent
recollection or memory of what the testimony was, and you
should not be unduly influenced by the notes of the other
jurors.  Notes are not entitled to any greater weight than the
recollection or impression of each juror as to what the
testimony was.

             As I said, you can take notes, but if you do,
you can leave them in the jury room or turn them upside down in
your chair at night.  Remember, they're for your own personal
use, and they're not to be given or read to anyone else.

             You'll notice that the court reporter is making
a complete record of the trial and all of the testimony that is
being received.  However, you should not expect to have a
typewritten transcript of the trial available to you during
your deliberations because it is not normally completed until
long after the trial itself.  You must therefore rely on your
own individual and collective memories concerning the

testimony.

On the other hand, as I said, any papers or other tangible exhibits received into evidence during the trial will be available during your deliberations. On some occasions during the trial, the exhibits may be handed to you for your brief inspection in the jury box. Others will not, but don't be concerned. As I said, you'll get to see and inspect all the exhibits that are received into evidence at the end of the case.

Now, a few words about your conduct as jurors. You as jurors must decide this case solely on the evidence presented here within the four walls of this courtroom. This means that during trial you must not conduct any individual research about the case, the matters in the case, and the individuals involved in the case. In other words, you should not consult dictionaries or reference material, search the internet, websites, blogs, or use any other electronic tools to obtain information about this case or to help you decide the case.

Please do not try to find information from any source outside the confines of this courtroom. Until you retire to deliberate, you may not discuss the case with anyone, even your fellow jurors. Don't form any opinion until all the evidence is in. Keep an open mind until you start your deliberations at the end of the case. After you retire to deliberate, you may

begin discussing the case with your fellow jurors, but you can't discuss the case with anyone else until you've returned a verdict or the case is over.

Now, I know everybody uses smartphones. That's another tool of technology. As I said, you must not talk to anyone at any time about the case or use these tools to communicate electronically with anyone about this case. This includes your family and friends. You also may not communicate with anyone about the case on your cell phone or through email or text messaging or Twitter or LinkedIn or YouTube, and you should not use any similar technology or social media, even if I've not specifically mentioned it here. I would ask you to inform me if you become aware of another juror's violation of the rules.

Now we'll begin the trial by affording the lawyers for each side an opportunity to make opening statements to you which may explain the issues in the case and summarize the facts they expect the evidence will show. After all the testimony and evidence has been presented, the lawyers will have another opportunity to address you and make final arguments.

The statements by the layers made now as well as the arguments at the end of the trial are not evidence in the case or instructions on the law. However, these statements and arguments are intended to help you understand the evidence, the

| | | |
|---|---|---|
| 10:32AM | 1 | issues and disputes you'll be called upon to decide, as well as |
| 10:32AM | 2 | the positions taken by each side.  So I ask you now to give the |
| 10:32AM | 3 | lawyers your close attention to opening statements. |
| 10:32AM | 4 | Mr. Schoen? |
| 10:32AM | 5 | MR. SCHOEN:  Your Honor, could we have a brief |
| 10:32AM | 6 | sidebar before I proceed with opening? |
| 10:32AM | 7 | THE COURT:  Sure. |
| 10:32AM | 8 | (At sidebar on the record.) |
| 10:32AM | 9 | MR. SCHOEN:  Your Honor, I believe the defense has |
| 10:32AM | 10 | stipulated to elements 1, 2 and 3 of the -- that we have to |
| 10:32AM | 11 | prove, and I believe you advised the jury that I have to prove |
| 10:33AM | 12 | 2 and 4. |
| 10:33AM | 13 | THE COURT:  I'll clear it up in closing instructions. |
| 10:33AM | 14 | MR. SCHOEN:  Okay.  Am I okay to say that in the |
| 10:33AM | 15 | opening? |
| 10:33AM | 16 | THE COURT:  Do you agree with that? |
| 10:33AM | 17 | MR. SHAHID:  We stipulated to three of the elements. |
| 10:33AM | 18 | THE COURT:  Okay. |
| 10:33AM | 19 | MR. SHAHID:  He is a felon, traveled in interstate |
| 10:33AM | 20 | commerce. |
| 10:33AM | 21 | THE COURT:  Okay.  So which one -- which element do |
| 10:33AM | 22 | you have to prove?  You have to prove what, 4? |
| 10:33AM | 23 | MR. SCHOEN:  We have to prove 4, yes. |
| 10:33AM | 24 | THE COURT:  Okay.  I'll just tell them. |
| 10:34AM | 25 | (End of discussion at sidebar.) |

| | |
|---|---|
| 10:34AM | 1 |
| 10:34AM | 2 |
| 10:34AM | 3 |
| 10:34AM | 4 |
| 10:34AM | 5 |
| 10:34AM | 6 |
| 10:34AM | 7 |
| 10:34AM | 8 |
| 10:34AM | 9 |
| 10:34AM | 10 |
| 10:34AM | 11 |
| 10:35AM | 12 |
| 10:35AM | 13 |
| 10:35AM | 14 |
| 10:35AM | 15 |
| 10:35AM | 16 |
| 10:35AM | 17 |
| 10:35AM | 18 |
| 10:35AM | 19 |
| 10:35AM | 20 |
| 10:35AM | 21 |
| 10:35AM | 22 |
| 10:35AM | 23 |
| 10:35AM | 24 |
| 10:35AM | 25 |

1    THE COURT:  Okay.  I misspoke when I gave the
2  elements of the felon in possession of a firearm, which is
3  Counts 1 and 5.  There are four elements.  Number 1, that
4  Mr. Fishburne had previously been convicted of a crime
5  punishable by a term of imprisonment exceeding one year.
6  Number 2, that Mr. Fishburne possessed the firearm and
7  ammunition.  Number 3, that the firearm and ammunition had
8  traveled in interstate and foreign commerce at some point.  And
9  Number 4, Mr. Fishburne did so knowingly; that is,
10  Mr. Fishburne must know the item was a firearm or ammunition
11  and the possession must be voluntary.  Mr. Fishburne has
12  stipulated to the existence of the first, third, and fourth
13  elements -- first, second, and third?
14    MR. SCHOEN:  First, second, and third.
15    THE COURT:  First, second, and third elements.
16  Excuse me.  That is, that he has previously been convicted, he
17  possessed the firearm, and the firearm had traveled in
18  interstate or foreign commerce.  So the Government would have
19  to prove element 4; that is, that Mr. Fishburne did so
20  knowingly, that Mr. Fishburne knew the item was a firearm, and
21  that the possession must be voluntary and intentional.
22    So that clears that up.  Thank you.  Okay.
23  Mr. Schoen?
24    MR. SCHOEN:  May it please the Court.
25    THE COURT:  Sure.

**MR. SCHOEN:** Good morning, ladies and gentlemen. My name is Chris Schoen. Along with my co-counsel Carra Henderson, we represent the United States.

I'm going to give a brief opening statement. Three crime scenes, two guns, one buyer, and zero reasonable doubt. This is a case about a felon who was determined to be armed. Under federal law, felons are not allowed to have guns. They can't buy them. They can't possess them. They can't get somebody else to give them to them. But this particular felon, Quentin John Fishburne, the Defendant in this case, was determined to break that law with the help of his girlfriend. Here's what happened. Let's talk about crime scene one, gun one.

It's May 2nd of 2014. Mr. Fishburne is driving his wife's Lincoln sedan, and he's got another person with him in the passenger's seat. He's speeding. A deputy with the Colleton County Sheriff's Department who sees him speeding tries to stop his car. Instead of stopping, Mr. Fishburne takes off at high speed. We're going to show you footage of the high speed chase that resulted. You're going to be able to see that car swerving across the road, passing other cars, driving 80, 90 miles an hour on country roads. You're also going to hear from the deputy who pursued Mr. Fishburne that day. He's going to tell you that he saw both occupants of the vehicle waving what he believed to be guns. You're going to

| | |
|---|---|
| 10:37AM | 1 |

see that the car pulls off on a dirt road and that two men jump
out of the side of the car and run into the woods.
Mr. Fishburne doesn't get very far.  The deputy takes him down
and arrests him.

And what did they find when they searched that
vehicle?  Two loaded guns on the floorboard of the car.

Now, one of those guns was a .380, and it had
been reported stolen.  We're actually not concerned about that
gun in this particular case.  It's the other gun.  It's a
9 millimeter Jimenez JA Nine.  That's the gun that we're
interested in.  That's what we're going to refer to as the
first gun or gun one.  That gun had been purchased by a woman
named Renata Shontel Ellison.  She purchased that gun in 2013,
the same year that she began a romantic relationship with
Mr. Fishburne.  She's Mr. Fishburne's girlfriend.  Not to be
confused with Mr. Fishburne's wife.  That's another woman named
Kenyetta Fishburne.  The girlfriend bought the gun.  The wife
owned the car.

What you're going to hear is that six months
after this chase, Ms. Ellison, the girlfriend, actually went to
the Colleton County Sheriff's Office and got them to give her
the gun back.  She claimed it.  Now, before she did that, in
September of 2014, she went out and she bought another gun, a
Smith & Wesson .40 caliber M&P Shield.  That's what we're going
to call gun two, the second gun.  Pay attention to that gun.

Let's talk about crime scene two, gun two.  It's March 31st of 2018.  Mr. Fishburne this time is driving his mom's car, and this time he is the only one in the vehicle.  He pulls up to a safety checkpoint in the city of Walterboro where Walterboro police officers are checking licenses and registrations.  He'll only roll down the window just a couple of inches, but that's enough for the officer who's doing the check to develop probable cause to search the vehicle.  So he asked Mr. Fishburne to pull the car over so he can search it.

And what you're going to hear is that Mr. Fishburne almost immediately said, "Anything you find in here, it's not mine."  Of course, what did the officer find when they searched the car right under the seat where Mr. Fishburne was sitting?  A loaded .40 caliber Smith & Wesson M&P Shield, the same gun that was purchased by his girlfriend, Renata Ellison, just a few months after he was arrested with her other gun.

As before, you're going to hear Ms. Ellison didn't own that car.  Ms. Ellison wasn't in the car, and the gun had not been reported stolen.  So now you have two instances where the same felon has been caught in vehicles belonging to members of his family with guns purchased by his girlfriend.  Two guns, two crime scenes.  Remember I told you that there was a third?  One last twist.

You're going to hear evidence that the

.40 caliber Smith & Wesson M&P Shield, the second gun that Ms. Ellison purchased, the shell casings from that gun match a shooting, a 2015 shooting from Walterboro.  Furthermore, the Government is going to show you evidence that Mr. Fishburne was present at the scene of that shooting.  Three crime scenes, two guns, one purchaser, zero reasonable doubt.

Let's be very clear about what it is that the Government has to prove and what it is we've charged.  Because while this case involves a shooting, it involves a car chase, what we charge is actually much simpler, and that's what the Judge instructed you about.  We charged a conspiracy, which is essentially this illegal agreement between Mr. Fishburne, Ms. Ellison and others, to illegally transfer firearms to felons or to straw purchase.  We've also charged felon in possession of a firearm from these two specific dates, the two car stops when he's running from the police, when that officer sees the gun in the hands of both occupants, and that other time when he's the only one in the car and his girlfriend's gun is right under his seat.

And the key question is did he knowingly possess the gun in those two instances?  That's it.

Three crime scenes, two guns, zero reasonable doubt.  At the end of today's trial, my co-counsel will stand before you, and she'll ask you for a verdict compelled by the facts, a verdict of guilty.  Thank you.

|          |    |                                                                      |
|----------|----|----------------------------------------------------------------------|
| 10:42 AM | 1  | **THE COURT:**  Thank you, Mr. Schoen.  Mr. Shahid?                  |
| 10:42 AM | 2  | **MR. SHAHID:**  May it please the Court.  Good morning.            |
| 10:42 AM | 3  | If you think that a person has a prior conviction of being a         |
| 10:42 AM | 4  | felon is guilty of a crime, raise your hand.  If you think that      |
| 10:42 AM | 5  | a person illegally possessed a gun as charged by the Government      |
| 10:42 AM | 6  | is guilty of that charge, raise your hand.  You took an oath a       |
| 10:42 AM | 7  | few moments ago, and the Judge instructed you on this, to            |
| 10:43 AM | 8  | listen to all of the evidence in this case, every bit of the         |
| 10:43 AM | 9  | evidence in this case.  What's also very important in this case      |
| 10:43 AM | 10 | is that you listen to and observe what's not in evidence.            |
| 10:43 AM | 11 | My name is Peter Shahid.  I'm a defense lawyer.                      |
| 10:43 AM | 12 | I've been practicing law almost 40 years in this county in this      |
| 10:43 AM | 13 | courtroom.  I'm going to introduce you to Mr. Fishburne.             |
| 10:43 AM | 14 | Mr. Fishburne?  This is Quentin Fishburne.  He is charged with       |
| 10:43 AM | 15 | these three separate counts of being a felon in possession of a      |
| 10:43 AM | 16 | firearm and with conspiracy.  This is his day in court.  Thank       |
| 10:43 AM | 17 | you, Quentin.  Have a seat.                                          |
| 10:43 AM | 18 | As the Court read to you and stated to you, that                    |
| 10:43 AM | 19 | there are four elements that the Government must prove.  We          |
| 10:43 AM | 20 | have stipulated, which means we agree and Government doesn't         |
| 10:44 AM | 21 | have to prove anything else along those stipulations, those         |
| 10:44 AM | 22 | elements.  Those elements include that there was a firearm, a        |
| 10:44 AM | 23 | gun; and that gun at some point in time moved from South             |
| 10:44 AM | 24 | Carolina to another state or from another state into South           |
| 10:44 AM | 25 | Carolina; that Mr. Fishburne was previously convicted of a           |

felony, and a felony charge means something that carries a
penalty of more than one year; and that he knew that he was a
person who had a previous conviction of more than one year.
We've agreed to those facts.  We made the Government's case
simple.

I want you to pay attention, and when you go
back to your jury room to deliberate at the end of the case,
take this document.  This is the Indictment that you'll have,
and pay attention very closely to what the Judge has instructed
you on on the elements and what's contained in the Indictment.
Because your obligation, your responsibility, is to find
Mr. Fishburne guilty only if, only if each and every one of
those elements are satisfied by a reasonable doubt.

This is not a game of horseshoes.  This is not a
game of maybe, of could have, of would have or should have.
This is a solemn responsibility that you have to listen to the
evidence and be able to establish whether or not he is guilty
of each and every one of those elements of each count.

And the key word that you'll have in front of
you with the Indictment is this phrase, knowingly possessed.
Knowingly possessed.

Now, you've heard the Government's opening
statement to you in which they have admitted that on the two
occasions, one in 2018 and the other in 2014 when there was a
traffic stop engaged, that there was guns found in the car.

And the Government told you on the case in 2014, that was not his car.

Now, how do you -- how do you establish knowingly possessed? Well, we've got the items in the car are -- not his car. That would negate knowingly possessed. The gun that was found that they're worried about and concerned about and charging him with is not titled in his name. That negates knowingly possessed.

Same thing with the first count, the 2018. The car that he was operating was not his car. The gun that they found is not his gun. It's not titled in his name.

That -- those facts, ladies and gentlemen, those facts alone create what's called a reasonable doubt, a reasonable doubt, and those -- the absence of the gun being titled in his name, the absence of the vehicle used that he was driving not being titled in his name is called reasonable doubt, and then you would have an obligation based on those two elements to find him not guilty.

He has to prove nothing. Mr. Fishburne has no obligation at all to do anything. He has no obligation to take this witness stand. He has no obligation to bring up witnesses to testify, because the burden is on the Government to prove each and every one of those elements beyond a reasonable doubt.

Likewise with the conspiracy. You heard the Judge's opening comments about what a conspiracy is. A

| | |
|---|---|
| 10:48AM | 1 |

conspiracy is at least two people. At least two people. It
can be more. It can be three. It can be 10. It could be a
hundred, but you've got to have at least two people to work
together in concert. That's like at a music concert, you got a
drummer playing and a person on a guitar playing instruments,
and they're playing the same song. They're playing the same
tune. They're in concert with one another. They're in sync
with one another. That's what conspiracy is. Conspiracy is
two or more people doing something in common that's illegal,
that's improper, that's against the law, but they have to be
connected together to do something with a common goal, in
concert, and think about a music concert when you think about
that. If one is playing one song and one is playing another,
they're not in concert. If one is off key, they will not be in
concert.

You've got to look at every one of the elements
that the Government is trying to establish in this conspiracy
about working together to lie to people, to get guns, and to
transfer guns to people who weren't supposed to be having them.
Listen the evidence and testimony along those lines, and the
Government has the obligation to prove each and every one of
those elements, that Mr. Fishburne and Ms. Ellison were acting
in concert together. That's just -- I suspect when you hear
that, you will find him not guilty of both of those counts, of
all three of those counts. That there was no conspiracy, and

that he did not knowingly possess.

I want to thank you for your service.  This is not easy.  You will sit in judgment of another human being. That's never easy.  Lawyers have stood in front of this bar, this jury bar, since this building was created in the late 19th century.  This building is one of the most historic buildings we have in our city, in our state.  Lawyers have stood in front of juries like you before and heard from several witnesses over here.  This building and this courtroom is named after the man in that portrait over there, Judge Blatt.  He's one of the longest serving jurists in the history of South Carolina.  One of the most historical cases ever decided in our country, <u>Brown v. Board of Education</u>, was born in this very courtroom by the man whose portrait is right behind you.  That man took a lot of courage, what he did and stood up against forces that wanted him to do something as opposed to making sure that our schools were segregated.

You may remember that when you were called for jury duty, we were in another courtroom, and you may remember the makeup of that courtroom.  It's a beautiful room.  This courtroom was created and constructed in the late 19th Century before we had these TV monitors and these nice speakers around here that you see, probably before the days of air conditioning, and what this building has and this courtroom that the other courtrooms don't have are windows.  You, ladies

| | |
|---|---|
| 10:51AM | 1 |
| 10:51AM | 2 |
| 10:51AM | 3 |
| 10:52AM | 4 |
| 10:52AM | 5 |
| 10:52AM | 6 |
| 10:52AM | 7 |
| 10:52AM | 8 |
| 10:52AM | 9 |
| 10:52AM | 10 |
| 10:52AM | 11 |
| 10:52AM | 12 |
| 10:52AM | 13 |
| 10:52AM | 14 |
| 10:52AM | 15 |
| 10:52AM | 16 |
| 10:52AM | 17 |
| 10:52AM | 18 |
| 10:52AM | 19 |
| 10:52AM | 20 |
| 10:53AM | 21 |
| 10:53AM | 22 |
| 10:53AM | 23 |
| 10:53AM | 24 |
| 10:53AM | 25 |

1  and gentlemen, are the windows.  You, ladies and gentlemen, are

2  the folks who let the light into the room.  Your solemn

3  obligation is to listen to the testimony of the witnesses that

4  come up.  Witnesses are witnesses, regardless if they are

5  people who are just normal citizens off the street or if

6  they're police officers.  It makes no difference.  You don't

7  weigh those person's testimony one against the other because

8  they happen to be a sworn police officer.  You're going to have

9  to listen to what's not presented to you, what evidence is

10  lacking in this, and because of the sort of things that you are

11  lacking, that's going to give you a reason to find

12  Mr. Fishburne not guilty, because you as the windows are going

13  to let the light into this room and shine with truth of this

14  case.

15          If the Government can't satisfy their burden

16  beyond a reasonable doubt, your obligation is to find him not

17  guilty.  Not exonerate him, not find him innocent, but to find

18  him not guilty.

19          This is a criminal case in which the elements

20  are very important and the bar is very high as to what the

21  Government's obligations are.  If they can't reach that burden,

22  if they can't reach that bar, then you have to let that light

23  come in through these windows, and you have to find

24  Mr. Fishburne not guilty, and that's what we're asking you to

25  do.  We're asking you to be the light that comes through these

| | | |
|---|---|---|
| 10:53AM | 1 | windows, to listen to the testimony and find Mr. Fishburne not |
| 10:53AM | 2 | guilty.  Thank you. |
| 10:53AM | 3 | THE COURT:  Thank you, Mr. Shahid.  You want to call |
| 10:53AM | 4 | your first witness? |
| 10:53AM | 5 | MS. HENDERSON:  Your Honor, at this point the |
| 10:53AM | 6 | Government would move several exhibits into evidence that are |
| 10:53AM | 7 | not being objected to. |
| 10:53AM | 8 | THE COURT:  Okay.  Sure. |
| 10:53AM | 9 | MS. HENDERSON:  We would move Government's Exhibit 1, |
| 10:53AM | 10 | Government's Exhibit 3, Government's Exhibit 9, Government's |
| 10:53AM | 11 | Exhibit 10, and Government's Exhibit 14 into evidence, Your |
| 10:53AM | 12 | Honor.  And at this time I would like to publish Government's |
| 10:54AM | 13 | Exhibit 1.  The rest of the exhibits will come in through other |
| 10:54AM | 14 | witnesses. |
| 10:54AM | 15 | THE COURT:  Okay. |
| 10:54AM | 16 | MS. HENDERSON:  Exhibit 1 is the stipulations that |
| 10:54AM | 17 | have been discussed, Your Honor.  The first stipulation is that |
| 10:54AM | 18 | Defendant, Quentin John Fishburne, began on December 4th, 1995 |
| 10:54AM | 19 | and continuing through March 31, 2018, had previously been |
| 10:54AM | 20 | convicted of a felony punishable by a term exceeding one year, |
| 10:54AM | 21 | and that Defendant, Quentin John Fishburne, has not been |
| 10:54AM | 22 | pardoned for the above-referenced conviction, nor has the |
| 10:54AM | 23 | conviction been expunged, nor have his civil rights to possess |
| 10:54AM | 24 | a firearm been restored. |
| 10:54AM | 25 | The second stipulation, that Defendant, Quentin |

| | | |
|---|---|---|
| 10:54AM | 1 | John Fishburne, on December 4th, 1995 and continuing through to |
| 10:54AM | 2 | March 31st, 2018, knew that he had previously been convicted of |
| 10:54AM | 3 | a felony punishable by a term exceeding one year and was |
| 10:54AM | 4 | therefore prohibited from possessing a firearm. |
| 10:54AM | 5 | And the third stipulation, that the Smith & |
| 10:54AM | 6 | Wesson Model M&P Shield .40 caliber firearm, serial number |
| 10:54AM | 7 | HSR7417, the .40 caliber ammunition, and the Jimenez Model JA |
| 10:55AM | 8 | Nine 9 millimeter firearm, serial number 239429, and |
| 10:55AM | 9 | 9 millimeter ammunition all traveled at some time in and |
| 10:55AM | 10 | affecting interstate commerce, and all conform to the |
| 10:55AM | 11 | definition of firearm and/or ammunition under federal law. |
| 10:55AM | 12 | And, Your Honor, at this point the Government |
| 10:55AM | 13 | would call Officer Delanty Langenfeld. |
| 10:55AM | 14 | THE COURT: Okay. |
| 10:55AM | 15 | COURTROOM DEPUTY: Please come forward to be sworn. |
| 10:55AM | 16 | Place your left hand on the Bible and raise your right hand. |
| 10:55AM | 17 | (Witness sworn.) |
| 10:55AM | 18 | COURTROOM DEPUTY: Thank you. You may have a seat in |
| 10:55AM | 19 | the witness box. |
| 10:55AM | 20 | DELANTY LANGENFELD, |
| 10:55AM | 21 | a witness called on behalf of the Government, being first duly |
| 10:55AM | 22 | sworn, was examined and testified as follows: |
| 10:55AM | 23 | DIRECT EXAMINATION |
| 10:55AM | 24 | BY MS. HENDERSON: |
| 10:55AM | 25 | Q. Good morning, Officer Langenfeld. |

## LANGENFELD - DIRECT EXAMINATION

| | | |
|---|---|---|
| 10:56AM | 1 | A.   Good morning. |
| 10:56AM | 2 | Q.   Can you please spell your first and last name? |
| 10:56AM | 3 | A.   First name is D-e-l-a-n-t-y.  Last name is |
| 10:56AM | 4 | L-a-n-g-e-n-f-e-l-d. |
| 10:56AM | 5 | Q.   Thank you.  Where are you currently employed? |
| 10:56AM | 6 | A.   With the Wake County Sheriff's Office. |
| 10:56AM | 7 | Q.   And what position do you hold with the Wake County |
| 10:56AM | 8 | Sheriff's Office? |
| 10:56AM | 9 | A.   Deputy sheriff. |
| 10:56AM | 10 | Q.   Prior to joining the Wake County Sheriff's Office as a |
| 10:56AM | 11 | deputy sheriff, were you employed with any other law |
| 10:56AM | 12 | enforcement agencies? |
| 10:56AM | 13 | A.   Yes, ma'am, I was. |
| 10:56AM | 14 | Q.   Can you please tell the jury where you've been employed? |
| 10:56AM | 15 | A.   I been employed in Jasper County Sheriff's Office, |
| 10:56AM | 16 | Walterboro P.D., Richland P.D., Colleton County Sheriff's |
| 10:56AM | 17 | Office. |
| 10:56AM | 18 | Q.   How many total years experience do you have in law |
| 10:56AM | 19 | enforcement? |
| 10:56AM | 20 | A.   Approximately 12 and a half. |
| 10:56AM | 21 | Q.   And which agency were you working for in 2014? |
| 10:56AM | 22 | A.   I was with the Colleton County Sheriff's Office. |
| 10:56AM | 23 | Q.   And do you recall a vehicle pursuit that you participated |
| 10:56AM | 24 | in on May 2nd, 2014? |
| 10:56AM | 25 | A.   Yes, ma'am, I do. |

| | | |
|---|---|---|
| 10:56AM | 1 | Q.   Can you please tell the jury how you became involved in |
| 10:56AM | 2 | that pursuit? |
| 10:56AM | 3 | A.   I was actually sitting stationary.  I was in the area at |
| 10:57AM | 4 | the time looking for an individual with a warrant when I |
| 10:57AM | 5 | observed a black in color Lincoln exceeding the speed limit of |
| 10:57AM | 6 | 45 miles per hour.  He was doing approximately 56 miles per |
| 10:57AM | 7 | hour.  Went behind the vehicle, initiated my blue lights and |
| 10:57AM | 8 | notified dispatch of what I had, and attempted to make a |
| 10:57AM | 9 | traffic stop.  The subject did not stop.  He accelerated speed, |
| 10:57AM | 10 | and therefore I advised them I was in pursuit of the vehicle. |
| 10:57AM | 11 | Q.   And what is the code for pursuit? |
| 10:57AM | 12 | A.   The code is 10-0. |
| 10:57AM | 13 | Q.   And when you radioed that dispatch that you're 10-0, what |
| 10:57AM | 14 | happens to the dispatch communications? |
| 10:57AM | 15 | A.   Dispatch typically sends out a tone which is an alert to |
| 10:57AM | 16 | let other deputies in the area know to clear the radio, that |
| 10:57AM | 17 | all transmission that's coming through is going to be for me |
| 10:57AM | 18 | because of the situation that I was in doing a pursuant. |
| 10:57AM | 19 | Q.   And is that what happened in this case? |
| 10:57AM | 20 | A.   Yes, ma'am, it was. |
| 10:57AM | 21 | Q.   And while you were in pursuit of the vehicle, what, if |
| 10:57AM | 22 | anything, did you observe the occupants inside that vehicle |
| 10:57AM | 23 | doing? |
| 10:57AM | 24 | A.   There was two occupants in the vehicle, and they had |
| 10:58AM | 25 | objects in their hands.  At that time I notified dispatch and |

10:58AM 1    let them know what was going on.

10:58AM 2    Q.    When you say they had objects in their hands, what do you

10:58AM 3    mean?

10:58AM 4    A.    It appears to be a firearm.

10:58AM 5    Q.    And you said you radioed to dispatch --

10:58AM 6    A.    Yes, I radioed that to dispatch and let them know.

10:58AM 7    Q.    And what -- as a result of seeing what you believe were

10:58AM 8    firearms in the occupants' hands, what did you do?

10:58AM 9    A.    I backed off from the vehicle, and I advised dispatch and

10:58AM 10   surrounding units.

10:58AM 11   Q.    Why did you back off the vehicle?

10:58AM 12   A.    For officer safety reasons.  I wasn't sure what was going

10:58AM 13   to happen at that point in time.

10:58AM 14   Q.    Even though you backed off the vehicle, did you continue

10:58AM 15   to pursue it?

10:58AM 16   A.    I did.

10:58AM 17   Q.    And are your lights and sirens still activated at this

10:58AM 18   time?

10:58AM 19   A.    Yes, ma'am, they were.

10:58AM 20   Q.    Did that vehicle eventually come to a stop?

10:58AM 21   A.    At -- it did, but not at that time when I radioed in, but

10:58AM 22   it came to a stop.

10:58AM 23   Q.    Where did that vehicle finally come to a stop?

10:58AM 24   A.    On the dirt portion of Brittlebank Road.

10:59AM 25   Q.    And what, if anything, is significant about that

| | | |
|---|---|---|
| 10:59AM | 1 | particular area of Colleton County? |
| 10:59AM | 2 | A.   It's a very high crime area, gangs -- |
| 10:59AM | 3 |         MR. SHAHID:  Objection, Your Honor. |
| 10:59AM | 4 |         THE COURT:  Basis? |
| 10:59AM | 5 |         MR. SHAHID:  It's irrelevant. |
| 10:59AM | 6 |         THE COURT:  Overruled. |
| 10:59AM | 7 | BY MS. HENDERSON: |
| 10:59AM | 8 | Q.   I'm sorry?  You were saying? |
| 10:59AM | 9 | A.   It's very high crime gang area.  We've had a lot of |
| 10:59AM | 10 | firearms out of that area, drug activity. |
| 10:59AM | 11 | Q.   And is there any particular gang that's associated with |
| 10:59AM | 12 | Brittlebank Road? |
| 10:59AM | 13 | A.   Yes. |
| 10:59AM | 14 | Q.   Which gang would that be? |
| 10:59AM | 15 | A.   The Cowboys and the Wildboys. |
| 10:59AM | 16 |         MR. SHAHID:  Again, Your Honor, objection.  This is |
| 10:59AM | 17 | irrelevant. |
| 10:59AM | 18 |         THE COURT:  What does it make more -- |
| 10:59AM | 19 |         MS. HENDERSON:  Your Honor, it becomes relevant with |
| 10:59AM | 20 | Mr. Fishburne's associations. |
| 10:59AM | 21 |         THE COURT:  Okay.  If you tie it up, I'll overrule |
| 10:59AM | 22 | your objection. |
| 10:59AM | 23 | BY MS. HENDERSON: |
| 10:59AM | 24 | Q.   Once the vehicle stopped on Brittlebank Road, what |
| 10:59AM | 25 | happened? |

| | | |
|---|---|---|
| 10:59AM | 1 | **A.** The driver and the occupant jumped out of the vehicle and |
| 10:59AM | 2 | ran away from my direction. |
| 10:59AM | 3 | **Q.** And where did they run? |
| 11:00AM | 4 | **A.** They ran into a wooded area. |
| 11:00AM | 5 | **Q.** Did they stay together? |
| 11:00AM | 6 | **A.** No, they weren't. |
| 11:00AM | 7 | **Q.** And did you pursue a particular person? |
| 11:00AM | 8 | **A.** Yes, ma'am, I did. |
| 11:00AM | 9 | **Q.** Who did you pursue? |
| 11:00AM | 10 | **A.** I pursued the driver. |
| 11:00AM | 11 | **Q.** And how did you know he was the driver? |
| 11:00AM | 12 | **A.** By what he was wearing. |
| 11:00AM | 13 | **Q.** And were you eventually able to apprehend the driver? |
| 11:00AM | 14 | **A.** Yes, ma'am, I was. |
| 11:00AM | 15 | **Q.** Officer Langenfeld, did you have department-issued body |
| 11:00AM | 16 | cameras back in 2014? |
| 11:00AM | 17 | **A.** No, ma'am, we did not. |
| 11:00AM | 18 | **Q.** Did you have a car that was operating a dash cam video? |
| 11:00AM | 19 | **A.** Yes.  Yes, ma'am, we were. |
| 11:00AM | 20 | **Q.** I'm going to hand you what's been marked for purposes of |
| 11:00AM | 21 | identification as Government's Exhibit 2.  Officer Langenfeld, |
| 11:00AM | 22 | do you recognize that? |
| 11:00AM | 23 | **A.** Yes, ma'am, I do. |
| 11:00AM | 24 | **Q.** And what is that? |
| 11:00AM | 25 | **A.** That is my dash cam video. |

| | | |
|---|---|---|
| 11:00AM | 1 | Q. And how do you know that's your dash cam video? |
| 11:00AM | 2 | A. Because of my initials on it. |
| 11:00AM | 3 | Q. Have you reviewed the contents of that video? |
| 11:00AM | 4 | A. Yes, ma'am, I did. |
| 11:00AM | 5 | Q. And does the video accurately and fairly depict the events |
| 11:01AM | 6 | that occurred that day? |
| 11:01AM | 7 | A. Yes, ma'am, it is. |
| 11:01AM | 8 | MS. HENDERSON: Your Honor, the Government would move |
| 11:01AM | 9 | Government's Exhibit 2 into evidence. |
| 11:01AM | 10 | MR. SHAHID: Your Honor, object to it, because he's |
| 11:01AM | 11 | already testified as to what he observed and what took place. |
| 11:01AM | 12 | This is just cumulative information. |
| 11:01AM | 13 | THE COURT: Okay. Overruled. |
| 11:01AM | 14 | MS. HENDERSON: Thank you, Your Honor. |
| 11:01AM | 15 | THE COURT: In evidence. |
| 11:01AM | 16 | MS. HENDERSON: Thank you, Your Honor. |
| 11:01AM | 17 | MR. SHAHID: That's Exhibit Number which one? |
| 11:01AM | 18 | THE COURT: 2. |
| 11:01AM | 19 | (Video played.) |
| 11:01AM | 20 | BY MS. HENDERSON: |
| 11:01AM | 21 | Q. Officer Langenfeld, if I could, please while we're waiting |
| 11:01AM | 22 | on you to move, tell the jury what we're seeing -- if you can |
| 11:01AM | 23 | just orient the jury to what they're looking at on the screen. |
| 11:01AM | 24 | A. Yes, ma'am. Typically what I'm doing is I'm sitting in a |
| 11:01AM | 25 | stationary position. My radar is still running for ongoing |

11:01AM 1   traffic, you know, anybody that's going past the speed limit.

11:02AM 2   Currently I'm just looking through some paperwork when my radar

11:02AM 3   went off, and that's when I was able to go behind the black in

11:02AM 4   color Lincoln to attempt to make a traffic stop.

11:02AM 5   Q.   And is this middle screen that is the seat of a car, is

11:02AM 6   that the back seat of your car?

11:02AM 7   A.   Yes, ma'am, it is.

11:02AM 8   Q.   And the things that we're seeing in the bottom right-hand

11:02AM 9   corner that have your name and the speed limit and stuff like

11:02AM 10   that, is that your -- is that your current speed?  Is that what

11:02AM 11   that shows?

11:02AM 12   A.   Yes, ma'am.  That's my current speed and --

11:02AM 13         MS. HENDERSON:  Pause it, please.

11:02AM 14                (Video paused.)

11:02AM 15         THE WITNESS:  It's my current speed and also the

11:02AM 16   icons in the boxes and stuff, like when it turns red, it

11:02AM 17   activates my emergency lights and brakes and everything.

11:02AM 18               (Video resumed.)

11:02AM 19   BY MS. HENDERSON:

11:02AM 20   Q.   So now we see a red right next to emergency lights.  Does

11:02AM 21   that mean you activated your blue lights?

11:02AM 22   A.   Yes, ma'am, it does.

11:02AM 23   Q.   Is that what triggers the sound to come on?

11:02AM 24   A.   Yes, ma'am, it does.

11:03AM 25         MS. HENDERSON:  You could pause it, please.

| | | |
|---|---|---|
| 11:03AM | 1 | (Video paused.) |
| 11:03AM | 2 | **BY MS. HENDERSON:** |
| 11:03AM | 3 | **Q.** What did you just inform dispatch? |
| 11:03AM | 4 | **A.** That I was in pursuit with a vehicle, my direction of |
| 11:03AM | 5 | travel, where we're heading at, and it was occupied by two |
| 11:03AM | 6 | individuals. |
| 11:03AM | 7 | **Q.** Thank you. |
| 11:04AM | 8 | (Video resumed.) |
| 11:04AM | 9 | **MS. HENDERSON:** Can you pause it, please? |
| 11:04AM | 10 | (Video paused.) |
| | 11 | **BY MS. HENDERSON:** |
| 11:04AM | 12 | **Q.** What did you just tell the dispatch at that point? |
| 11:04AM | 13 | **A.** I told dispatch -- I notified them and said it appears |
| 11:04AM | 14 | they have something in their hands. |
| 11:04AM | 15 | **Q.** And is this the point where you back off this vehicle? |
| 11:04AM | 16 | **A.** Yes, ma'am. |
| 11:04AM | 17 | **MS. HENDERSON:** Can you back it up just a few |
| 11:04AM | 18 | seconds? |
| | 19 | (Video resumed.) |
| 11:05AM | 20 | **BY MS. HENDERSON:** |
| 11:05AM | 21 | **Q.** So we've now entered the Brittlebank Road area; is that |
| 11:05AM | 22 | correct? |
| 11:05AM | 23 | **A.** That's correct. |
| 11:05AM | 24 | **MS. HENDERSON:** Can you pause it, please? |
| 11:06AM | 25 | (Video paused.) |

| | | |
|---|---|---|
| 11:06AM | 1 | BY MS. HENDERSON: |
| 11:06AM | 2 | Q.    You keep using the term "bushbond".  What's that mean? |
| 11:06AM | 3 | A.    That's a term that we use in law enforcement when somebody |
| 11:06AM | 4 | is about to get out the vehicle and start running on foot. |
| 11:06AM | 5 | (Video resumed.) |
| 11:06AM | 6 | MS. HENDERSON:  Can you pause it, please? |
| 11:06AM | 7 | (Video paused.) |
| 11:06AM | 8 | BY MS. HENDERSON: |
| 11:06AM | 9 | Q.    Officer Langenfeld, obviously unlike a body cam, the dash |
| 11:06AM | 10 | camera does not follow you so we can't see what's happening in |
| 11:07AM | 11 | the woods, but we hear you using some pretty strong language. |
| 11:07AM | 12 | Can you please tell the jury what we can't see is going on in |
| 11:07AM | 13 | those woods? |
| 11:07AM | 14 | A.    Yes, at that time when I was running behind the Defendant, |
| 11:07AM | 15 | I couldn't see his hands, and he was still running, and he |
| 11:07AM | 16 | wasn't complying until I gave him loud verbal commands to let |
| 11:07AM | 17 | me see his hands, and due to the adrenaline of me not knowing |
| 11:07AM | 18 | if he had weapons on him at that time and what I observed when |
| 11:07AM | 19 | I was driving behind him, I had to take certain precautions. |
| 11:07AM | 20 | Therefore he finally complied. |
| 11:07AM | 21 | (Video resumed.) |
| | 22 | BY MS. HENDERSON: |
| 11:07AM | 23 | Q.    Okay.  At this point, Officer Langenfeld, do you have |
| 11:07AM | 24 | sight still on the passenger? |
| 11:07AM | 25 | A.    No, ma'am, I lost the passenger at that time. |

11:09AM 1 **Q.** Officer Langenfeld, is this you that we see coming out of
11:09AM 2 the woods?

11:09AM 3 **A.** Yes, ma'am, it is.

11:09AM 4 **Q.** Officer Langenfeld, after you apprehended the driver, were
11:09AM 5 you able to identify who he was?

11:09AM 6 **A.** Yes, ma'am, I was.

11:09AM 7 **Q.** And how were you able to identify him?

11:09AM 8 **A.** Based off a search incident to arrest, I found several
11:09AM 9 items in his person, and he had a debit card on him with the
11:10AM 10 name Quentin Fishburne.

11:10AM 11 **Q.** And did that debit card have a picture on it?

11:10AM 12 **A.** No, ma'am, it didn't.

11:10AM 13 **Q.** How were you able to confirm that the person standing
11:10AM 14 there was, in fact, Quentin Fishburne?

11:10AM 15 **A.** We ran his information through dispatch, and they sent us
11:10AM 16 a picture on the phone. We believe we were able to identify
11:10AM 17 him.

11:10AM 18 **Q.** And is the person that you saw driving that vehicle that
11:10AM 19 you placed under arrest and identified and Quentin Fishburne on
11:10AM 20 the scene in the courtroom today?

11:10AM 21 **A.** Yes, ma'am, he is.

11:10AM 22 **Q.** And where is he?

11:10AM 23 **A.** He is a sitting right over there (indicating).

11:10AM 24 **Q.** Next to Mr. Shahid right here?

11:10AM 25 **A.** Yes, ma'am.

11:10AM 1          **MS. HENDERSON:** Please let the record reflect that

11:10AM 2     the witness has identified the Defendant, Mr. Fishburne.

11:10AM 3     **BY MS. HENDERSON:**

11:10AM 4     **Q.** Officer Langenfeld, while you were dealing with

11:10AM 5     Mr. Fishburne, are you aware of any items that were located

11:10AM 6     within the vehicle that were taken into evidence?

11:10AM 7     **A.** Yes, ma'am, I was.

11:10AM 8     **Q.** And what were they?

11:10AM 9     **A.** There were two firearms.

11:10AM 10    **Q.** Do you know what the two firearms were?

11:10AM 11    **A.** One of the firearms was a Jimenez Arms, and the other was

11:10AM 12    a Walter.

11:10AM 13    **Q.** And do you know if either of those firearms returned

11:10AM 14    stolen?

11:10AM 15    **A.** Yes, ma'am, one were.

11:11AM 16    **Q.** Which one did?

11:11AM 17    **A.** The Walter was stolen.

11:11AM 18    **Q.** And did you ever question -- or I apologize. Do you

11:11AM 19    remember the serial number for the other firearm, the Jimenez

11:11AM 20    Arms?

11:11AM 21    **A.** I would have to refer to my report.

11:11AM 22    **Q.** Do you have your report, a copy of your report with you?

11:11AM 23    **A.** No, ma'am, I don't.

11:11AM 24          **MS. HENDERSON:** Permission to approach, Your Honor?

11:11AM 25          **THE COURT:** Sure.

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
| 11:11AM | 1 | THE WITNESS:  And you need a serial number for the |
| 11:11AM | 2 | stolen one? |
| 11:11AM | 3 | BY MS. HENDERSON: |
| 11:11AM | 4 | Q.   For the Jimenez Arms. |
| 11:11AM | 5 | A.   Oh, okay.  It's going to be serial number 239429. |
| 11:11AM | 6 | Q.   And the Jimenez did not return stolen, correct? |
| 11:11AM | 7 | A.   Correct. |
| 11:11AM | 8 | Q.   Okay.  And did you also have the tag number for that |
| 11:11AM | 9 | vehicle that Mr. Fishburne was driving? |
| 11:11AM | 10 | A.   Yes, ma'am. |
| 11:11AM | 11 | Q.   And do you remember what at that tag number was? |
| 11:11AM | 12 | A.   I'm going to refer to this report again.  It was FLU998, |
| 11:12AM | 13 | South Carolina tag. |
| 11:12AM | 14 | Q.   Okay.  Officer Langenfeld, do you remember who the car |
| 11:12AM | 15 | came back registered to? |
| 11:12AM | 16 | A.   It came back to a Kenyetta -- I believe it was a Kenyetta |
| 11:12AM | 17 | Fishburne. |
| 11:12AM | 18 | Q.   After the firearms were located in the vehicle, did you |
| 11:12AM | 19 | ever question Mr. Fishburne about them? |
| 11:12AM | 20 | A.   Yes, ma'am, I did. |
| 11:12AM | 21 | Q.   And what statements, if any, did he make? |
| 11:12AM | 22 | A.   He stated -- as I can recall, "what firearms?"  And I |
| 11:12AM | 23 | believe he said it twice.  And he said there was no firearms in |
| 11:12AM | 24 | the vehicle. |
| 11:12AM | 25 | Q.   And after those firearms were located, did you take |

11:12AM  1  custody of them and place them into evidence?

11:12AM  2  A.   Yes, ma'am, I did.

11:12AM  3        MS. HENDERSON:  Beg the Court's indulgence, Your

11:12AM  4  Honor.  Thank you.  Please answer any questions Mr. Shahid has.

11:13AM  5        THE WITNESS:  Yes, ma'am.

11:13AM  6        MR. SHAHID:  Would you pull that back up, please, and

11:13AM  7  just turn off that tape, the CD?  Can you fast forward it to

11:13AM  8  where you had it stopped?  Can you fast forward it a little bit

11:15AM  9  more?  Pause it right there.

11:15AM  10                    CROSS-EXAMINATION

11:15AM  11                    BY MR. SHAHID:

11:15AM  12  Q.   Detective -- deputy, I'm sorry.  How are you doing today?

11:15AM  13  A.   I'm all right, sir.

11:15AM  14  Q.   So you have how many years of law enforcement experience?

11:15AM  15  A.   Approximately 12 and a half.

11:15AM  16  Q.   And how many law enforcement agencies have you been with

11:15AM  17  during that 12 and a half years?

11:15AM  18  A.   I've been with four.

11:15AM  19  Q.   Four?

11:15AM  20  A.   Yes, sir.

11:15AM  21  Q.   So about every three years or so you've been with a

11:15AM  22  different agency on average?

11:15AM  23  A.   Give or take, yes, sir.

11:15AM  24  Q.   And the county that you're working out of is out of

11:15AM  25  Georgia now?

11:15AM 1    A.   No, sir, North Carolina.

11:15AM 2    Q.   North Carolina?

11:15AM 3    A.   Yes, sir.

11:15AM 4    Q.   Get my area right.  Now, as you were having Mr. Fishburne

11:15AM 5 in custody, there's a car right there that's blocking the car

11:15AM 6 that he was operating; is that correct?

11:15AM 7    A.   You talking about the truck?

11:15AM 8    Q.   The truck.

11:16AM 9    A.   Yes, sir.

11:16AM 10    Q.   So you were busy with Mr. Fishburne, and you were not the

11:16AM 11 one who actually collected the firearm; is that correct?

11:16AM 12    A.   No, sir, not at that time.

11:16AM 13    Q.   There was another deputy who was assisting you who

11:16AM 14 collected the firearms?

11:16AM 15    A.   Yes, sir.

11:16AM 16    Q.   And the firearms were collected and found on the

11:16AM 17 passenger's side of the car; is that correct?

11:16AM 18    A.   I believe it was found on the floorboard.

11:16AM 19    Q.   Of the passenger's side of the car?

11:16AM 20    A.   Yes, sir.

11:16AM 21    Q.   Okay.  Not on the driver's side, but on the passenger's

11:16AM 22 side of the car?

11:16AM 23    A.   According to the deputy that found it, yes.

11:16AM 24    Q.   All right.  Now, the particular firearm we're talking

11:16AM 25 about was not registered to Mr. Fishburne; isn't that correct?

| | | |
|---|---|---|
| 11:16AM | 1 | A. Which firearm are you talking about? |
| 11:16AM | 2 | Q. The Jimenez -- the gun we're talking about in question |
| 11:16AM | 3 | here. |
| 11:16AM | 4 | A. It was registered to someone else. |
| 11:16AM | 5 | Q. To somebody else, not to him? |
| 11:16AM | 6 | A. No, sir. |
| 11:16AM | 7 | Q. All right. And the vehicle that he was operating was in |
| 11:16AM | 8 | the name of somebody else as well; is that correct? |
| 11:16AM | 9 | A. Yes, sir. |
| 11:16AM | 10 | Q. All right. And do you have with you the results of a |
| 11:17AM | 11 | fingerprint examination of that gun? |
| 11:17AM | 12 | A. No, sir, I don't have that with me. |
| 11:17AM | 13 | Q. The guns were never fingerprinted? |
| 11:17AM | 14 | A. I don't -- I wasn't on crime scene, so I didn't |
| 11:17AM | 15 | fingerprint anything. We usually have a technician that does |
| 11:17AM | 16 | all of that. |
| 11:17AM | 17 | Q. All right. And do you know if they ever were |
| 11:17AM | 18 | fingerprinted? |
| 11:17AM | 19 | A. I can't tell you if they were or not. |
| 11:17AM | 20 | Q. All right. So we don't have any information of whether or |
| 11:17AM | 21 | not fingerprints were recovered from that gun? |
| 11:17AM | 22 | A. I don't have information. |
| 11:17AM | 23 | Q. Okay. And did you take the guns into custody yourself, or |
| 11:17AM | 24 | somebody else did? |
| 11:17AM | 25 | A. Yes, sir, I took it into custody and submitted it into |

11:17AM 1 evidence.

11:17AM 2 Q.    All right.  And so we can't see -- exactly from this

11:17AM 3 video, we can't see how the guns were recovered because that

11:17AM 4 truck is blocking our view from your camera; is that right?

11:17AM 5 A.    Right.

11:17AM 6 Q.    And we don't have any other information, any other videos

11:17AM 7 from anybody else taking a view or a recording visually of the

11:17AM 8 detective or the deputy or the police officer who actually

11:17AM 9 recovered the guns from the vehicle; do we?

11:18AM 10 A.    I'm not sure.  I'm just focused on my video here.

11:18AM 11 Q.    But have you seen any other videos pursuant to you coming

11:18AM 12 to court today?

11:18AM 13 A.    No, sir.

11:18AM 14 Q.    Were you asked to review any other videos coming to court

11:18AM 15 today to testify?

11:18AM 16 A.    No, sir.

11:18AM 17 Q.    All right.  But you clearly reviewed this CD?

11:18AM 18 A.    Yes, sir.

11:18AM 19 Q.    Okay.  As you were preparing your report of what took

11:18AM 20 place in May of 2014, did you talk to other officers to see if

11:18AM 21 they had any other recordings?

11:18AM 22 A.    No, sir.

11:18AM 23 Q.    Did you talk to the -- I presume when you took the guns

11:18AM 24 into custody, you put them in some kind of evidence bag?

11:18AM 25 A.    Yes, sir.

11:18AM 1  Q.   Took them to the evidence locker?

11:18AM 2  A.   Yes, sir.

11:18AM 3  Q.   Did you ever talk to the evidence technician or your crime

11:18AM 4  scene or anybody else and say, "Please take these guns and have

11:18AM 5  them dusted for fingerprints?"

11:18AM 6  A.   No, sir.  When -- they have their own process that they do

11:18AM 7  where we just drop the evidence, and whatever goes on from

11:18AM 8  there, that's a different department.

11:18AM 9  Q.   But you're considered the officer involved in the

11:19AM 10 prosecution of this case; aren't you?

11:19AM 11 A.   Yes, sir.

11:19AM 12 Q.   Okay.  So did you do anything else to follow up, to follow

11:19AM 13 up on your investigation of this case?

11:19AM 14 A.   No, sir.

11:19AM 15 Q.   Okay.  Did you talk to the woman whose name is titled --

11:19AM 16 who owns this gun?

11:19AM 17 A.   No, sir.

11:19AM 18 Q.   Did she ever talk to you about anything regarding this

11:19AM 19 being her gun?

11:19AM 20 A.   No, sir.

11:19AM 21 Q.   You understand at some point in time that gun was returned

11:19AM 22 to her, right?

11:19AM 23 A.   I don't know if it was or not, sir.

11:19AM 24 Q.   We don't have that gun in evidence today; do we?

11:19AM 25 A.   I'm not sure, sir.

11:19AM 1  Q.   Okay.  Did you ever talk to the owner of the car?

11:19AM 2  A.   No, sir.

11:19AM 3  Q.   And when we looked at the video, would you tell the jury

11:19AM 4  today as you were giving chase through this -- this pursuit of

11:19AM 5  this car, you thought they were still holding something in

11:19AM 6  their hands inside the car?

11:19AM 7  A.   Yes, sir.

11:19AM 8  Q.   Okay.  And but you couldn't tell exactly what that was?

11:20AM 9  A.   It -- I could -- I told what it appeared.

11:20AM 10  Q.   What it appeared?

11:20AM 11  A.   Yes, sir.

11:20AM 12  Q.   Now, Deputy, what appeared and what is is two different

11:20AM 13  things; aren't they?

11:20AM 14  A.   Correct.

11:20AM 15  Q.   So you're not sure definitively what they had in their

11:20AM 16  hands; are you?

11:20AM 17  A.   But he's talking about experience, I was able to tell

11:20AM 18  because of difference of, you know --

11:20AM 19  Q.   So y'all driving at a high rate of speed, I think maybe up

11:20AM 20  to about 57, 60 miles an hour; is that right?

11:20AM 21  A.   More than that, sir.

11:20AM 22  Q.   More than that?

11:20AM 23  A.   Yes, sir.

11:20AM 24  Q.   Okay.  So -- and they're moving ahead of you?

11:20AM 25  A.   Yes, sir.

11:20AM  1   Q.   And you focus on the car, and you radio in on the car

11:20AM  2   giving your dispatch your location, correct?

11:20AM  3   A.   Correct.

11:20AM  4   Q.   Okay.  But you weren't sure positively what you saw them

11:20AM  5   holding in their hands, what they appear to have been?

11:20AM  6   A.   Well, sir, I know that it wasn't a Bible in their hands,

11:20AM  7   so it appeared to be a firearm in their hands.

11:21AM  8   Q.   Now, you still got your report in front of you?

11:21AM  9   A.   No, sir.

11:21AM  10          MS. HENDERSON:  You need a clean copy?

11:21AM  11          MR. SHAHID:  Whatever you used.  Thank you.

11:21AM  12  BY MR. SHAHID:

11:21AM  13  Q.   You remember writing about that part?

11:21AM  14  A.   About --

11:21AM  15  Q.   About what you saw in the car?  I'm going to ask you to

11:21AM  16  review your notes one more time.

11:21AM  17  A.   Yes, sir.

11:21AM  18  Q.   And you go about middle, halfway down.

11:21AM  19  A.   Yes, sir, I write --

11:21AM  20  Q.   Isn't your report, Officer -- Deputy, "I observed that

11:21AM  21  both occupants of the vehicle were waving something in the air

11:21AM  22  believed to be a firearm"?

11:21AM  23  A.   Yes, sir.

11:21AM  24  Q.   "Something in the air"?

11:21AM  25  A.   Yes, sir.

| | | |
|---|---|---|
| 11:22AM | 1 | **MR. SHAHID:** Give me just one second, Judge. |
| 11:22AM | 2 | **THE COURT:** Sure. |
| 11:22AM | 3 | (Pause.) |
| 11:22AM | 4 | BY MR. SHAHID: |
| 11:22AM | 5 | Q.   I just want to go back to one other thing that -- a |
| 11:22AM | 6 | question asked to you by Government's lawyer.  Mr. Fishburne |
| 11:22AM | 7 | did not say that was his gun; is that what I understand your |
| 11:22AM | 8 | testimony to be? |
| 11:22AM | 9 | A.   Right. |
| 11:22AM | 10 | Q.   Okay.  So he never said, "That's my gun."  He said the |
| 11:22AM | 11 | exact opposite; is that correct? |
| 11:22AM | 12 | A.   Yes, sir. |
| 11:22AM | 13 | **MR. SHAHID:** Okay.  Thank you.  No further questions. |
| 11:22AM | 14 | REDIRECT EXAMINATION |
| 11:22AM | 15 | BY MS. HENDERSON: |
| 11:23AM | 16 | Q.   Officer Langenfeld, are you confident in your testimony |
| 11:23AM | 17 | today that what you saw them have in their hands in that car |
| 11:23AM | 18 | was a firearm? |
| 11:23AM | 19 | A.   Yes, ma'am. |
| 11:23AM | 20 | Q.   And was the passenger of that vehicle apprehended? |
| 11:23AM | 21 | A.   Yes, ma'am, he was. |
| 11:23AM | 22 | Q.   And was that passenger Renata Ellison? |
| 11:23AM | 23 | A.   No, ma'am. |
| 11:23AM | 24 | Q.   Was that passenger Kenyetta Fishburne? |
| 11:23AM | 25 | A.   No, ma'am. |

11:23AM  1   Q.   So the registered owner of the vehicle nor the purchaser

11:23AM  2   of the gun were in the car?

11:23AM  3   A.   No, ma'am.

11:23AM  4          MS. HENDERSON:  Thank you, Your Honor.  I mean thank

11:23AM  5   you, Officer Langenfeld.

11:23AM  6          THE COURT:  Anything else?

11:23AM  7          MR. SHAHID:  That's it.

11:23AM  8          THE COURT:  You're excused.  Thank you very much.

11:23AM  9          THE WITNESS:  Thank you, sir.

11:23AM 10              (Witness excused.)

11:23AM 11          THE COURT:  Can the witness be excused and go back to

11:23AM 12   North Carolina?

11:23AM 13          MR. SHAHID:  Not Georgia, North Carolina.

11:23AM 14          THE COURT:  No problem?

11:23AM 15          MS. HENDERSON:  No, Your Honor.

11:23AM 16          THE COURT:  Okay.  All right.  Ladies and gentlemen

11:23AM 17   of the jury, this is a good time to take our morning break.

11:23AM 18   Why don't you go to the jury room, relax, and we'll start again

11:23AM 19   in about 15 minutes.

        20              (Jury out at 11:23 a.m.)

11:24AM 21          THE COURT:  Okay.  All right.  We'll start again at a

11:24AM 22   quarter till.

        23              (Recess from 11:24 a.m. to 11:45 a.m.)

11:45AM 24          THE COURT:  Take your seats.  Thank you.  Anything

11:45AM 25   before we bring the jury in?

11:45AM 1        MR. SHAHID:  Judge, I just want to renew my previous

11:45AM 2    objection about the prior witness's testimony about this being

11:45AM 3    a gang-related area, the Cowboys.  I mean, that's just so

11:45AM 4    highly prejudicial as to where we're going with this case that

11:45AM 5    I would like that testimony to be stricken from the record.

11:45AM 6        THE COURT:  Yes?

11:45AM 7        MS. HENDERSON:  Your Honor, the stipulation that we

11:45AM 8    agreed upon to deal with the 2015 incident has Mr. Fishburne

11:45AM 9    admitting he's an associate of the Cowboys.  That's going to be

11:46AM 10   a fact in evidence.

11:46AM 11       THE COURT:  What will be in evidence?

11:46AM 12       MS. HENDERSON:  That he's an associate of the

11:46AM 13   Cowboys.

11:46AM 14       THE COURT:  How is that going to be in evidence?

11:46AM 15       MS. HENDERSON:  It's stipulated to, Your Honor.

11:46AM 16       THE COURT:  In another case?

11:46AM 17       MS. HENDERSON:  No, your Honor, in our stipulation

11:46AM 18   that we have agreed upon in this case.

11:46AM 19       THE COURT:  Okay.

11:46AM 20       MR. SHAHID:  The stipulation we entered into was that

11:46AM 21   incident took place in November of 2015.  He was an associate.

11:46AM 22   Then we got this information from this other deputy clear out

11:46AM 23   of the blue that he's chasing these guys in an area where

11:46AM 24   there's gang activity, including the Cowboys.  That's just --

11:46AM 25   has got no connection at all with him what happened in 2014.

| | | |
|---|---|---|
| 11:46AM | 1 | That was something that happened in 2015. |
| 11:46AM | 2 | **THE COURT:** Okay. Well, I'll take it under |
| 11:46AM | 3 | advisement. I'll see it -- I'll strike it later on. |
| 11:46AM | 4 | **MR. SHAHID:** Thank you. |
| 11:46AM | 5 | **THE COURT:** Anything else? |
| 11:46AM | 6 | **MR. SCHOEN:** Nothing from the Government, Your Honor. |
| | 7 | (Jury in at 11:48 a.m.) |
| 11:48AM | 8 | **THE COURT:** Okay. Take your seats. Thank you. You |
| 11:48AM | 9 | want to call your next witness, please? |
| 11:48AM | 10 | **MS. HENDERSON:** Thank you, Your Honor. The |
| 11:48AM | 11 | Government would call Officer Richard Riney. |
| 11:48AM | 12 | **COURTROOM DEPUTY:** Please come forward to be sworn. |
| 11:48AM | 13 | Place your left hand on the Bible. Raise your right hand, |
| 11:48AM | 14 | please. |
| 11:48AM | 15 | (Witness sworn.) |
| 11:48AM | 16 | **COURTROOM DEPUTY:** Thank you. You can have a seat in |
| 11:48AM | 17 | the witness box. |
| 11:48AM | 18 | **RICHARD RINEY,** |
| 11:48AM | 19 | a witness called on behalf of the Government, being first duly |
| 11:48AM | 20 | sworn, was examined and testified as follows: |
| 11:48AM | 21 | **DIRECT EXAMINATION** |
| 11:48AM | 22 | **BY MS. HENDERSON:** |
| 11:48AM | 23 | Q.   Good afternoon, Officer Riney. |
| 11:49AM | 24 | A.   Good morning. |
| 11:49AM | 25 | Q.   Where are you currently employed? |

11:49AM 1 **A.** Bluffton Police Department.

11:49AM 2 **Q.** How long have you worked for the Bluffton Police

11:49AM 3 Department?

11:49AM 4 **A.** A little over two years.

11:49AM 5       **MR. SHAHID:** Your Honor, I'm sorry. I'm having a

11:49AM 6 hard time hearing him.

11:49AM 7       **THE COURT:** Move that mic to you, okay? Thank you,

11:49AM 8 Officer.

11:49AM 9 **BY MS. HENDERSON:**

11:49AM 10 **Q.** And prior to joining the Bluffton Police Department, did

11:49AM 11 you work for any other law enforcement agencies?

11:49AM 12 **A.** Yes, ma'am. I worked for the Colleton County Sheriff's

11:49AM 13 Office for four years, South Carolina Highway Patrol for 12

11:49AM 14 years, and I was a police adviser for the Department of State

11:49AM 15 doing international training to police officers in other

11:49AM 16 countries.

11:49AM 17 **Q.** And so how many total years have you spent in law

11:49AM 18 enforcement?

11:49AM 19 **A.** 22.

11:49AM 20 **Q.** And in those 22 years, when were you working in Colleton

11:49AM 21 County?

11:49AM 22 **A.** Between the years of 2013 and 2017, I believe.

11:49AM 23 **Q.** So you were employed with Colleton County in 2014?

11:49AM 24 **A.** Yes, ma'am.

11:49AM 25 **Q.** What position did you hold with Colleton County at that

11:49AM  1  time?

11:49AM  2  A.   Corporal sergeant.

11:49AM  3  Q.   And do you recall if you were working on May 2nd, 2014

11:49AM  4  when Officer Langenfeld became involved in a pursuit with a

11:50AM  5  Lincoln in Colleton County?

11:50AM  6  A.   Yes, ma'am.

11:50AM  7  Q.   How did you become aware of that vehicle pursuit?

11:50AM  8  A.   Through the radio communications from Officer Langenfeld.

11:50AM  9  Q.   What, if anything, did you do when you heard that Officer

11:50AM 10  Langenfeld was in pursuit of a vehicle?

11:50AM 11  A.   Started traveling in his direction to assist.

11:50AM 12       MR. SHAHID:  I'm sorry.  He's got a soft voice, and

11:50AM 13  he's not speaking into the microphone.

11:50AM 14  BY MS. HENDERSON:

11:50AM 15  Q.   You could please just speak up?  What, if anything, did

11:50AM 16  you do when you realized that Officer Langenfeld was in pursuit

11:50AM 17  of that vehicle?

11:50AM 18  A.   Started traveling in the direction of the pursuit to

11:50AM 19  assist.

11:50AM 20  Q.   And do you know at what speed you reached trying to get to

11:50AM 21  him?

11:50AM 22  A.   I would say 80, 90 miles an hour.

11:50AM 23  Q.   Why were you traveling at such high speeds?

11:50AM 24  A.   Because it's a pursuit, and Officer Langenfeld was by

11:50AM 25  himself in the pursuit, and the occupants of the vehicle were

| | | |
|---|---|---|
| 11:50AM | 1 | potentially armed. |
| 11:51AM | 2 | Q.   At what point did you actually join up with Officer |
| 11:51AM | 3 | Langenfeld in the pursuit? |
| 11:51AM | 4 | A.   After the pursuit had concluded, on the dirt portion of |
| 11:51AM | 5 | Brittlebank Road, I met with Sergeant Rob Edwards who was |
| 11:51AM | 6 | already on scene and Officer Langenfeld who was escorting the |
| 11:51AM | 7 | suspect out of the woods in handcuffs. |
| 11:51AM | 8 | Q.   What did you do upon arriving on scene? |
| 11:51AM | 9 | A.   Approached the suspect vehicle, cleared it for safety to |
| 11:51AM | 10 | make sure there was no other occupants in the vehicle. |
| 11:51AM | 11 | Q.   And when you were clearing that vehicle, what, if |
| 11:51AM | 12 | anything, did you observe inside it? |
| 11:51AM | 13 | A.   Front passenger floorboard, two firearms that were |
| 11:51AM | 14 | partially protruding out from the passenger's seat. |
| 11:51AM | 15 | Q.   Do you remember what those two firearms were? |
| 11:51AM | 16 | A.   One was a Jimenez 9 millimeter.  The other one was a |
| 11:51AM | 17 | Walter .380. |
| 11:51AM | 18 | Q.   And did either of those firearms contain ammunition? |
| 11:51AM | 19 | A.   They did.  They were fully loaded with -- each one had a |
| 11:51AM | 20 | round in the chamber. |
| 11:52AM | 21 | Q.   What did you do after you observed the firearms laying on |
| 11:52AM | 22 | the passenger floorboard? |
| 11:52AM | 23 | A.   Put on my gloves, retrieved the firearms, made them safe |
| 11:52AM | 24 | to pass on to whoever was going to collect them.  That would be |
| 11:52AM | 25 | Sergeant David Long. |

| | | |
|---|---|---|
| 11:52AM | 1 | **Q.** When you say make them safe, what does that mean? |
| 11:52AM | 2 | **A.** Unload them, lock the slide back. |
| 11:52AM | 3 | **Q.** And then after you made them safe, you gave them to who? |
| 11:52AM | 4 | I'm sorry. |
| 11:52AM | 5 | **A.** Sergeant David Long. |
| 11:52AM | 6 | **Q.** And were they placed into evidence after that point? |
| 11:52AM | 7 | **A.** Yes, ma'am. |
| 11:52AM | 8 | **MS. HENDERSON:** Beg the Court's indulgence, Your |
| 11:52AM | 9 | Honor. |
| 11:52AM | 10 | (Pause.) |
| 11:52AM | 11 | **MS. HENDERSON:** Thank you, Officer Riney. Please |
| 11:52AM | 12 | answer any questions Mr. Shahid has. |
| 11:52AM | 13 | **CROSS-EXAMINATION** |
| 11:52AM | 14 | **BY MR. SHAHID:** |
| 11:52AM | 15 | **Q.** Good morning. |
| 11:52AM | 16 | **A.** Good morning, sir. |
| 11:52AM | 17 | **Q.** How are you doing today? |
| 11:52AM | 18 | **A.** Doing great. |
| 11:52AM | 19 | **Q.** You've got a soft voice. I'm going to come a little bit |
| 11:52AM | 20 | closer to you, all right? |
| 11:52AM | 21 | **A.** All right. |
| 11:52AM | 22 | **Q.** Where are you currently employed? |
| 11:52AM | 23 | **A.** Bluffton Police Department, Bluffton. |
| 11:52AM | 24 | **Q.** Bluffton? |
| 11:52AM | 25 | **A.** In Bluffton, South Carolina, yes. |

11:53AM 1   Q.   So you've been with how many agencies in your career?

11:53AM 2   A.   Approximately four.

11:53AM 3   Q.   And how many years have you been in law enforcement?

11:53AM 4   A.   Just under 22.

11:53AM 5   Q.   So you were involved in retrieving these firearms; is that

11:53AM 6   correct?

11:53AM 7   A.   Yes.

11:53AM 8   Q.   All right.  And you say that the firearms that you

11:53AM 9   retrieved were on the passenger's side of the car; is that

11:53AM 10  correct?

11:53AM 11  A.   Yes, sir, floorboard.

11:53AM 12  Q.   So your involvement was simply coming up to the car that

11:53AM 13  was stopped by the other deputy; is that right?

11:53AM 14  A.   Yes, sir.

11:53AM 15  Q.   All right.  You don't have any other information

11:53AM 16  concerning what transpired before that; is that correct?

11:53AM 17  A.   Other than the --

11:53AM 18  Q.   Only what you heard over the radio?

11:53AM 19  A.   Yes, sir.

11:53AM 20  Q.   All right.  And now the two guns, I believe that you gave

11:53AM 21  a report that the guns were partially under the seat; is that

11:53AM 22  correct?

11:53AM 23  A.   Yes, sir.

11:53AM 24  Q.   All right.  And I think you testified earlier a few

11:53AM 25  seconds ago that you had on gloves; is that correct?

sic

11:53AM 1  A.   Yes, sir.

11:54AM 2  Q.   When you retrieved the firearms?

11:54AM 3  A.   Yes, sir.

11:54AM 4  Q.   So what did you do after retrieving the firearms using

11:54AM 5  those gloves?

11:54AM 6  A.   Passed them on to Sergeant Long who ran them through NCIC.

11:54AM 7  Q.   Did you ask for those guns to be fingerprinted, dusted for

11:54AM 8  fingerprints?

11:54AM 9  A.   Excuse me?  What was the --

11:54AM 10 Q.   Did you ask that those guns be dusted for fingerprints?

11:54AM 11 A.   I did not.

11:54AM 12 Q.   And the purpose of putting the gloves on was to make sure

11:54AM 13 that if you wanted to preserve evidence, that was a safe way of

11:54AM 14 doing that; is that correct?

11:54AM 15 A.   Yes, sir, that's standard procedure.

11:54AM 16      MR. SHAHID:  Be with you in one second, Judge.

11:54AM 17      THE COURT:  Sure.

11:54AM 18           (Pause.)

11:54AM 19 BY MR. SHAHID:

11:54AM 20 Q.   That concluded your involvement with this case after you

11:54AM 21 turned the firearms over to the other law enforcement officer;

11:54AM 22 is that right?

11:54AM 23 A.   Other than completing a report, yes, sir.

11:54AM 24      MR. SHAHID:  Okay.  Thank you very much.  Nothing

11:54AM 25 further.

| | | |
|---|---|---|
| 11:54AM | 1 | **MS. HENDERSON:** Nothing further, Your Honor. |
| 11:54AM | 2 | **THE COURT:** Have a good trip back. |
| 11:55AM | 3 | **THE WITNESS:** Thank you, sir. |
| 11:55AM | 4 | (Witness excused.) |
| 11:55AM | 5 | **MS. HENDERSON:** Your Honor, the Government would |
| 11:55AM | 6 | calls Lance Corporal James Davis. |
| 11:55AM | 7 | **COURTROOM DEPUTY:** Please come forward to be sworn. |
| 11:55AM | 8 | Place your left hand on the Bible and raise your right hand. |
| 11:55AM | 9 | (Witness sworn). |
| 11:55AM | 10 | **COURTROOM DEPUTY:** Have a seat in witness box. |
| 11:55AM | 11 | **JAMES DAVIS,** |
| 11:55AM | 12 | a witness called on behalf of the Government, being first duly |
| 11:55AM | 13 | sworn, was examined and testified as follows: |
| 11:55AM | 14 | **DIRECT EXAMINATION** |
| 11:55AM | 15 | **BY MS. HENDERSON:** |
| 11:55AM | 16 | **Q.** Good afternoon, Lance Corporal Davis. Where are you |
| 11:55AM | 17 | currently employed? |
| 11:55AM | 18 | **A.** The Walterboro Police Department. |
| 11:55AM | 19 | **Q.** And how long have you been employed with the Walterboro |
| 11:55AM | 20 | Police Department? |
| 11:55AM | 21 | **A.** For a little over three and a half years at this point. |
| 11:55AM | 22 | **Q.** And have you worked in any other law enforcement agencies? |
| 11:55AM | 23 | **A.** Yes, ma'am. I actually started with the Walterboro Police |
| 11:56AM | 24 | Department back in 2004. I worked there for about two -- three |
| 11:56AM | 25 | and a half years -- excuse me, two and a half years. Then I |

11:56AM 1  moved over to the Colleton County Sheriff's Office, and I was

11:56AM 2  there for right at 10 years prior to coming back over to the

11:56AM 3  city police department recently.

11:56AM 4  Q.   So how many total years have you had with law enforcement?

11:56AM 5  A.   About 16 and a half.

11:56AM 6  Q.   And in those 16 years, were you working for Colleton

11:56AM 7  County in 2014?

11:56AM 8  A.   Yes, ma'am, I was.

11:56AM 9  Q.   And what was your rank at Colleton County in 2014?

11:56AM 10 A.   I was a senior sergeant over criminal investigations.

11:56AM 11 Q.   Did you hold any other titles at the Sheriff's Department?

11:56AM 12 A.   Yes, ma'am, I was also the primary evidence custodian for

11:56AM 13 the department at that time.

11:56AM 14 Q.   What are the responsibilities of the evidence custodian?

11:56AM 15 A.   Well, any evidence that is brought in by any officer in

11:56AM 16 the department comes to the evidence -- to the evidence

11:56AM 17 custodian, evidence locker where it's then locked in and

11:56AM 18 secured and either taken for further processing to SLED or to

11:56AM 19 another agency and then stored until time for court.  Once

11:57AM 20 everything is disposed of, it's also part of my job to return

11:57AM 21 property back to the rightful owner, things like that.

11:57AM 22 Q.   And hitting on that last point you just made, if a

11:57AM 23 rightful owner comes into the Sheriff's Office and wants their

11:57AM 24 property back, do they have to show any sort of proof of

11:57AM 25 ownership before you can give them back their property?

# JAMES DAVIS - DIRECT EXAMINATION

11:57AM  1    A.    Yes, ma'am, usually we required some type of proof of

11:57AM  2    ownership.

11:57AM  3    Q.    If somebody were to come in and claim a fireship -- a

11:57AM  4    fireship, sorry -- a firearm, what sort of ownership would they

11:57AM  5    have to show you?

11:57AM  6    A.    Typically some type of receipt of purchase where they

11:57AM  7    purchased it from a gun dealer, firearms dealer, something of

11:57AM  8    that nature.

11:57AM  9    Q.    And is that return documented somehow?

11:57AM  10   A.    Yes, ma'am.

11:57AM  11   Q.    And how is it documented?

11:57AM  12   A.    We fill out a receipt form.  Every agency's got a little

11:57AM  13   bit different form, but it pretty much a form showing the date

11:57AM  14   and time that the item was returned, a description of said

11:57AM  15   item, and signatures of the officer releasing it and the person

11:57AM  16   who's receiving the item.

11:57AM  17           MS. HENDERSON:  Permission to approach the witness,

11:57AM  18   Your Honor?

11:57AM  19           THE COURT:  Sure.

11:58AM  20   BY MS. HENDERSON:

11:58AM  21   Q.    Lance Corporal Davis, I'm going to hand you what's already

11:58AM  22   been admitted into evidence as Government's Exhibit 3.  Do you

11:58AM  23   recognize that?

11:58AM  24   A.    Yes, ma'am, I do.

11:58AM  25   Q.    And what is it?

| | | |
|---|---|---|
| 11:58AM | 1 | **A.**   It's a photocopy of the receipt that I would have done. |
| 11:58AM | 2 | It looks that it was a receipt where a firearm was returned to |
| 11:58AM | 3 | a Miss Renata Ellison on December the 23rd of 2014. |
| 11:58AM | 4 | **Q.**   I'm sorry, Lance Corporal Davis.  I was checking on some |
| 11:58AM | 5 | technical issues so we could get it pulled up for the jury, and |
| 11:58AM | 6 | I'm sorry.  I'm going to have to ask you to repeat that. |
| 11:58AM | 7 | **A.**   Sure.  It's just a photocopy of the written receipt where |
| 11:58AM | 8 | the item -- this item was returned to a Miss Renata Ellison by |
| 11:58AM | 9 | myself on December the 23rd of 2014. |
| 11:58AM | 10 | **Q.**   And what was returned to Ms. Ellison? |
| 11:58AM | 11 | **A.**   It's a black in color Jimenez Arms 9 millimeter handgun |
| 11:58AM | 12 | with a magazine. |
| 11:59AM | 13 | **Q.**   And is that a serial number that we see written on there? |
| 11:59AM | 14 | **A.**   Yes, ma'am, it is. |
| 11:59AM | 15 | **Q.**   And what is that serial number? |
| 11:59AM | 16 | **A.**   239429. |
| 11:59AM | 17 | **Q.**   And how did you know you were returning this to Renata |
| 11:59AM | 18 | Ellison? |
| 11:59AM | 19 | **A.**   The -- at the very top next to the date where I actually |
| 11:59AM | 20 | hand -- had handwritten in Ms. Ellison's name, and then at the |
| 11:59AM | 21 | very bottom where it says received by is Ms. Ellison's |
| 11:59AM | 22 | signature and date and then my name, my signature and date |
| 11:59AM | 23 | directly below that. |
| 11:59AM | 24 | **MS. HENDERSON:**  Can we have the next page, please? |
| 11:59AM | 25 | Permission to approach, Your Honor? |

| | | |
|---|---|---|
| 11:59AM | 1 | THE COURT: Sure. |
| 11:59AM | 2 | MS. HENDERSON: Miss Murray, can I switch to the |
| 11:59AM | 3 | Elmo, please? |
| 11:59AM | 4 | BY MS. HENDERSON: |
| 12:00PM | 5 | Q. Lance Corporal Davis, did you make the photocopy of that |
| 12:00PM | 6 | license? |
| 12:00PM | 7 | A. Yes, ma'am. |
| 12:00PM | 8 | Q. And what is -- whose license is that? |
| 12:00PM | 9 | A. That is Renata Ellison. |
| 12:00PM | 10 | Q. And that is who you returned the firearm to that day; is |
| 12:00PM | 11 | that correct? |
| 12:00PM | 12 | A. Yes, ma'am, that's why I would have -- I photocopied the |
| 12:00PM | 13 | license and attached it with the receipt. |
| 12:00PM | 14 | MS. HENDERSON: Thank you, Lance Corporal Davis. |
| 12:00PM | 15 | Please answer any questions Mr. Shahid has. |
| 12:00PM | 16 | THE WITNESS: Yes, ma'am. |
| 12:00PM | 17 | CROSS-EXAMINATION |
| 12:00PM | 18 | BY MR. SHAHID: |
| 12:00PM | 19 | Q. Good morning. |
| 12:00PM | 20 | A. Good morning, sir. |
| 12:00PM | 21 | Q. How are you doing today? |
| 12:00PM | 22 | A. I'm doing pretty good. |
| 12:01PM | 23 | Q. Good. Back in 2000 -- my name is Peter Shahid, and I |
| 12:01PM | 24 | represent Mr. Fishburne, and I'm going to ask you some |
| 12:01PM | 25 | questions about your testimony that you just gave to this jury. |

| | | |
|---|---|---|
| 12:01PM | 1 | **A.**   Yes, sir. |
| 12:01PM | 2 | **Q.**   So back in 2014, you were a supervising sergeant? |
| 12:01PM | 3 | **A.**   I was a senior sergeant in the criminal investigation |
| 12:01PM | 4 | division for the Sheriff's Office, yes, sir. |
| 12:01PM | 5 | **Q.**   Okay.  So that means that you had other officers who you |
| 12:01PM | 6 | supervised and watch over and make sure they did the right |
| 12:01PM | 7 | thing; is that correct? |
| 12:01PM | 8 | **A.**   To an extent.  All the investigators at that time were |
| 12:01PM | 9 | sergeants.  However, I was the senior as far as the seniority |
| 12:01PM | 10 | time and service. |
| 12:01PM | 11 | **Q.**   So in the course of an investigation, you want to make |
| 12:01PM | 12 | sure that things are followed through; is that correct? |
| 12:01PM | 13 | **A.**   Yes, sir, as much as possible. |
| 12:01PM | 14 | **Q.**   Okay.  And this firearm that we're talking about ended up |
| 12:01PM | 15 | in your official capacity as the custodian of evidence; is that |
| 12:01PM | 16 | right? |
| 12:01PM | 17 | **A.**   Yes, sir. |
| 12:01PM | 18 | **Q.**   So from May of 2014 to December of 2014, this firearm was |
| 12:02PM | 19 | in the official custody, control of the Walterboro -- of the |
| 12:02PM | 20 | Colleton County Sheriff's Office? |
| 12:02PM | 21 | **A.**   I don't know the dates, but that could -- that very well |
| 12:02PM | 22 | could be if it was -- I don't know when it was actually logged |
| 12:02PM | 23 | in to evidence, turned in to evidence, but if it was logged in, |
| 12:02PM | 24 | unless there was some other documentation showing where it had |
| 12:02PM | 25 | been taken for any other testing or -- you know, forensic |

| | | |
|---|---|---|
| 12:02PM | 1 | testing or anything like that, shy of that, then yes, it would |
| 12:02PM | 2 | have been in my -- in the department -- in the locker's custody |
| 12:02PM | 3 | up until it was returned. |
| 12:02PM | 4 | Q.   So did you have any prior knowledge or information about |
| 12:02PM | 5 | this firearm being recovered? |
| 12:02PM | 6 | A.   I do not recall, to be honest with you, that particular -- |
| 12:02PM | 7 | that particular case.  I do not recall. |
| 12:02PM | 8 | Q.   All right.  So at some point in time, this woman comes up |
| 12:02PM | 9 | to you or makes contact with you and says, "I want my firearm |
| 12:02PM | 10 | back;" is that fair? |
| 12:02PM | 11 | A.   Yes, sir, that's fair. |
| 12:02PM | 12 | Q.   And at that -- when that happened, did you engage with the |
| 12:02PM | 13 | principal officer who recovered the firearm and have a |
| 12:02PM | 14 | discussion with that particular officer? |
| 12:03PM | 15 | A.   I would have done some due diligence to ensure that the |
| 12:03PM | 16 | case was disposed of, that there were no holds on the firearm, |
| 12:03PM | 17 | that it wasn't attached to any other evidentiary case that was |
| 12:03PM | 18 | still pending prior to being released, but as far as specifics |
| 12:03PM | 19 | of talking to the original case officer, I don't recall |
| 12:03PM | 20 | personally. |
| 12:03PM | 21 | Q.   So -- this is evidence?  This gun is evidence? |
| 12:03PM | 22 | A.   Yes, sir. |
| 12:03PM | 23 | Q.   Of a crime? |
| 12:03PM | 24 | A.   Yes, sir. |
| 12:03PM | 25 | Q.   Or a potential crime or somebody got arrested for this |

| | | |
|---|---|---|
| 12:03PM | 1 | gun, and so you got it for a reason? |
| 12:03PM | 2 | A.   Okay.  Yes, sir. |
| 12:03PM | 3 | Q.   Okay.  And were you made aware that the charges against |
| 12:03PM | 4 | Mr. Fishburne associated with this gun was dismissed? |
| 12:03PM | 5 | A.   I don't -- again, I don't recall the specifics, but I |
| 12:03PM | 6 | would have made a -- I would have made some effort to confirm |
| 12:03PM | 7 | that there were no pending charges attached to -- to that |
| 12:03PM | 8 | firearm before it was released. |
| 12:03PM | 9 | Q.   So there was no more need for the gun? |
| 12:03PM | 10 | A.   At that -- to my knowledge, at that time, those are -- |
| 12:03PM | 11 | like I said, I would have confirmed that the charges -- any |
| 12:04PM | 12 | charges attached were disposed of at that point, so that -- |
| 12:04PM | 13 | before releasing the firearm. |
| 12:04PM | 14 | Q.   All right.  And so the gun was returned to this person |
| 12:04PM | 15 | whose driver's license is shown on the screen right now? |
| 12:04PM | 16 | A.   Yes, sir, that's correct. |
| 12:04PM | 17 | Q.   And what's that person's name? |
| 12:04PM | 18 | A.   Renata Ellison. |
| 12:04PM | 19 | Q.   I want to hand you a copy of the Second Superseding |
| 12:04PM | 20 | Indictment and ask you to read the second name of the Defendant |
| 12:04PM | 21 | on that Indictment. |
| 12:04PM | 22 | A.   The Renata Shontel Ellison? |
| 12:04PM | 23 | Q.   Yeah.  Is that the same name that -- on that driver's |
| 12:04PM | 24 | license? |
| 12:04PM | 25 | A.   Yes, sir, it is. |

12:04 PM 1   Q.   Now, what processes were done with this firearm as far as

12:04 PM 2   having it tested for fingerprints?

12:04 PM 3   A.   I do not know.  I do not recall the -- any details on that

12:04 PM 4   aspect of it from the original incident.

12:05 PM 5   Q.   So the charges regarding the use of this firearm were no

12:05 PM 6   longer needed, and thus the gun was returned to the rightful

12:05 PM 7   owner?

12:05 PM 8   A.   To my knowledge, yes, sir.

12:05 PM 9   Q.   And -- well, and that's what you signed on Exhibit

12:05 PM 10  Number 3?

12:05 PM 11  A.   Correct.

12:05 PM 12  Q.   Returning this firearm.  She signed for it, and you gave

12:05 PM 13  it away, back to her?

12:05 PM 14  A.   Yes, sir, that's correct.

12:05 PM 15       MR. SHAHID:  Let me get this marked for

12:05 PM 16  identification only, please.

12:06 PM 17       THE COURT:  You want to show that to them?

12:06 PM 18       MR. SHAHID:  Yes, just for identification at this

12:06 PM 19  point, Judge.

12:06 PM 20       MS. HENDERSON:  Your Honor, may we approach?

12:06 PM 21       THE COURT:  Just give me -- he just marked it for

12:06 PM 22  identification.

12:06 PM 23       MS. HENDERSON:  Before we go any further, we need to

12:06 PM 24  approach, Your Honor.

12:06 PM 25       THE COURT:  He can't do anything unless he moves it

12:06PM  1    into evidence.  If he moves it into evidence, then I'll make a

12:06PM  2    ruling.

12:06PM  3              MR. SHAHID:  I'm going to go through the process.

12:07PM  4              THE COURT:  Just identify it.

12:07PM  5              MR. SHAHID:  Yeah.

12:07PM  6              THE COURT:  Okay.

12:07PM  7    BY MR. SHAHID:

12:07PM  8    Q.    Sir, you said earlier that you had gone through the

12:07PM  9    process to make sure that the gun was no longer needed; is that

12:07PM 10    correct?

12:07PM 11    A.    Yes, sir.

12:07PM 12    Q.    Including whether or not the charges were disposed of; is

12:07PM 13    that right?

12:07PM 14    A.    Yes, sir.

12:07PM 15    Q.    I've marked only -- this document only -- for

12:07PM 16    identification only.  Have you seen something like this before?

12:07PM 17    A.    Yes, sir.

12:07PM 18    Q.    Okay.  And you see the name of the Defendant on there?

12:07PM 19    A.    Yes, sir, I do.

12:07PM 20    Q.    Okay.  And do you know whether or not that particular

12:07PM 21    firearm that we were talking about returned to Ms. Ellison was

12:07PM 22    associated with the name on that document?

12:07PM 23    A.    I do not know, to be completely honest with you.  I'm not

12:07PM 24    sure.

12:07PM 25    Q.    Would you have seen something like that prior to turning

| | | |
|---|---|---|
| 12:07 PM | 1 | the firearm over to Ms. Ellison? |
| 12:07 PM | 2 | A.    Possibly.  The other -- another way that we typically -- |
| 12:08 PM | 3 | that I typically -- we follow up on it would be just contacting |
| 12:08 PM | 4 | the clerk's office directly and finding out -- getting |
| 12:08 PM | 5 | confirmation that cases are -- or that the case has been |
| 12:08 PM | 6 | disposed of, things like that, so I may or may not have seen |
| 12:08 PM | 7 | this actual document at that time. |
| 12:08 PM | 8 | Q.    So just so the jury's clear on this, just because someone |
| 12:08 PM | 9 | walks in and says, "I want my property back," you're not doing |
| 12:08 PM | 10 | that until certain boxes are checked off? |
| 12:08 PM | 11 | A.    Yes, sir, that's correct. |
| 12:08 PM | 12 | Q.    Number 1, the item is no longer needed? |
| 12:08 PM | 13 | A.    Yes, sir. |
| 12:08 PM | 14 | Q.    And two, that's the rightful owner of the gun? |
| 12:08 PM | 15 | A.    Yes, sir. |
| 12:08 PM | 16 | Q.    Or the property we're talking about? |
| 12:08 PM | 17 | A.    Yes, sir. |
| 12:08 PM | 18 | Q.    And in this particular instance when we're dealing with |
| 12:08 PM | 19 | this firearm, those two things were done? |
| 12:08 PM | 20 | A.    Yes, sir. |
| 12:08 PM | 21 | Q.    And what I've handed to you is an order.  You would have |
| 12:08 PM | 22 | received or reviewed something like what I've marked as |
| 12:08 PM | 23 | exhibit -- as that document before turning that gun over? |
| 12:08 PM | 24 | A.    Either that or -- again, either that, or I would have |
| 12:08 PM | 25 | contacted the clerk's office directly to confirm the -- |

12:09PM 1    **Q.**   Does that appear to you to be a court order?

12:09PM 2    **A.**   Yes, sir, it definitely appears to be court documentation.

12:09PM 3    **Q.**   And does it show a date when the order was executed?

12:09PM 4           **THE COURT:**  Wait a minute.  You haven't --

12:09PM 5           **MR. SHAHID:**  I'm just asking if it has a date.  I'm

12:09PM 6    not asking him the date.

12:09PM 7           **THE COURT:**  Okay.  That's it.

12:09PM 8           **THE WITNESS:**  Yes, it does.

12:09PM 9    BY MR. SHAHID:

12:09PM 10    **Q.**   Okay.  We don't want to publish that to the jury yet, but

12:09PM 11    it shows a date and a defendant's name on that; is that

12:09PM 12    correct?

12:09PM 13    **A.**   Yes, sir, it does.

12:09PM 14           **MR. SHAHID:**  Judge, at this point I would move it

12:09PM 15    into evidence.

12:09PM 16           **MS. HENDERSON:**  Your Honor, we need a sidebar,

12:09PM 17    please.

12:09PM 18           **THE COURT:**  Let's -- I don't like sidebars because it

12:09PM 19    takes up time.  If you got an objection, how about state the

12:09PM 20    objection.

12:09PM 21           **MS. HENDERSON:**  Your Honor, he's opening the door to

12:09PM 22    other territory.

12:09PM 23           **THE COURT:**  I'm sorry?

12:09PM 24           **MS. HENDERSON:**  He has opened the door to go into

12:09PM 25    other territory.

## DAVIS – REDIRECT EXAMINATION

| | | |
|---|---|---|
| 12:09PM | 1 | **THE COURT:** Don't you want him to do that? |
| 12:09PM | 2 | **MS. HENDERSON:** Sure, Your Honor. |
| 12:09PM | 3 | **THE COURT:** Okay. All right. I guess that means |
| 12:09PM | 4 | withdraw the objection. That's fine. |
| 12:09PM | 5 | **MR. SHAHID:** Give me just -- before I proceed, check |
| 12:10PM | 6 | one -- |
| 12:10PM | 7 | **THE COURT:** Before you proceed, why don't you find |
| 12:10PM | 8 | out -- be careful what you ask for, because you might get it. |
| 12:10PM | 9 | (Pause.) |
| 12:10PM | 10 | **MR. SHAHID:** Nothing further, Judge. |
| 12:10PM | 11 | **THE COURT:** Okay. So it's marked for identification |
| 12:10PM | 12 | only. Thank you. |
| 12:10PM | 13 | **MR. SHAHID:** That's the exhibit. Thank you, sir. |
| 12:10PM | 14 | Appreciate your testimony. |
| 12:10PM | 15 | REDIRECT EXAMINATION |
| 12:10PM | 16 | BY MS. HENDERSON: |
| 12:11PM | 17 | Q. Lance Corporal Davis, is there more than one way to |
| 12:11PM | 18 | dispose of a case? |
| 12:11PM | 19 | A. Yes, ma'am. |
| 12:11PM | 20 | Q. Could you also have returned a gun if convictions had |
| 12:11PM | 21 | taken place? |
| 12:11PM | 22 | A. Yes, ma'am. |
| 12:11PM | 23 | **MS. HENDERSON:** No further questions, Your Honor |
| 12:11PM | 24 | **THE COURT:** Anything else? |
| 12:11PM | 25 | |

|  |  |
|---|---|
| 12:11PM | 1 |
| 12:11PM | 2 |
| 12:11PM | 3 |

**RECROSS-EXAMINATION**

**BY MR. SHAHID:**

Q.   Did Ms. Ellison say anything else to you prior to returning the firearm back to her?

A.   I don't recall.  Nothing particular that I recall.

Q.   Did she give you anything else besides the proof of purchase of that gun, the ownership of that gun?

A.   Not that I recall.  Driver's license that I photocopied.

        MR. SHAHID:  Thank you, sir.

        THE COURT:  Okay.  Thank you.  Thank you very much. You're excused.

        THE WITNESS:  Thank you.

                (Witness excused.)

        MR. SCHOEN:  Your Honor, the Government calls Robert Cook.

        COURTROOM DEPUTY:  Please come forward to be sworn. Place your left hand on the Bible.  Raise your right hand, please.

                (Witness sworn.)

        COURTROOM DEPUTY:  Thank you.  You may have a seat.

                **ROBERT COOK,**

a witness called on behalf of the Government, being first duly sworn, was examined and testified as follows:

                **DIRECT EXAMINATION**

                **BY MR. SCHOEN:**

| | | |
|---|---|---|
| 12:13PM | 1 | Q. Good morning. |
| 12:13PM | 2 | A. Good morning. |
| 12:13PM | 3 | Q. Could you please introduce yourself to the jury?  Speak |
| 12:13PM | 4 | into that microphone so they can hear you. |
| 12:13PM | 5 | A. I'm Robert W. Cook, Senior. |
| 12:13PM | 6 | Q. And where are you employed? |
| 12:13PM | 7 | A. City of Walterboro Police Department. |
| 12:13PM | 8 | Q. Say again? |
| 12:13PM | 9 | A. City of Walterboro Police Department. |
| 12:13PM | 10 | Q. What's your current rank with the City of Walterboro |
| 12:13PM | 11 | Police Department? |
| 12:13PM | 12 | A. I'm a sergeant. |
| 12:13PM | 13 | Q. How long have you been employed with the City of |
| 12:13PM | 14 | Walterboro Police Department? |
| 12:13PM | 15 | A. Approximately 13 years. |
| 12:13PM | 16 | Q. Prior to joining the Walterboro Police Department, where |
| 12:13PM | 17 | were you employed? |
| 12:13PM | 18 | A. I was in St. George for five months, the Colleton County |
| 12:13PM | 19 | Sheriff's Office for two and a half years, and prior to that I |
| 12:13PM | 20 | was 20 years in the Army from which I retired. |
| 12:13PM | 21 | Q. Thank you for your service.  I want to direct your |
| 12:13PM | 22 | attention to March 31st of 2018.  Do you recall that day? |
| 12:13PM | 23 | A. Yes, sir. |
| 12:13PM | 24 | Q. And what were you doing on March 31st of 2018? |
| 12:13PM | 25 | A. At the time of this incident, we were doing a traffic |

12:14PM  1   safety checkpoint.

12:14PM  2   Q.   Who was the ranking officer at that traffic safety

12:14PM  3   checkpoint?

12:14PM  4   A.   I was.

12:14PM  5   Q.   And where was the -- where was the checkpoint located?

12:14PM  6   A.   In the area of Center Street and Hiers Corner which is

12:14PM  7   located in the city of Walterboro.

12:14PM  8   Q.   Why did you set up a traffic checkpoint at that particular

12:14PM  9   location?

12:14PM  10  A.   Because of complaints from the people who live in the

12:14PM  11  neighborhood.  It's in front of a school zone, and they were

12:14PM  12  complaining about large amount of traffic and speeders and

12:14PM  13  careless drivers in the neighborhood.

12:14PM  14  Q.   And what was it that you were checking for when people

12:14PM  15  came to the checkpoint?

12:14PM  16  A.   License, registration, and insurance cards.

12:14PM  17  Q.   So walk me through this.  You walk up to the vehicle --

12:14PM  18  A.   Yes, sir.  The car pulls up to whichever officer was

12:14PM  19  standing there.  That officer would ask the person for a

12:14PM  20  license, registration, and insurance.  We checked everyone that

12:14PM  21  came through.  If there was no issues, that person was released

12:14PM  22  to go on their own.

12:14PM  23  Q.   You said every driver?

12:15PM  24  A.   Yes, sir.

12:15PM  25  Q.   So you're not picking and choosing one versus another?

|          |    |                                                             |
|----------|----|-------------------------------------------------------------|
| 12:15 PM | 1  | A.    No, sir.                                               |
| 12:15 PM | 2  | Q.    Do you know Quentin John Fishburne?                    |
| 12:15 PM | 3  | A.    At that time only by name.                            |
| 12:15 PM | 4  | Q.    Did you ever seen him before, had any interactions with |
| 12:15 PM | 5  | him?                                                         |
| 12:15 PM | 6  | A.    Not that I recall, no, sir.                           |
| 12:15 PM | 7  | Q.    I want to talk about the cameras that you wear when you're |
| 12:15 PM | 8  | on duty.                                                     |
| 12:15 PM | 9  | A.    Yes, sir.                                              |
| 12:15 PM | 10 | Q.    Where do you have cameras when you're working?        |
| 12:15 PM | 11 | A.    We have cameras mounted in our vehicles as well as body |
| 12:15 PM | 12 | cameras mounted on our person.                              |
| 12:15 PM | 13 | Q.    When you're operating one of these traffic checkpoints, |
| 12:15 PM | 14 | when do you turn your body camera on?                       |
| 12:15 PM | 15 | A.    When it looks like we're going to have a -- possibly write |
| 12:15 PM | 16 | a citation or do a vehicle search or have an issue with a   |
| 12:15 PM | 17 | person that's coming through the checkpoint.                |
| 12:15 PM | 18 | Q.    Do you -- do you run them continuously with -- for every |
| 12:15 PM | 19 | person who comes through the checkpoint?                    |
| 12:15 PM | 20 | A.    No, sir.  If we did that, we're on a 12-hour shift.  If we |
| 12:15 PM | 21 | ran the camera continuously for 12 hours, it wouldn't make it |
| 12:16 PM | 22 | through the 12 hours.                                        |
| 12:16 PM | 23 | Q.    When you say, "it wouldn't make it through," what do you |
| 12:16 PM | 24 | mean?                                                        |
| 12:16 PM | 25 | A.    The cameras have a time on them that we run them.  We  |

12:16PM 1 could -- if we run the camera for 12 continuous hours, chances
12:16PM 2 are at about the halfway point, the cameras would lose the
12:16PM 3 amount of time that they could retain to be able to be charged.
12:16PM 4 If we're on a checkpoint for two hours and we run the camera
12:16PM 5 continuously for two hours, and we still got at least four more
12:16PM 6 hours on shift, there would be an issue with the camera
12:16PM 7 somewhere down the road.
12:16PM 8 Q.   All right.  I want to --
12:16PM 9       MR. SCHOEN:  Permission to approach the witness?
12:16PM 10       THE COURT:  Sure.
12:16PM 11       MR. SCHOEN:  Let the record reflect that I'm
12:16PM 12 approaching the witness with what's been previously marked as
12:16PM 13 Government's Exhibit 5.
12:16PM 14       MR. SHAHID:  5?
12:16PM 15       MR. SCHOEN:  5.
12:16PM 16 BY MR. SCHOEN:
12:16PM 17 Q.   Sergeant, do you recognize what I just handed you?
12:17PM 18 A.   Yes, sir.
12:17PM 19 Q.   And what is that?
12:17PM 20 A.   It's a video of our checkpoint that day.
12:17PM 21 Q.   And how do you know that that's what that is?
12:17PM 22 A.   I previously reviewed it, and it's been marked with his
12:17PM 23 information, and I've also initialed it.  I've seen the video.
12:17PM 24       MR. SCHOEN:  Okay.  Can we bring up Exhibit 5?
12:17PM 25       THE COURT:  Is it in evidence?

12:17PM  1      MR. SCHOEN:  Oh.  Your Honor, I move Exhibit 5 into
12:17PM  2  evidence.
12:17PM  3      THE COURT:  Any objection?
12:17PM  4      MR. SHAHID:  No objection.
12:17PM  5      THE COURT:  Okay.  In evidence.
12:17PM  6      MR. SCHOEN:  Can you please bring up Exhibit 5?
      7          (Video played.)
12:17PM  8      MR. SCHOEN:  All right.  Stop it right here.
12:17PM  9          (Video paused.)
     10  BY MR. SCHOEN:
12:17PM 11  Q.   Just want to get a little bit of information about where
12:17PM 12  we are and what we're looking at.  About what time of day is
12:17PM 13  this?
12:17PM 14  A.   It's somewhere around 15:25 or 3:25 in the afternoon.
12:18PM 15  Q.   And what street are we on right here?
12:18PM 16  A.   Right here we are on Center Street on the shoulder of the
12:18PM 17  road.
12:18PM 18  Q.   Is this the location where you were conducting the
12:18PM 19  checkpoint?
12:18PM 20  A.   It's actually the intersection of Center Street and Hiers
12:18PM 21  Corner.  We had him pull to this area for more room to conduct
12:18PM 22  the search.
12:18PM 23  Q.   And who is this person who is -- well, I should say who's
12:18PM 24  the person with their hands in the air?
12:18PM 25  A.   That is Mr. Fishburne.

12:18PM 1    Q.   Do you recognize Mr. Fishburne in the courtroom today?

12:18PM 2    A.   Yes, sir.

12:18PM 3    Q.   Can you point him out?

12:18PM 4    A.   Over your left shoulder.

12:18PM 5    Q.   What's he wearing?

12:18PM 6    A.   Appears to be glasses.  Has a beard and a blue shirt near

12:18PM 7    as I can tell.

12:18PM 8         MR. SHAHID:  We'll stipulate, Judge, as to the

12:18PM 9    Defendant.

12:18PM 10        MR. SCHOEN:  Let the record reflect that he's

12:18PM 11   correctly identified the Defendant, Mr. Fishburne.

12:18PM 12   BY MR. SCHOEN:

12:18PM 13   Q.   Who is this person who is frisking Mr. Fishburne?

12:18PM 14   A.   That is Patrolman Duboise.

12:18PM 15        MR. SCHOEN:  All right.  Let's play a little bit

12:19PM 16   more.

12:20PM 17                   (Video resumed.)

12:20PM 18        MR. SCHOEN:  Stop right there.

12:20PM 19                   (Video paused.)

12:20PM 20   BY MR. SCHOEN:

12:20PM 21   Q.   What did you just ask?

12:20PM 22   A.   I asked him if he had found a handgun, which he had said,

12:20PM 23   "Gun," and I asked him if he had found it.  It's underneath the

12:20PM 24   driver's seat of the vehicle.

12:20PM 25        MR. SCHOEN:  Okay.  Let's keep playing it.

| | | |
|---|---|---|
| 12:20 PM | 1 | (Video resumed.) |
| 12:20 PM | 2 | MR. SCHOEN: Let's stop it here. |
| 12:20 PM | 3 | (Video paused.) |
| 12:20 PM | 4 | BY MR. SCHOEN: |
| 12:20 PM | 5 | Q. What are you doing here? |
| 12:20 PM | 6 | A. I'm detaining Mr. Fishburne. |
| 12:20 PM | 7 | Q. Why are you detaining him? |
| 12:20 PM | 8 | A. We found an unlawful carried weapon inside the vehicle, so |
| 12:20 PM | 9 | he was detained. |
| 12:20 PM | 10 | Q. Okay. So when you say an unlawful -- unlawfully carried |
| 12:20 PM | 11 | weapon, where under South Carolina law can you carry a weapon |
| 12:20 PM | 12 | in your car? |
| 12:20 PM | 13 | A. There's three places that you're allowed by South |
| 12:20 PM | 14 | Carolina. It's in a center console, in a glove box, or in the |
| 12:20 PM | 15 | trunk of your vehicle. |
| 12:20 PM | 16 | Q. So under the seat is not a place where you could lawfully |
| 12:21 PM | 17 | carry a gun? |
| 12:21 PM | 18 | A. No, sir, unless you have a concealed carry permit, and he |
| 12:21 PM | 19 | does not. |
| 12:21 PM | 20 | MR. SCHOEN: I want to back up real quickly, if we |
| 12:21 PM | 21 | can, to about 17 seconds. |
| 12:21 PM | 22 | (Video resumed.) |
| 12:21 PM | 23 | MR. SCHOEN: Stop it right there for me. Back up |
| 12:21 PM | 24 | just a tad. I want to ask him about the license plate. Stop |
| 12:21 PM | 25 | it. |

| | | |
|---|---|---|
| 12:21PM | 1 | (Video paused.) |
| 12:21PM | 2 | BY MR. SCHOEN: |
| 12:21PM | 3 | Q.   Can you read me the -- can you read the license plate off |
| 12:21PM | 4 | of that vehicle? |
| 12:21PM | 5 | A.   It appears to be PFM377. |
| 12:22PM | 6 | Q.   PFM377? |
| 12:22PM | 7 | A.   Yes, sir. |
| 12:22PM | 8 | MR. SCHOEN:  All right.  I want to jump up to about 3 |
| 12:22PM | 9 | minutes and 45 seconds. |
| 12:22PM | 10 | (Video resumed.) |
| 12:22PM | 11 | BY MR. SCHOEN: |
| 12:24PM | 12 | Q.   Let me just ask it this way.  When you find a gun, what, |
| 12:24PM | 13 | if any, checks do you do on that gun? |
| 12:24PM | 14 | A.   We run a serial number check in case it's stolen, and we |
| 12:24PM | 15 | ask if the person who we take it from is prohibited from |
| 12:24PM | 16 | possessing a firearm in the state of South Carolina. |
| 12:24PM | 17 | Q.   Did you run that check with regard to this gun? |
| 12:24PM | 18 | A.   Yes, sir, every gun we get, we run the serial number on. |
| 12:24PM | 19 | Q.   And what did you learn with regard to whether or not the |
| 12:24PM | 20 | gun had been reported stolen? |
| 12:24PM | 21 | A.   At that time, it was not stolen, but we did learn that |
| 12:24PM | 22 | Mr. Fishburne was prohibited from possessing a firearm |
| 12:24PM | 23 | federally and statewide. |
| 12:24PM | 24 | Q.   And what did you do with this vehicle? |
| 12:24PM | 25 | A.   We turned it over to his mother when she arrived. |

| | | |
|---|---|---|
| 12:24 PM | 1 | **Q.** Mr. Fishburne's mother? |
| 12:24 PM | 2 | **A.** Yes, sir. |
| 12:24 PM | 3 | **Q.** Why did you turn it over to Mr. Fishburne's mother? |
| 12:24 PM | 4 | **A.** We had already searched the car. We really had no reason |
| 12:24 PM | 5 | to hold the car, and I believe it was registered to her in the |
| 12:24 PM | 6 | first place, so we turned it over to her. |
| 12:24 PM | 7 | **MR. SCHOEN:** All right. Permission to approach the |
| 12:25 PM | 8 | witness -- |
| 12:25 PM | 9 | **THE COURT:** Sure. |
| 12:25 PM | 10 | **MR. SCHOEN:** -- with what's been previously marked as |
| 12:25 PM | 11 | Government's Exhibit 4. |
| 12:25 PM | 12 | **BY MR. SCHOEN:** |
| 12:25 PM | 13 | **Q.** Can you identify what I just handed you? |
| 12:25 PM | 14 | **A.** Yes, sir, it's a video from the same traffic stop, my |
| 12:25 PM | 15 | in-car video. |
| 12:25 PM | 16 | **Q.** When you say your "in-car video," where is that coming |
| 12:25 PM | 17 | from? |
| 12:25 PM | 18 | **A.** It's a camera head that's mounted on the windshield of the |
| 12:25 PM | 19 | car, and the control box is in the interior of the car, and it |
| 12:25 PM | 20 | records our stops. |
| 12:25 PM | 21 | **Q.** Okay. Have you previously had a chance to look at that |
| 12:25 PM | 22 | disk? |
| 12:25 PM | 23 | **A.** Yes, sir. |
| 12:25 PM | 24 | **Q.** And how do you know that your in-car footage from that day |
| 12:25 PM | 25 | is on that disk? |

| | | |
|---|---|---|
| 12:25 PM | 1 | A.    I have initialed it, and it says, "Cook in-car video." |
| 12:25 PM | 2 | MR. SCHOEN:  Okay.  Your Honor, at this time we would |
| 12:25 PM | 3 | move Government's Exhibit 4 into evidence. |
| 12:25 PM | 4 | THE COURT:  Any objection? |
| 12:25 PM | 5 | MR. SHAHID:  No objection. |
| 12:25 PM | 6 | THE COURT:  In evidence. |
| 12:25 PM | 7 | MR. SCHOEN:  Can we just bring this up?  I'm going to |
| 12:25 PM | 8 | ask him just a short question about it. |
| 12:26 PM | 9 | (Video played.) |
| 12:26 PM | 10 | MR. SCHOEN:  All right.  You can stop it. |
| 12:26 PM | 11 | BY MR. SCHOEN: |
| 12:26 PM | 12 | Q.    Do you recognize this as footage from that same day? |
| 12:26 PM | 13 | A.    Yes, sir. |
| 12:26 PM | 14 | MR. SCHOEN:  All right.  I'm going to ask another |
| 12:26 PM | 15 | officer about what's shown on this video, so I don't have any |
| 12:26 PM | 16 | further questions for you at this time. |
| 12:26 PM | 17 | THE WITNESS:  Yes, sir. |
| 12:26 PM | 18 | MR. SCHOEN:  Will you please answer any questions |
| 12:26 PM | 19 | from Mr. Shahid? |
| 12:26 PM | 20 | THE WITNESS:  Yes, sir. |
| 12:26 PM | 21 | MR. SHAHID:  Excuse me, Judge.  One second, please. |
| 12:26 PM | 22 | THE COURT:  Sure. |
| 12:26 PM | 23 | CROSS-EXAMINATION |
| 12:26 PM | 24 | BY MR. SHAHID: |
| 12:26 PM | 25 | Q.    Good afternoon.  How are you doing today? |

| | | |
|---|---|---|
| 12:26PM | 1 | **A.**   Okay.  Yourself? |
| 12:26PM | 2 | **Q.**   Good.  Couple of questions I have for you.  I'm Peter |
| 12:27PM | 3 | Shahid, and I represent Mr. Fishburne. |
| 12:27PM | 4 | **A.**   Yes, sir. |
| 12:27PM | 5 | **Q.**   Your Honor the supervising sergeant on the scene for this |
| 12:27PM | 6 | checkpoint; is that correct? |
| 12:27PM | 7 | **A.**   Yes, sir. |
| 12:27PM | 8 | **Q.**   And the checkpoint started at what hour? |
| 12:27PM | 9 | **A.**   I believe it was 13:50, which is -- |
| 12:27PM | 10 | **Q.**   I'm sorry, I'm going to ask you if you mind using that |
| 12:27PM | 11 | microphone. |
| 12:27PM | 12 | **A.**   It was 13:50, 10 minutes to 2:00. |
| 12:27PM | 13 | **Q.**   And in layman's term, how long did that checkpoint last? |
| 12:27PM | 14 | **A.**   Approximately an hour and a half. |
| 12:27PM | 15 | **Q.**   And the sole reason for having that checkpoint, if I |
| 12:27PM | 16 | understand your testimony, is about complaints about people |
| 12:27PM | 17 | speeding; is that correct? |
| 12:27PM | 18 | **A.**   Yes, sir. |
| 12:27PM | 19 | **Q.**   And when you had the encounter with Mr. Fishburne, the |
| 12:27PM | 20 | checkpoint was concluded; is that correct? |
| 12:27PM | 21 | **A.**   It was being broken down as we were speaking with |
| 12:27PM | 22 | Mr. Fishburne. |
| 12:28PM | 23 | **Q.**   And I believe that you testified earlier that there were |
| 12:28PM | 24 | other cars that were stopped; is that correct? |
| 12:28PM | 25 | **A.**   Yes, sir. |

12:28PM 1  Q.   And were other cars stopped that involved some criminal

12:28PM 2  activity such as simple possession of marijuana or drug

12:28PM 3  paraphernalia?

12:28PM 4  A.   Yes, sir.

12:28PM 5  Q.   And those cars that you stopped or pulled over, those cars

12:28PM 6  were not searched; were they?

12:28PM 7  A.   I believe the one that I did get simple possession out of

12:28PM 8  was searched.

12:28PM 9  Q.   And in doing that, that did not cause the checkpoint to be

12:28PM 10  shut down?

12:28PM 11  A.   No, sir.

12:28PM 12  Q.   So your involvement with this, Sergeant, was coming out to

12:28PM 13  the car after Mr. Fishburne had an encounter with another

12:28PM 14  officer; is that correct?

12:28PM 15  A.   Yes, sir.

12:29PM 16  Q.   And you had your body-worn camera on.  That's what we were

12:29PM 17  watching in that video was your body-worn camera?

12:29PM 18  A.   That's correct, yes, sir.

12:29PM 19  Q.   So you're required by Walterboro police policy to have

12:29PM 20  your camera activated and working when you have an encounter

12:29PM 21  with a citizen; is that correct?

12:29PM 22  A.   Yes, sir.

12:29PM 23  Q.   Including when you have such things as traffic stops?

12:29PM 24  A.   That's correct.

12:29PM 25  Q.   Or that you may be engaged into the investigation of a --

12:29PM 1    of suspicious activity?

12:29PM 2    A.    Yes, sir.

12:29PM 3    Q.    And I think you testified earlier, Sergeant, that when

12:29PM 4    Mrs. -- Mr. Fishburne's mom came up, you turned the car over to

12:29PM 5    her?

12:29PM 6    A.    That's correct.

12:29PM 7    Q.    You had done what you needed to do with the car?

12:29PM 8    A.    Yes, sir.

12:29PM 9    Q.    Didn't need to keep the car any longer?

12:29PM 10   A.    Yes, sir.

12:29PM 11   Q.    So you gave the car back over to the rightful owner?

12:29PM 12   A.    To who?

12:29PM 13   Q.    To the rightful owner.

12:29PM 14   A.    Yes, sir.

12:29PM 15   Q.    At that point, you were not the one to locate the firearm;

12:30PM 16   is that correct?

12:30PM 17   A.    That's correct.

12:30PM 18   Q.    That was Officer Duboise?

12:30PM 19   A.    Yes, sir.

12:30PM 20   Q.    And did you do a report about this incident, Sergeant?

12:30PM 21   A.    I did not.

12:30PM 22   Q.    Prior to having this checkpoint go into effect, did y'all

12:30PM 23   write any kind of report or sort of a plan on how you were

12:30PM 24   going to do this checkpoint?

12:30PM 25   A.    No, sir, we asked for permission from the captain, and he

| | | |
|---|---|---|
| 12:30PM | 1 | gave it. |
| 12:30PM | 2 | Q.    And that was something verbally? |
| 12:30PM | 3 | A.    That's correct. |
| 12:30PM | 4 | Q.    That was not written either? |
| 12:30PM | 5 | A.    No, sir. |
| 12:30PM | 6 | Q.    Now, there are other ways of slowing cars down, isn't it, |
| 12:30PM | 7 | Sergeant, by having a car with a radar out there patrolling the |
| 12:30PM | 8 | area? |
| 12:30PM | 9 | A.    That's correct. |
| 12:31PM | 10 | MR. SHAHID:  Excuse me just one second, Judge. |
| 12:31PM | 11 | THE COURT:  Sure. |
| 12:31PM | 12 | (Pause.) |
| 12:31PM | 13 | MR. SHAHID:  Everybody, bear with me one second.  I |
| 12:31PM | 14 | just need to check something real quick. |
| 12:31PM | 15 | THE COURT:  Sure. |
| 12:31PM | 16 | (Pause.) |
| 12:32PM | 17 | MR. SHAHID:  Nothing further, Judge.  Thank you. |
| 12:32PM | 18 | MR. SCHOEN:  No redirect, Your Honor. |
| 12:32PM | 19 | THE COURT:  Okay.  Thank you, Sergeant.  You can go |
| 12:32PM | 20 | back to work. |
| 12:32PM | 21 | THE WITNESS:  Thank you, sir. |
| 12:32PM | 22 | (Witness excused.) |
| 12:32PM | 23 | MR. SCHOEN:  Permission to approach and -- |
| 12:33PM | 24 | THE COURT:  Sure. |
| 12:33PM | 25 | MR. SCHOEN:  -- tender this into evidence.  Your |

12:33PM 1 Honor, the Government calls Officer Brandon Duboise to the

12:33PM 2 stand.

12:33PM 3               **THE COURT:**  Okay.

12:33PM 4               **COURTROOM DEPUTY:**  Please come forward to be sworn.

12:33PM 5 Place your left hand on the Bible and raise your right hand.

12:33PM 6                          (Witness sworn.)

12:33PM 7                      **BRANDON DUBOISE,**

12:33PM 8 a witness called on behalf of the Government, being first duly

12:33PM 9 sworn, was examined and testified as follows:

12:33PM 10                   DIRECT EXAMINATION

12:33PM 11                   BY MR. SCHOEN:

12:33PM 12 Q.   Good morning, Officer.

12:33PM 13 A.   Good morning.

12:33PM 14 Q.   Would you please introduce yourself to the jury?

12:33PM 15 A.   I am Officer Duboise with the Walterboro Police

12:33PM 16 Department.

12:33PM 17 Q.   How long have you been with the Walterboro Police

12:33PM 18 Department?

12:33PM 19 A.   Close to three years now.

12:33PM 20 Q.   And what is your current position with the Walterboro

12:33PM 21 Police Department?

12:33PM 22 A.   I am a Lance Corporal, also a canine handler.

12:34PM 23 Q.   And prior to joining the Walterboro Police Department,

12:34PM 24 what did you do?

12:34PM 25 A.   I worked for a family business doing automotive work,

1    fixing cars.

2    Q.    And prior to that, what's your educational background?

3    A.    I got a bachelor's degree in business.

4    Q.    I want to direct your attention to March 31st, 2018.  Do

5    you remember that day?

6    A.    I do.

7    Q.    And what were you doing on March 31st, 2018?

8    A.    We were conducting a safety checkpoint at Hiers Corner and

9    Center Street, me and three other officers.

10   Q.    And when you conduct this safety checkpoint, what are you

11   doing?

12   A.    Basically checking license, tags, making sure nobody is

13   speeding through the area, basically slow people down.

14   Q.    And when you're out on these patrols, do you run your body

15   camera the entire time?

16   A.    Not the entire time.

17   Q.    And why don't you do that?

18   A.    Usually battery power.  We have the whole shift to operate

19   our batteries, so to preserve that battery power, we just turn

20   it on and off.

21   Q.    When do you turn it on?

22   A.    Usually during an encounter with a person, as far as

23   searching a vehicle, something --

24   Q.    So if you were issuing a citation or if you're -- if

25   you're searching somebody, you turn it on in that instance?

| | | |
|---|---|---|
| 12:35PM | 1 | A.   Correct. |
| 12:35PM | 2 | Q.   Let me ask you this.  Did you turn your body camera on |
| 12:35PM | 3 | when you searched Mr. Fishburne? |
| 12:35PM | 4 | A.   I was under the impression I did, but apparently not. |
| 12:35PM | 5 | Q.   Can you tell the jury, how do these body cameras work? |
| 12:35PM | 6 | What decides whether they're on or off? |
| 12:35PM | 7 | A.   I have it with me.  It's just a flush button on the front. |
| 12:35PM | 8 | So you -- I mean, you barely touch it, and you don't know if |
| 12:35PM | 9 | it's on or off unless you look at the screen and it's got a |
| 12:35PM | 10 | little red light, and it tells you it's recording, and on that |
| 12:35PM | 11 | day I had my safety vest on, so I couldn't see my camera. |
| 12:35PM | 12 | Q.   So you believe you intended to turn your camera on? |
| 12:36PM | 13 | A.   I did try to push it. |
| 12:36PM | 14 | Q.   Did the camera come on?  Did you end up with any footage? |
| 12:36PM | 15 | A.   No footage. |
| 12:36PM | 16 | Q.   Okay.  I do want to -- I do want to show you some footage, |
| 12:36PM | 17 | what's been previously admitted as Government's Exhibit 4. |
| 12:36PM | 18 |           MR. SCHOEN:  Can you bring up Government's Exhibit 4? |
| 12:36PM | 19 |                    (Video played.) |
| 12:36PM | 20 |           MR. SCHOEN:  Stop it right here. |
| 12:36PM | 21 |                    (Video paused.) |
| 12:36PM | 22 | BY MR. SCHOEN: |
| 12:36PM | 23 | Q.   Do you recognize what we're looking at here? |
| 12:36PM | 24 | A.   That is the car driven by Mr. Fishburne that day. |
| 12:36PM | 25 | Q.   This red car right up here? |

12:36PM 1    A.    Yes, sir.

12:36PM 2    Q.    Okay.  And who is this getting ready to open the door to

12:36PM 3    that car?

12:36PM 4    A.    That is myself.

12:36PM 5              MR. SCHOEN:  Okay.  Let's play it a little more.

12:37PM 6                        (Video resumed.)

12:37PM 7              MR. SCHOEN:  All right.  Pause right there.

12:37PM 8                        (Video paused.)

9    BY MR. SCHOEN:

12:37PM 10   Q.    What are you doing here?

12:37PM 11   A.    Basically patting him down, because there was a -- an odor

12:37PM 12   of marijuana present in that vehicle, so --

12:37PM 13   Q.    Okay.  Go ahead.

12:37PM 14   A.    Once I pulled him out, I just patted him down, checked his

12:37PM 15   pockets real fast, make sure there's no weapons or narcotics.

12:37PM 16   Q.    Why did you -- why were you searching his vehicle in the

12:37PM 17   first place?

12:37PM 18   A.    Due to the odor of marijuana present.

12:37PM 19   Q.    Okay.  So he pulls up to the traffic checkpoint.  What

12:37PM 20   happens?

12:37PM 21   A.    He rolls his window down about two, three inches, where I

12:37PM 22   can just barely make out the top of his head.  He wasn't

12:37PM 23   hostile, but he did have a small attitude, just didn't want to

12:37PM 24   be there.

12:37PM 25   Q.    Okay.  And what did -- what did you detect when that

DUBOISE - DIRECT EXAMINATION

| | | |
|---|---|---|
| 12:37 PM | 1 | window went down just a little bit? |
| 12:37 PM | 2 | A.   I could smell the odor of marijuana, and that's when I |
| 12:37 PM | 3 | asked him to pull off to the side of the road. |
| 12:38 PM | 4 | Q.   Had you ever met Mr. Fishburne before this particular day? |
| 12:38 PM | 5 | A.   This is the first encounter. |
| 12:38 PM | 6 | Q.   Do you recognize Mr. Fishburne in the courtroom? |
| 12:38 PM | 7 | A.   I do. |
| 12:38 PM | 8 | Q.   And can you point him out? |
| 12:38 PM | 9 | A.   (Indicating.) |
| 12:38 PM | 10 | Q.   And can you describe what he's wearing, where he's |
| 12:38 PM | 11 | sitting? |
| 12:38 PM | 12 | A.   Blue button up shirt with gold glasses. |
| 12:38 PM | 13 | MR. SCHOEN:  Let the record reflect that the witness |
| 12:38 PM | 14 | has correctly identified the Defendant, Quentin John Fishburne. |
| 12:38 PM | 15 | THE COURT:  Sure. |
| 12:38 PM | 16 | BY MR. SCHOEN: |
| 12:38 PM | 17 | Q.   What did Mr. Fishburne say to you when you asked him to |
| 12:38 PM | 18 | pull over and -- so you could search his car? |
| 12:38 PM | 19 | A.   He -- the only thing I can remember is, "If you find |
| 12:38 PM | 20 | anything in the car, it's not mine." |
| 12:38 PM | 21 | Q.   He said, "If you find anything in this car, it's not |
| 12:38 PM | 22 | mine."  What did that make you think? |
| 12:38 PM | 23 | A.   I mean, just like anybody else, that pretty much screams |
| 12:38 PM | 24 | guilt, that I'm going to find something in that car. |
| 12:38 PM | 25 | MR. SCHOEN:  All right.  Let's watch a little more of |

DUBOISE - DIRECT EXAMINATION

| | | |
|---|---|---|
| 12:38 PM | 1 | this video. |
| 12:40 PM | 2 | (Video resumed.) |
| 12:40 PM | 3 | MR. SCHOEN: All right. Stop. |
| 12:40 PM | 4 | (Video paused.) |
| | 5 | BY MR. SCHOEN: |
| 12:40 PM | 6 | Q. What's in your hand? |
| 12:40 PM | 7 | A. It's a black handgun that I found under the driver's seat. |
| 12:40 PM | 8 | Q. Found under the driver's seat of this vehicle right here? |
| 12:40 PM | 9 | A. Yep. |
| 12:40 PM | 10 | Q. What are you doing with the gun right there? |
| 12:40 PM | 11 | A. I'm clearing the weapon to make sure there's no ammunition |
| 12:40 PM | 12 | in the chamber. |
| 12:40 PM | 13 | Q. Okay. Are you wearing gloves when you do this? |
| 12:40 PM | 14 | A. I am not. |
| 12:40 PM | 15 | Q. Okay. Why weren't you wearing gloves? |
| 12:40 PM | 16 | A. This particular day, I was in a spare car. You could see |
| 12:40 PM | 17 | it. It was the Crown Vic parked on the left side. I didn't |
| 12:40 PM | 18 | have all my gear with me, so I didn't have a pair of gloves |
| 12:40 PM | 19 | present. |
| 12:40 PM | 20 | Q. When you're starting to search his car, did you expect to |
| 12:40 PM | 21 | find a gun? |
| 12:40 PM | 22 | A. I did not expect to find a gun. |
| 12:41 PM | 23 | Q. So what is it that you're doing with that gun in your |
| 12:41 PM | 24 | hands? |
| 12:41 PM | 25 | A. Like I said, I'm clearing it to make sure it's clear of |

12:41PM 1    ammunition so it won't go off on me or anybody else, and then I

12:41PM 2    actually run the serial number to make sure the weapon is

12:41PM 3    clear, not stolen.

12:41PM 4    Q.    Okay.  And what is the -- what was the status of the

12:41PM 5    weapon as far as being loaded?

12:41PM 6    A.    It was loaded.

12:41PM 7    Q.    Was it chambered?

12:41PM 8    A.    I don't recall that, but it was --

12:41PM 9    Q.    Loaded?

12:41PM 10   A.    Yes, it was loaded.

12:41PM 11   Q.    And how about whether or not it was reported stolen?  Had

12:41PM 12   the gun been reported stolen?

12:41PM 13   A.    It was clear.  It was not reported stolen at that time.

12:41PM 14          MR. SCHOEN:  Court's indulgence for just one moment.

12:41PM 15                        (Pause.)

        16          MR. SCHOEN:  Your Honor, permission to approach about

12:42PM 17   what has previously been marked as Government's Exhibit 6?

12:42PM 18          THE COURT:  Sure.

12:42PM 19   BY MR. SCHOEN:

12:42PM 20   Q.    Can you identify what I've just handed you?

12:42PM 21   A.    I can.  It's the same weapon I'm holding in the screen.

12:42PM 22   Q.    And how do you know that that is the same weapon that

12:42PM 23   you're holding in the screen?

12:42PM 24   A.    Based off serial numbers.

12:42PM 25   Q.    Do you have your report with you?

12:42 PM  1    A.    I do not.

12:42 PM  2              MR. SCHOEN:  Can I -- Your Honor, I'd request

12:42 PM  3    permission to approach and hand Officer Duboise a portion of

12:42 PM  4    his report from that day.

12:42 PM  5              THE COURT:  Sure.

12:42 PM  6    BY MR. SCHOEN:

12:42 PM  7    Q.    What have I just handed you, Officer Duboise?

12:43 PM  8    A.    This is the incident report typed by myself.

12:43 PM  9    Q.    Does that -- why don't you take minute to review that

12:43 PM  10   report.  Does the serial number for the gun you found appear in

12:43 PM  11   that report?

12:43 PM  12   A.    Yes, sir.

12:43 PM  13   Q.    And what's that serial number for us?

12:43 PM  14   A.    It's H, hotel; S, Sierra; R, Romeo, 7417.

12:43 PM  15   Q.    HSR7417, you said?

12:43 PM  16   A.    Yes, sir.

12:43 PM  17   Q.    Can you give that firearm a look and tell us what the

12:43 PM  18   serial number on that is?

12:43 PM  19   A.    It's going to be the same serial number, HSR7417.

12:43 PM  20             MR. SCHOEN:  Your Honor, at this point the Government

12:43 PM  21   would move Exhibit 6 into evidence.

12:43 PM  22             MR. SHAHID:  Subject to my prior objection, Your

12:43 PM  23   Honor.

12:43 PM  24             THE COURT:  Sure.  In evidence.

12:44 PM  25             MR. SCHOEN:  Permission to approach with Government's

| | | |
|---|---|---|
| 12:44PM | 1 | Exhibit 7? |
| 12:44PM | 2 | THE COURT:  Sure.  No problem. |
| 12:44PM | 3 | MR. SCHOEN:  Permission to retrieve and publish |
| 12:44PM | 4 | Government's 6? |
| 12:44PM | 5 | THE COURT:  Sure. |
| 12:44PM | 6 | MR. SCHOEN:  Give that a look while I'm -- |
| 12:44PM | 7 | THE WITNESS:  All right. |
| 12:44PM | 8 | A JUROR:  Hold it down a little lower. |
| 12:44PM | 9 | BY MR. SCHOEN: |
| 12:45PM | 10 | Q.   Can you identify Government's Exhibit 7? |
| 12:45PM | 11 | A.   I can. |
| 12:45PM | 12 | Q.   What is Government's Exhibit 7? |
| 12:45PM | 13 | A.   This is the evidence bag with my handwriting on it with |
| 12:45PM | 14 | seven rounds of .40 caliber ammunition inside. |
| 12:45PM | 15 | MR. SCHOEN:  Your Honor, the Government would move |
| 12:45PM | 16 | Exhibit 7 into evidence. |
| 12:45PM | 17 | MR. SHAHID:  Subject to my objection. |
| 12:45PM | 18 | THE COURT:  Sure.  In evidence. |
| 12:45PM | 19 | BY MR. SCHOEN: |
| 12:45PM | 20 | Q.   Can you tell us, that .40 caliber ammunition, can you fire |
| 12:45PM | 21 | that .40 caliber ammunition through that gun right there? |
| 12:45PM | 22 | A.   Yes, sir. |
| 12:45PM | 23 | Q.   So Government's Exhibit 7 is ammunition that is of a |
| 12:45PM | 24 | proper caliber that can be fired through Government's Exhibit |
| 12:45PM | 25 | 6? |

| | | |
|---|---|---|
| 12:45 PM | 1 | **A.**   Yes, sir. |
| 12:45 PM | 2 | **Q.**   Who took the car? |
| 12:45 PM | 3 | **A.**   I believe a family member showed up.  At that time I was |
| 12:45 PM | 4 | taking Mr. Fishburne to the jail, so I'm not positive who took |
| 12:45 PM | 5 | the car. |
| 12:46 PM | 6 | **MR. SCHOEN:**  Permission to approach and publish |
| 12:46 PM | 7 | evidence? |
| 12:46 PM | 8 | **THE COURT:**  Sure. |
| 12:46 PM | 9 | (Pause.) |
| 12:46 PM | 10 | **MR. SCHOEN:**  Brief indulgence, Your Honor. |
| 12:46 PM | 11 | **THE COURT:**  Sure. |
| 12:46 PM | 12 | **MR. SCHOEN:**  Thank you, Corporal Duboise.  I don't |
| 12:46 PM | 13 | have any other questions for you at this time.  Please answer |
| 12:46 PM | 14 | any questions from opposing counsel. |
| 12:46 PM | 15 | **THE WITNESS:**  Yes, sir. |
| 12:47 PM | 16 | **MR. SHAHID:**  Judge, you want to take a break now? |
| 12:47 PM | 17 | **THE COURT:**  Just wait until after your |
| 12:47 PM | 18 | cross-examination. |
| 12:47 PM | 19 | **MR. SHAHID:**  I'm sorry? |
| 12:47 PM | 20 | **THE COURT:**  I'll just wait until after your |
| 12:47 PM | 21 | cross-examination, and then we'll go to lunch. |
| 12:47 PM | 22 | **MR. SHAHID:**  I'm still not -- |
| 12:47 PM | 23 | **THE COURT:**  I'll just wait until after your |
| 12:47 PM | 24 | cross-examination, and then we'll go to lunch. |
| 12:47 PM | 25 | **MR. SHAHID:**  Thank you, Judge. |

| | | |
|---|---|---|
| 12:47PM | 1 | THE COURT:  You're welcome. |
| 12:47PM | 2 | MR. SHAHID:  The batteries in one of my hearing aids |
| 12:47PM | 3 | died, so I apologize.  It happens every now and then.  That's |
| 12:47PM | 4 | why I ask these witnesses to make sure they talk into the |
| 12:47PM | 5 | microphone here. |
| 12:47PM | 6 | THE COURT:  No problem.  No problem. |
| 12:47PM | 7 | CROSS-EXAMINATION |
| 12:47PM | 8 | BY MR. SHAHID: |
| 12:47PM | 9 | Q.   Officer Duboise, I'm Peter Shahid, and I represent |
| 12:47PM | 10 | Mr. Fishburne.  I'm going to ask you some questions about this |
| 12:47PM | 11 | traffic stop. |
| 12:47PM | 12 | A.   Yes, sir. |
| 12:47PM | 13 | MR. SHAHID:  So if I can pull up the -- Judge, I can |
| 12:48PM | 14 | do this one of two ways.  I can use my own computer on |
| 12:48PM | 15 | replaying these tapes, or I could ask the Government to help me |
| 12:48PM | 16 | with that, whatever is easier for them.  I don't mind. |
| 12:48PM | 17 | THE COURT:  Go ahead.  She's already got it queued |
| 12:48PM | 18 | up. |
| 12:48PM | 19 | PARALEGAL:  I just need to know what number. |
| 12:48PM | 20 | COURTROOM DEPUTY:  She's got it uploaded. |
| 12:48PM | 21 | MS. HENDERSON:  She just needs the numbers.  She has |
| 12:48PM | 22 | them.  She just needs to know what number. |
| 12:48PM | 23 | MR. SHAHID:  Oh, 4.  Sorry. |
| 12:48PM | 24 | THE COURT:  You want to pull up Exhibit 4? |
| 12:48PM | 25 | MR. SHAHID:  Yes, sir. |

| | | |
|---|---|---|
| 12:48 PM | 1 | **THE COURT:**  Okay.  Thank you.  There we go. |
| 12:48 PM | 2 | (Video played.) |
| 12:48 PM | 3 | **MR. SHAHID:**  If you could just stop to right there |
| 12:49 PM | 4 | for one second. |
| 12:49 PM | 5 | (Video paused.) |
| 12:49 PM | 6 | BY MR. SHAHID: |
| 12:49 PM | 7 | Q.   Officer, you see the license tag of that car? |
| 12:49 PM | 8 | A.   Yes, sir. |
| 12:49 PM | 9 | Q.   Okay.  And right to the very left of that, seems to be an |
| 12:49 PM | 10 | item on the car or items on the car? |
| 12:49 PM | 11 | A.   Yes, sir. |
| 12:49 PM | 12 | Q.   And are those items the driver's license? |
| 12:49 PM | 13 | A.   It appears so.  Maybe a registration or insurance card. |
| 12:49 PM | 14 | Q.   So when you encounter somebody at this checkpoint, the |
| 12:49 PM | 15 | purpose of that is to verify they have a valid driver's |
| 12:49 PM | 16 | license? |
| 12:49 PM | 17 | A.   Correct. |
| 12:49 PM | 18 | Q.   That they have proper insurance? |
| 12:49 PM | 19 | A.   Correct. |
| 12:49 PM | 20 | Q.   And proper registration for the car? |
| 12:49 PM | 21 | A.   Correct. |
| 12:49 PM | 22 | Q.   So at some point in time, you had the Camaro pull over to |
| 12:49 PM | 23 | the side of the road; is that correct? |
| 12:49 PM | 24 | A.   Yes, sir. |
| 12:49 PM | 25 | Q.   And prior to having the car pull over to the side of the |

| | | |
|---|---|---|
| 12:49PM | 1 | road, you had testified about the initial encounter with |
| 12:49PM | 2 | Mr. Fishburne at the checkpoint? |
| 12:49PM | 3 | A.  Yes, sir. |
| 12:50PM | 4 | Q.  And you had asked at that point for his driver's license, |
| 12:50PM | 5 | registration, and insurance information; is that correct? |
| 12:50PM | 6 | A.  Yes, sir. |
| 12:50PM | 7 | Q.  So at that point the information -- the items he gave you |
| 12:50PM | 8 | at the initial encounter, he had the proper driver's license, |
| 12:50PM | 9 | insurance card, and registration; is that correct? |
| 12:50PM | 10 | A.  I'm not sure if he had everything, but there is paperwork |
| 12:50PM | 11 | on the trunk, yes. |
| 12:50PM | 12 | Q.  Officer, is there any reason to believe that information |
| 12:50PM | 13 | he gave you at that point was incorrect or incomplete? |
| 12:50PM | 14 | A.  No, sir. |
| 12:50PM | 15 | Q.  That's a "no," correct? |
| 12:50PM | 16 | A.  Uh-huh. |
| 12:50PM | 17 | Q.  All right.  And the purpose of the checkpoint as I |
| 12:50PM | 18 | understand, sir, is to do just that, is to check those items. |
| 12:50PM | 19 | If those things clear, the driver is supposed to be let go and |
| 12:50PM | 20 | released? |
| 12:50PM | 21 | A.  Unless there's a deep smell of -- odor of marijuana. |
| 12:50PM | 22 | Q.  Well, back to my question to you.  By the way, are you |
| 12:50PM | 23 | chewing gum up there?  Can you hear me okay, Officer? |
| 12:51PM | 24 | A.  Yes, sir. |
| 12:51PM | 25 | Q.  All right.  So let me make sure I got all this correct. |

12:51PM 1    That there's no information that you possess on March 31st

12:51PM 2    that -- at the point of initial contact, his driver's license,

12:51PM 3    insurance, or registration were all intact?

12:51PM 4    A.    I'm not sure at that time.  He was detained for the odor

12:51PM 5    of marijuana, and then his license was ran afterwards.

12:51PM 6    Q.    Let me just go through this encounter with you initially.

12:51PM 7    A.    Uh-huh.

12:51PM 8    Q.    You don't have your body camera working --

12:51PM 9    A.    Correct.

12:51PM 10   Q.    -- is that correct?  And I think what you told this jury

12:51PM 11   earlier that all you had to do was sort of look down and see if

12:51PM 12   a red light came on?

12:51PM 13   A.    Yes, sir.

12:51PM 14   Q.    And you didn't do that?

12:51PM 15   A.    I'm wearing a safety vest in the picture.

12:51PM 16   Q.    I'm asking you, sir, did you check to see if the red light

12:51PM 17   came on?

12:51PM 18   A.    I'm not sure.

12:51PM 19   Q.    You're not sure?

12:51PM 20   A.    No, sir.

12:51PM 21   Q.    Now, part of the policy with the Walterboro Police

12:51PM 22   Department is for you to activate your body camera when you

12:51PM 23   have an encounter with the public?

12:52PM 24   A.    Sure, yes, sir.

12:52PM 25   Q.    And part of that policy is also to include when you're

12:52PM 1  doing traffic stops like you're doing right now?

12:52PM 2  A.    Yes, sir.

12:52PM 3  Q.    So when I'm asking you these questions about whether or

12:52PM 4  not Mr. Fishburne or any driver when you have that encounter

12:52PM 5  properly produced a driver's license and insurance,

12:52PM 6  registration, one way of verifying that is if your camera was

12:52PM 7  operating properly?

12:52PM 8  A.    Yes, sir.

12:52PM 9  Q.    And all you had to do was look down and see if the red

12:52PM 10 light came on or off; is that correct?

12:52PM 11 A.    Sure, correct.

12:52PM 12 Q.    And you tell the jury today that the reason we don't have

12:52PM 13 that piece of information or that video or that evidence is

12:52PM 14 because you didn't bother to look and see if that red light was

12:52PM 15 on or off?

12:52PM 16 A.    We do have video, but it's just not my video.

12:52PM 17 Q.    It's not yours --

12:52PM 18 A.    Correct.

12:52PM 19 Q.    -- is that right?  Because this video that we're looking

12:52PM 20 at right now came from another officer?

12:52PM 21 A.    Yes, sir, but I'm present in that video.

12:52PM 22 Q.    But this does not capture, Officer, the initial encounter

12:53PM 23 you had with Mr. Fishburne; is that correct?

12:53PM 24 A.    Correct.

12:53PM 25 Q.    Because you asked him to pull over to the side of the

118

DUBOISE - CROSS-EXAMINATION

12:53PM  1    road?

12:53PM  2    A.    Correct.

12:53PM  3    Q.    So at the initial encounter when you were engaging in the

12:53PM  4    conversation with him, you would have been able to pick up his

12:53PM  5    responses?

12:53PM  6    A.    Sure, yes, sir.

12:53PM  7    Q.    And that's something the jury could have heard today if

12:53PM  8    you had bothered to look and make sure your camera was working

12:53PM  9    or not working?

12:53PM  10   A.    Yes, sir.

12:53PM  11   Q.    And that may have been evidence helpful to him; is that

12:53PM  12   correct?

12:53PM  13   A.    Sure, correct.

12:53PM  14   Q.    But you didn't take the time to check and see if your

12:53PM  15   camera was working properly?

12:53PM  16   A.    Yes, sir.

12:53PM  17   Q.    Okay.  Now, at the end of this encounter with

12:53PM  18   Mr. Fishburne, I think you testified earlier that the car was

12:53PM  19   released back to a family member; is that right?

12:53PM  20   A.    Yes, sir.  Like I said, I wasn't present when the car was

12:53PM  21   released.

12:53PM  22   Q.    And you did a search of the car?

12:53PM  23   A.    Yes, sir.

12:54PM  24   Q.    And that's when you found this firearm?

12:54PM  25   A.    Yes, sir.

12:54 PM 1   Q.  And the search of the firearm -- the location of the

12:54 PM 2   firearm was underneath the seat?

12:54 PM 3   A.  Yes, sir, right where you adjust the seat, under the seat.

12:54 PM 4   Q.  So it wasn't clearly visible?

12:54 PM 5   A.  You had to look for it.

12:54 PM 6   Q.  You had to look for it?

12:54 PM 7   A.  Yes, sir.

12:54 PM 8   Q.  And you spent some time doing that?

12:54 PM 9   A.  I did.

12:54 PM 10   Q.  Okay.  And I think at a prior testimony that you gave this

12:54 PM 11   morning on direct examination, you were not wearing any gloves?

12:54 PM 12   A.  Correct.

12:54 PM 13   Q.  Now, if we run the tape a little bit further, we will see

12:54 PM 14   that there is Sergeant Cook and another officer on the scene;

12:54 PM 15   is that right?

12:54 PM 16   A.  Yes, sir.

12:54 PM 17   Q.  All right.  And did you ask them if they had any gloves

12:54 PM 18   you could wear?

12:54 PM 19   A.  I didn't.

12:54 PM 20   Q.  Now, as you were going through this checkpoint, Officer,

12:54 PM 21   you know you're going to be encountering other individuals; is

12:54 PM 22   that correct?

12:54 PM 23   A.  Sure, yes, sir.

12:54 PM 24   Q.  And you're going to be asking them for their driver's

12:54 PM 25   license, insurance, or registration card.  You're going to have

12:55PM  1  a hand-to-hand contact with these folks?

12:55PM  2  A.   Yes, sir.

12:55PM  3  Q.   And you didn't see reason at that point to have on gloves

12:55PM  4  either; did you?

12:55PM  5  A.   It's not per policy that we wear gloves.

12:55PM  6  Q.   I didn't ask you if it's policy or not, Officer.  I'm

12:55PM  7  asking you, you didn't see the need as you were having

12:55PM  8  encounters with these other drivers or motorists whether or not

12:55PM  9  to have on gloves as you're exchanging their information?

12:55PM 10  A.   No, sir, I don't see the need.

12:55PM 11  Q.   All right.  Now, did you take custody of this firearm?

12:55PM 12  A.   I did.

12:55PM 13  Q.   Did you turn it over to evidence?

12:55PM 14  A.   I did.

12:55PM 15  Q.   And at any point in time, Officer, did you ask for this

12:55PM 16  firearm to be checked for fingerprints?

12:55PM 17  A.   I did not.

12:55PM 18  Q.   And so today as we're standing -- having this hearing

12:55PM 19  today in court, this trial in court today, there's no

12:55PM 20  fingerprint evidence off this firearm; is there?

12:55PM 21  A.   No, sir.

12:55PM 22  Q.   And that was an opportunity for you to preserve the

12:55PM 23  evidence in such a way so that if, in fact, possession of the

12:55PM 24  firearm came into question, that's one way of determining

12:55PM 25  possession of the firearm, by fingerprints; is that correct?

12:55 PM  1  A.   Yes, sir.

12:55 PM  2  Q.   So that doesn't exist for us either; does it?

12:56 PM  3  A.   No, sir.  At the time I didn't have the necessary need to

12:56 PM  4  send it for fingerprinting.

12:56 PM  5  Q.   I'm sorry?

12:56 PM  6  A.   I didn't have the necessary need to send it off for

12:56 PM  7  fingerprinting.

12:56 PM  8  Q.   That's based on your assumption; isn't it, Officer?

12:56 PM  9  A.   Yes, sir.

12:56 PM  10  Q.   That's something for the jury to decide, not for you?

12:56 PM  11  A.   Sure.

12:56 PM  12  Q.   Now, when you -- earlier in the video, we see that

12:56 PM  13  you're --

12:56 PM  14        MR. SHAHID:  If you could just play this a little bit

12:56 PM  15  longer.

12:56 PM  16        PARALEGAL:  Do you want me to back it up or keep

12:56 PM  17  playing?

12:56 PM  18        MR. SHAHID:  I just want him coming out of the car.

12:56 PM  19              (Video resumed.)

20        PARALEGAL:  It's playing.

12:56 PM  21        MR. SHAHID:  Do you need this or --

12:56 PM  22        MS. HENDERSON:  No.

12:57 PM  23        MR. SHAHID:  You just scan it forward.  That's all

12:57 PM  24  I'm asking her.  Just -- can you stop -- stop it right there.

12:57 PM  25              (Video paused.)

BY MR. SHAHID:

Q.   So you're doing a pat-down of Mr. Fishburne; is that correct?

A.   Yes, sir.

Q.   And nothing is found on him when you do that pat-down?

A.   At that time nothing was found.

Q.   And so he's -- as we play the rest of the video, he walks back to the back of the car and appears to be on the telephone; is that right?

A.   Yes, sir.

Q.   When you did the search of the car, Officer, did you find any marijuana residue inside the car?

A.   I don't recall on the residue, but there was no actual marijuana found inside the car.

Q.   There was no marijuana found inside the car.  It was found on him; wasn't it?

A.   Correct.

Q.   All right.  Now, let me just go back a little bit.  The reason that you had him pull over from your testimony is, from what you said, you could smell marijuana coming out of the car; is that correct?

A.   Yes, sir.

Q.   All right.  And so there was no evidence of any marijuana being burnt in the car?

A.   I don't recall that.

12:58PM  1    Q.   Well, if there was, would you have searched and looked for
12:58PM  2    it?
12:58PM  3    A.   Sure.
12:58PM  4    Q.   Wouldn't that have been evidence, Officer --
12:58PM  5    A.   Sure.
12:58PM  6    Q.   -- of simple possession of marijuana if there was burnt
12:58PM  7    marijuana in the car?
12:58PM  8    A.   Burnt marijuana as in ashes?
12:58PM  9    Q.   Ashes, residue.
12:58PM 10    A.   I don't collect ashes, no, sir.
12:58PM 11    Q.   And you didn't check for that; did you?
12:58PM 12    A.   No, sir.
12:58PM 13    Q.   And if you were smelling marijuana coming out of the car,
12:58PM 14    that would have supported your contention that there was
12:58PM 15    marijuana coming out of the car?
12:58PM 16    A.   Yes, sir.  He was present in said car, which --
12:58PM 17    Q.   He was in the car.  I understand that.
12:58PM 18    A.   Yes, sir.
12:58PM 19    Q.   But there's nothing else to show residue inside the car --
12:58PM 20    A.   Yes, sir.
12:58PM 21    Q.   -- that indicated something was being smoked or used?
12:58PM 22    A.   The marijuana was present on his person.  He was inside
12:58PM 23    the car.
12:58PM 24    Q.   On his person?
12:58PM 25    A.   Yes, sir.

12:58 PM 1  Q.   And that was found in the crotch of his pants, as I

12:58 PM 2  understand it; is that correct?

12:58 PM 3  A.   Yes, sir.

12:58 PM 4  Q.   And it wasn't found immediately when you did the pat-down

12:58 PM 5  of him; was it?

12:59 PM 6  A.   No, sir.

12:59 PM 7  Q.   Even though in your report that you prepared indicated

12:59 PM 8  that it was found as part of the pat-down, isn't that correct?

12:59 PM 9       MR. SCHOEN:  Objection.  Misstates the evidence.

12:59 PM 10      THE COURT:  I'll sustain the objection.  You can use

12:59 PM 11  the report.  Let him read it.

12:59 PM 12      MR. SHAHID:  I can cross-examine him on that

12:59 PM 13  question, Judge, on that issue.

12:59 PM 14      THE COURT:  Well, if you give him the report, yeah.

12:59 PM 15      MR. SHAHID:  Sir?

12:59 PM 16      THE COURT:  If you give him the report.

12:59 PM 17      MR. SHAHID:  I intend to.

12:59 PM 18      THE COURT:  Okay.  Sure.

12:59 PM 19  BY MR. SHAHID:

12:59 PM 20  Q.   Is that correct, Officer?

12:59 PM 21  A.   I didn't state it was found during the traffic stop, no.

12:59 PM 22  Q.   I want to hand to you --

12:59 PM 23      MR. SHAHID:  Get this marked for identification.

12:59 PM 24      THE COURT:  What number is that?

12:59 PM 25      MR. SHAHID:  1 or 2?

| | |
|---|---|
| 12:59PM | 1 |
| 12:59PM | 2 |
| 12:59PM | 3 |
| 1:00PM | 4 |

COURTROOM DEPUTY:  This is 2.

THE COURT:  2 for identification only at this time.

MR. SHAHID:  You want to put the "2" on there?

COURTROOM DEPUTY:  Yes.

BY MR. SHAHID:

Q.    I'm going to hand you, Officer, what's been marked for
identification as Defendant's Exhibit Number 2.

A.    All right.

Q.    Is that a copy of the same thing that was previously shown
to you by the Government, of your report?

A.    Yes, sir, it's a --

Q.    And don't you have written in there, Officer, that after
you exited the vehicle, you performed a search of the -- exited
the vehicle, and his person was searched, and he had a small
bag of marijuana inside his pants?

A.    I didn't say "and".  There's a period.  "His person was
searched," period.  "He had a small bag of marijuana."

Q.    "He exited the vehicle, and his person was searched.  He
had a small bag of marijuana inside his pants leg, crotch;" is
that correct?

A.    Yes, sir.

Q.    And then the next entry is, "A search was also done of the
vehicle to find a Smith & Wesson firearm?"

A.    Yes, sir.

Q.    So in the chronology of events as you're reporting on

1:01PM 1    there, you're reporting that the car pulled over, he exited the

1:01PM 2    vehicle, you did a pat-down, found the marijuana, then you

1:01PM 3    searched the car and found a gun in the way that report is

1:01PM 4    written?

1:01PM 5    A.    It could be perceived that way, yes, sir.

1:01PM 6    Q.    I'm sorry?

1:01PM 7    A.    It can be perceived that way, yes, sir.

1:01PM 8    Q.    I'm not asking perception, Officer.  I am asking that is

1:02PM 9    written in your report?

1:02PM 10   A.    Yes, sir.

1:02PM 11   Q.    Clearly, Officer, that's not what happened, because we

1:02PM 12   clearly see on the video that he's returned to the back of the

1:02PM 13   car.

1:02PM 14   A.    Yes, sir.

1:02PM 15   Q.    And he's free -- I mean not free, but he's out there while

1:02PM 16   you and Officer -- Sergeant Cook are searching the car?

1:02PM 17   A.    Sure, yes, sir.

1:02PM 18   Q.    Now, Officer Duboise, to do a checkpoint, you've got to go

1:02PM 19   through some procedures of having that done; is that correct?

1:02PM 20   A.    Yes, sir, I don't handle that.  Supervisors do.

1:02PM 21   Q.    And that report that was shown to you as -- for

1:03PM 22   identification Number 2, that is the only report that was

1:03PM 23   prepared by you in preparation for this checkpoint?

1:03PM 24   A.    Afterwards, yes.

1:03PM 25   Q.    Okay.  And there's no indication at all whether or not

127

DUBOISE - CROSS-EXAMINATION

1:03PM  1  y'all followed the proper procedure --
1:03PM  2          MR. SCHOEN:  Objection, Your Honor.  This is totally
1:03PM  3  irrelevant.
1:03PM  4          THE COURT:  What is it to make more or less likely in
1:03PM  5  this case?
1:03PM  6          MR. SHAHID:  I think, Judge, it goes to the
1:03PM  7  information of what he followed or didn't follow in
1:03PM  8  preparation, because he's -- his testimony is about his
1:03PM  9  encounter this -- with the Defendant and what took place along
1:03PM  10 those lines, so what happened beforehand I think is relevant
1:03PM  11 for the jury to understand and be aware of.
1:03PM  12         THE COURT:  Yes.  Go ahead.
1:03PM  13         MR. SHAHID:  Thank you.
1:03PM  14 BY MR. SHAHID:
1:03PM  15 Q.   Now, in order to do a checkpoint, Officer, you've got to
1:03PM  16 follow certain process and procedures; is that correct?
1:03PM  17 A.   Yes, sir.  I don't set up the checkpoints.
1:03PM  18 Q.   I'm sorry?
1:03PM  19 A.   I don't set up the checkpoints, but yes.
1:04PM  20 Q.   But there is a proper procedure and policy that is in
1:04PM  21 place for that to occur; is that correct?
1:04PM  22 A.   For supervisors, yes.
1:04PM  23 Q.   Are you familiar with that policy and procedure?
1:04PM  24 A.   I am not, because I'm not a supervisor.
1:04PM  25 Q.   Were you a sworn officer with the Walterboro Police

1:04PM 1 Department back when this search took place?

1:04PM 2 A.   Yes, sir.

1:04PM 3        MR. SHAHID:   May I have this marked for

1:04PM 4 identification Number 3, please?

1:04PM 5 BY MR. SHAHID:

1:04PM 6 Q.   I'm going to hand you what I've had marked as Defendant's

1:04PM 7 Exhibit Number 3 and ask if you're familiar with that policy?

1:04PM 8 A.   Yes, sir.

1:04PM 9 Q.   Now this policy is -- deals with checkpoints; is that

1:04PM 10 correct?

1:04PM 11 A.   Traffic safety checkpoints, yes, sir.

1:05PM 12 Q.   And does that policy apply to all individuals involved

1:05PM 13 with the Walterboro Police Department?

1:05PM 14 A.   Yes, sir.

1:05PM 15 Q.   And you were engaged in that process of being involved in

1:05PM 16 that checkpoint; is that right?

1:05PM 17 A.   Not setting it up, but I did run the checkpoint, yes, sir.

1:05PM 18 Q.   Not in setting it up, but enforcing it?

1:05PM 19 A.   Yes, sir.

1:05PM 20 Q.   Being engaged in it; is that correct?

1:05PM 21 A.   Yes, sir.

1:05PM 22 Q.   Now the report I asked you to identify earlier has nothing

1:05PM 23 in that report to indicate whether or not that there were

1:05PM 24 checkpoint signs posted in compliance with that report; are

1:05PM 25 there?

| | | |
|---|---|---|
| 1:05 PM | 1 | A.   No, sir. |
| 1:05 PM | 2 | Q.   And according to the policy, there are supposed to be |
| 1:05 PM | 3 | signs warning motorists in advance? |
| 1:05 PM | 4 | MR. SCHOEN:  Objection, Your Honor. |
| 1:05 PM | 5 | THE COURT:  I think I'll sustain the objection now. |
| 1:05 PM | 6 | We're getting way afield of what we're here for. |
| 1:05 PM | 7 | MR. SHAHID:  Judge, I think -- |
| 1:05 PM | 8 | THE COURT:  I already ruled.  I don't care what you |
| 1:06 PM | 9 | think, okay? |
| 1:06 PM | 10 | MR. SHAHID:  Yes, sir.  I understand.  I'm presuming, |
| 1:06 PM | 11 | Judge, your ruling would prohibit me from asking him any more |
| 1:06 PM | 12 | questions concerning the policy on the checkpoint itself? |
| 1:06 PM | 13 | THE COURT:  That's correct. |
| 1:06 PM | 14 | MR. SHAHID:  Can I proffer -- |
| 1:06 PM | 15 | THE COURT:  Not now.  You can proffer at the proper |
| 1:06 PM | 16 | time, yes. |
| 1:06 PM | 17 | MR. SHAHID:  Excuse me.  I'm seeing if I have any |
| 1:06 PM | 18 | other questions. |
| 1:06 PM | 19 | THE COURT:  No problem. |
| 1:06 PM | 20 | (Pause.) |
| 1:06 PM | 21 | BY MR. SHAHID: |
| 1:06 PM | 22 | Q.   Officer Duboise, I think that it already came out in the |
| 1:06 PM | 23 | testimony, but this checkpoint was in effect for about an hour, |
| 1:07 PM | 24 | hour and a half; is that about right? |
| 1:07 PM | 25 | A.   Yes, sir, about an hour and a half. |

| | | |
|---|---|---|
| 1:07 PM | 1 | **Q.** And you had encounters with about maybe three or four |
| 1:07 PM | 2 | other people in this process? |
| 1:07 PM | 3 | **A.** There was probably 50, 60 people. I mean, there was |
| 1:07 PM | 4 | steady cars coming through the whole time. I don't have an |
| 1:07 PM | 5 | exact number for you, no. |
| 1:07 PM | 6 | **Q.** And maybe three or four that you issued a citation for for |
| 1:07 PM | 7 | various reasons; does that sound about right? |
| 1:07 PM | 8 | **A.** Yes, sir. |
| 1:07 PM | 9 | **Q.** And as soon as you had the encounter with Mr. Fishburne, |
| 1:07 PM | 10 | right after that point is when you ceased using the checkpoint; |
| 1:07 PM | 11 | is that right? |
| 1:07 PM | 12 | **A.** Yes, sir. |
| 1:07 PM | 13 | **MR. SHAHID:** Thank you. Nothing further at this |
| 1:07 PM | 14 | time, Judge. |
| 1:07 PM | 15 | **MR. SCHOEN:** Brief redirect? |
| 1:07 PM | 16 | **THE COURT:** Sure. |
| 1:07 PM | 17 | REDIRECT EXAMINATION |
| 1:07 PM | 18 | BY MR. SCHOEN: |
| 1:07 PM | 19 | **Q.** Just wanted to clarify a couple of things. First of all, |
| 1:07 PM | 20 | when you -- when Mr. Fishburne pulled up, what did you smell? |
| 1:07 PM | 21 | **A.** Marijuana. |
| 1:07 PM | 22 | **Q.** Do you have experience dealing with marijuana as a law |
| 1:07 PM | 23 | enforcement officer? |
| 1:07 PM | 24 | **A.** I do. It's got a very unique smell. |
| 1:08 PM | 25 | **Q.** And are you confident what you smelled was marijuana? |

1:08PM  1    A.    Yes, sir.

1:08PM  2    Q.    Did you ultimately find marijuana on Mr. Fishburne's

1:08PM  3    person?

1:08PM  4    A.    Yes, sir.

1:08PM  5    Q.    Opposing counsel took issue with the way that your report

1:08PM  6    was written.  Did you intend the report to be confusing?

1:08PM  7    A.    No, sir.

1:08PM  8    Q.    Did you intend the report to be misleading?

1:08PM  9    A.    No, sir.

1:08PM 10    Q.    Did you intend not to turn your body camera on?

1:08PM 11    A.    No, sir.

1:08PM 12          MR. SCHOEN:   Thank you.  No further questions.

1:08PM 13                      RECROSS-EXAMINATION

1:08PM 14                      BY MR. SHAHID:

1:08PM 15    Q.    Officer, you do a report in order to provide a document so

1:08PM 16    that when it comes time to examine what took place, we got a

1:08PM 17    report of what happened; is that correct?

1:08PM 18    A.    Yes, sir, sure.

1:08PM 19    Q.    And you want that report to be accurate?

1:08PM 20    A.    Yes, sir.

1:08PM 21    Q.    To the best of your ability; is that correct?

1:08PM 22    A.    Yes, sir.

1:08PM 23    Q.    So in the sequence of things, that's an important part of

1:08PM 24    all of this; isn't it?

1:08PM 25    A.    Yes, sir.

1:08PM 1           MR. SHAHID:  Nothing else, Your Honor.  Thank you

1:09PM 2    very much.

1:09PM 3           THE COURT:  Thank you very much.  You're excused.

1:09PM 4           THE WITNESS:  Thank you.

1:09PM 5                       (Witness excused.)

1:09PM 6           THE COURT:  Ladies and gentlemen, you can go to

1:09PM 7    lunch.  Don't discuss the case among yourselves.  Don't let

1:09PM 8    anybody discuss it with you.  We'll come back.  We'll start

1:09PM 9    again about 2:30, all right?

       10           (Jury out at 1:09 p.m.)

1:09PM 11          THE COURT:  Okay.  You want to make your proffer at

1:09PM 12   this time?

1:09PM 13          MR. SHAHID:  Judge, I was just going to go back over

1:09PM 14   with him the policy --

1:09PM 15          THE COURT:  You were going to go do what you did at

1:09PM 16   the suppression hearing?

1:09PM 17          MR. SHAHID:  Pretty much.

1:09PM 18          THE COURT:  Okay.

1:09PM 19          MR. SHAHID:  That would summarize it, yes.  Maybe not

1:10PM 20   to the great detail we did a couple of weeks ago, but something

1:10PM 21   along those same lines.

1:10PM 22          THE COURT:  But that's not a jury issue.  That's my

1:10PM 23   issue, and I've already decided on it, so that's why I

1:10PM 24   sustained the objection.

1:10PM 25          MR. SHAHID:  Just making my record, Judge.

| | | |
|---|---|---|
| 1:10PM | 1 | THE COURT:  That's my story, and I'm sticking to it. |
| 1:10PM | 2 | We'll see y'all at 2:30.  Thank you. |
| 1:10PM | 3 | MR. SCHOEN:  Your Honor, for planning purposes, the |
| 1:10PM | 4 | Government has two witnesses left. |
| 1:10PM | 5 | THE COURT:  All right. |
| 1:10PM | 6 | MR. SCHOEN:  If we could before the jury comes back |
| 1:10PM | 7 | in have a few minutes to discuss with Your Honor the issue with |
| 1:10PM | 8 | the letter -- |
| 1:10PM | 9 | THE COURT:  Okay. |
| 1:10PM | 10 | MR. SCHOEN:  -- I think that would be helpful. |
| 1:10PM | 11 | THE COURT:  All right.  So why don't you come back at |
| 1:10PM | 12 | 2:15? |
| 1:10PM | 13 | MR. SCHOEN:  Yes, Your Honor. |
| 1:10PM | 14 | MR. SHAHID:  What time? |
| 1:10PM | 15 | THE COURT:  2:15. |
| 1:10PM | 16 | MR. SHAHID:  I have batteries back in my office.  I'm |
| 1:10PM | 17 | going to replace my batteries, I promise. |
| 1:10PM | 18 | THE COURT:  So we'll see y'all at 2:15.  The jury |
| 1:10PM | 19 | comes back at 2:30. |
| | 20 | (Recess from 1:10 p.m. to 2:19 p.m.) |
| 2:19PM | 21 | THE COURT:  Take your seats.  Thanks.  Okay. |
| 2:19PM | 22 | Mr. Schoen, you wanted to -- |
| 2:19PM | 23 | MR. SCHOEN:  Your Honor, I wanted to propose a |
| 2:19PM | 24 | potential resolution to the issue regarding this letter.  I |
| 2:19PM | 25 | understand the point Mr. Shahid is making.  I think the law is |

1   fairly clear that I have to be given the opportunity to

2:19 PM   2   cross-examine a witness in order for the unavailability to

2:19 PM   3   allow that letter to come in.  But I don't -- I don't

2:19 PM   4   necessarily object to allowing the letter in provided that I'm

2:19 PM   5   given the opportunity through the agent to establish the

2:19 PM   6   testimony that I would have established had I been given the

2:20 PM   7   opportunity to cross-examine her in a similar type of way, and

2:20 PM   8   so provided that we can get into the evidence about her

2:20 PM   9   recanting the statement and the statements that she made to

2:20 PM  10   Special Agent Callahan and that that evidence would be allowed

2:20 PM  11   in, and provided the fact that we can go into what it is he

2:20 PM  12   confronted her with, which is not just this previous purchase

2:20 PM  13   to Quentin Fishburne.  It's the fact that she bought yet

2:20 PM  14   another gun, and that other gun was found in the presence of

2:20 PM  15   somebody who wasn't her and matched another shooting.

2:20 PM  16          I don't think there is any question if she had

2:20 PM  17   taken the stand in that bond hearing, I would have absolutely

2:20 PM  18   cross-examined her on that.  And so I don't -- again, I don't

2:20 PM  19   object if we want to bring that letter in.  I just have to have

2:20 PM  20   a full opportunity to develop the evidence, and quite frankly.

2:20 PM  21   Judge, because of the previous rulings, we don't have all of

2:20 PM  22   those witnesses here.  I have an agent who knows about it, and

2:20 PM  23   I think I can offer that evidence as to impeach her statement

2:20 PM  24   in the same kind of way I would cross-examine her about it, but

2:21 PM  25   that's what I'm willing to propose, and I understand the Court

could overrule me and let it in on very different terms, but that seems to me to be a fair way to allow Mr. Fishburne -- allow this jury to have all this evidence, they evaluate it, and allow us not to have that as a major issue in the case.

**THE COURT:** Okay. What you say, Mr. Shahid? Any objection to that?

**MR. SHAHID:** Well, that's sort of what I think is going to be a little bit of a dilemma. This is what I understand happened. So Ms. Ellison appears for this bond hearing in April -- yeah, April of 2018. She presents to Mr. Fishburne's lawyer at the time a notarized statement saying, "The gun is mine, not his," words to that effect. At some point after that, I think Agent Callahan went to go see her at his -- at her mother's house and confronted her with the purported statement and some other information before she was charged as a defendant in this case.

So the Government is willing to stipulate to the admission of that statement if they are allowed to present information about another gun that is not related to Mr. Fishburne. So I'm not sure, first, how that is, in fact, impeaching her. If she was live and in person in that chair, whether or not that would -- is something you could cross-examine her, because she's talking about a gun that she bought in -- this third gun, this Bersa. He's talking about, you know, "You bought this gun for, I guess, illegal purposes,"

| | | |
|---|---|---|
| 2:22PM | 1 | consistent with his conspiracy Indictment.  I'm not sure if |
| 2:23PM | 2 | that lays the foundation for proper cross-examination to get |
| 2:23PM | 3 | into that gun at all, particularly since it's not associated |
| 2:23PM | 4 | with my client in any way, and the prejudicial impact of |
| 2:23PM | 5 | that -- |
| 2:23PM | 6 | THE COURT:  Well, I mean, they've already -- I think |
| 2:23PM | 7 | Mr. Schoen said in his opening statement we're only dealing |
| 2:23PM | 8 | here with two guns, and I think somebody may have mentioned the |
| 2:23PM | 9 | third gun.  I don't know. |
| 2:23PM | 10 | MR. SCHOEN:  No, I mentioned a third crime scene, but |
| 2:23PM | 11 | not -- |
| 2:23PM | 12 | THE COURT:  That's right.  I'm sorry. |
| 2:23PM | 13 | MR. SHAHID:  Third crime scene. |
| 2:23PM | 14 | THE COURT:  So you're in a dilemma. |
| 2:23PM | 15 | MR. SHAHID:  I just think the statement should come |
| 2:23PM | 16 | in as it is. |
| 2:23PM | 17 | THE COURT:  The research we've done says the |
| 2:23PM | 18 | statement doesn't come in. |
| 2:23PM | 19 | MR. SHAHID:  I'm sorry? |
| 2:23PM | 20 | THE COURT:  The research we've done says the |
| 2:23PM | 21 | statement doesn't come in. |
| 2:23PM | 22 | MR. SHAHID:  Does not come in? |
| 2:23PM | 23 | THE COURT:  Does not come in.  Now, if you want to |
| 2:23PM | 24 | accept the Government's offer, that's fine with me, but absent |
| 2:23PM | 25 | doing that, I think I've got -- she's unavailable as witness. |

| | | |
|---|---|---|
| 2:24 PM | 1 | She's a defendant.  She can't be subpoenaed, and if she were |
| 2:24 PM | 2 | subpoenaed, she would take the Fifth Amendment.  She told us |
| 2:24 PM | 3 | that here this morning.  So she's unavailable as a witness, and |
| 2:24 PM | 4 | if she were available, then the Government has the right under |
| 2:24 PM | 5 | 801(d)(2)(C), (D) or (E), to put in evidence to cross-examine |
| 2:24 PM | 6 | her -- I mean to put in other evidence that shows the |
| 2:24 PM | 7 | untruthfulness of that statement. |
| 2:24 PM | 8 | So, Mr. Schoen, what you're taking about is |
| 2:24 PM | 9 | letting him put that statement in in his case. |
| 2:24 PM | 10 | MR. SCHOEN:  Yeah, or, I mean -- |
| 2:24 PM | 11 | THE COURT:  And then calling Callahan tomorrow. |
| 2:24 PM | 12 | MR. SCHOEN:  I can call him back again or -- I don't |
| 2:24 PM | 13 | want to -- I don't want it to be said that the Government was |
| 2:24 PM | 14 | the one that -- I don't know that it really matters, I mean, |
| 2:24 PM | 15 | who puts it in, but I -- I want it to be very clear on the |
| 2:24 PM | 16 | record that he's the one who wants it in.  I don't want to |
| 2:25 PM | 17 | be -- I don't want the Fourth Circuit to come back and say, |
| 2:25 PM | 18 | "You shouldn't have put that in.  You weren't allowed to put |
| 2:25 PM | 19 | that in, Government." |
| 2:25 PM | 20 | THE COURT:  So you're going to put that in in your |
| 2:25 PM | 21 | case if you're allowed to do it. |
| 2:25 PM | 22 | MR. SHAHID:  I just want to make this point very |
| 2:25 PM | 23 | clear.  The Government is going to be allowed to offer |
| 2:25 PM | 24 | information about her purchase of another firearm, the Bersa |
| 2:25 PM | 25 | firearm, and that Agent Callahan had a conversation with her, |

interview with her, and she recanted?  I want to be able to get

into the details of the conversation that Agent Callahan had

with her, and I want to be able to get into the fact -- part of

the way that conversation went down, what happened was there

was an initial bond hearing, and Mr. Fishburne appears, and we

get some notice that Ms. Ellison intends to offer this letter,

so Judge Baker gave us three or four days.  This agent went and

did his digging, and what he found in those days was quite

impressive with all of these purchases.  Then when she came

back, I said, "Judge, please, let's put her on the stand.  I

have some questions for her," and the Judge wouldn't allow me

to do that because she was concerned about the rights of

Ms. Ellison as a potential defendant, and so they just had the

letter basically read in court, and she said, "I'll take it for

what it's worth."

            And then Special Agent Callahan went and talked

with Ms. Ellison, and what he confronted her with was the total

picture.  It wasn't just the gun from Mr. Fishburne.  He

said -- and correct me if I'm wrong.  He said, "Listen, I know

you've bought three guns, and two of those guns ended up with

Quentin Fishburne, and another one of them ended up with

somebody else who was being chased by the Walterboro Police

Department, and it wasn't you, and I also know that gun --

there's a ballistic link between that gun and a shooting where

your husband was a suspect."  And at that point after she heard

2:26PM 1   that full litany of, "Here's what I know," it's at that point

2:26PM 2   she says, "Can I recant?"

2:26PM 3              THE COURT:  Okay.

2:26PM 4              MR. SCHOEN:  "I want to tell you the truth."

2:26PM 5              MR. SHAHID:  And --

2:26PM 6              THE COURT:  It's going to be clear on the record if

2:26PM 7   you are allowed to call Agent Callahan that the Bersa has no

2:27PM 8   connection whatsoever with Mr. Fishburne.

2:27PM 9              MR. SCHOEN:  Absolutely.  And, Judge, I would even be

2:27PM 10  able -- I'd be willing to say that -- and I think the records

2:27PM 11  suggest that what we have is that we don't think the unknown

2:27PM 12  person who was being pursued was Mr. Fishburne.  They believe

2:27PM 13  it was an African-American male, but they don't think it was

2:27PM 14  Mr. Fishburne.

2:27PM 15             THE COURT:  Okay.

2:27PM 16             MR. SHAHID:  And one other point I want to make sure

2:27PM 17  that we're clear on:  That even though Ms. Ellison was not

2:27PM 18  named as a defendant, because I don't think the Indictment had

2:27PM 19  come out yet, she was a target of the Government's

2:27PM 20  investigation to this case when Agent Callahan confronted her.

2:27PM 21             THE COURT:  You mean at the time of the bond hearing

2:27PM 22  where Magistrate Judge Baker said, "No, we're not going to --

2:27PM 23  you can't testify.  You've got too much at stake"?

2:27PM 24             MR. SHAHID:  Because she may be subjected to federal

2:27PM 25  prosecution.

| | |
|---|---|
| 2:27PM | 1 |

**THE COURT:** All right. So essentially Magistrate Judge Baker took the Fifth Amendment -- told her to take the Fifth Amendment, I would guess.

**MR. SHAHID:** Well, yes.

**THE COURT:** Okay.

**MR. SHAHID:** She saw what was going on.

**THE COURT:** So she took Magistrate Judge Baker's advice and didn't testify, and there was no reason -- there was no way for him to cross-examine someone who doesn't testify.

**MR. SHAHID:** The dilemma that we're having now is what Judge Baker recognized in April 2018 potentially.

**THE COURT:** Okay. So it's your choice. What do you want to do?

**MR. SHAHID:** Can I consult with my client?

**THE COURT:** Sure. No problem. It's his life, like I say.

(Pause.)

**MR. SHAHID:** We'll do that, Judge.

**THE COURT:** Do what?

**MR. SHAHID:** We'll introduce --

**THE COURT:** You'll introduce the statement in your case, and then you can call Callahan in reply.

**MR. SCHOEN:** Call him back. I don't know from just a mechanics standpoint how it's going to work. I'm not sure what witness he can get it in through. I can ask Callahan.

| | |
|---|---|
| 2:29PM | 1 | Callahan was at the hearing, so we can put it in through |
| 2:29PM | 2 | Callahan.  In that case, do you want me just to ask him -- |
| 2:29PM | 3 | THE COURT:  Or when Mr. Shahid cross-examines Officer |
| 2:29PM | 4 | Callahan, he can say, "Didn't she give this statement," and he |
| 2:29PM | 5 | can move it into evidence through Callahan, and then you can |
| 2:29PM | 6 | explain it.  He doesn't have to recall him.  How does that |
| 2:29PM | 7 | sound? |
| 2:29PM | 8 | MR. SHAHID:  I think that's good. |
| 2:29PM | 9 | MR. SCHOEN:  Can I confer with co-counsel real |
| 2:30PM | 10 | quickly? |
| 2:30PM | 11 | THE COURT:  Sure. |
| 2:30PM | 12 | (Pause.) |
| 2:30PM | 13 | MR. SCHOEN:  The one thing we're a little bit worried |
| 2:30PM | 14 | about, Judge, we don't want the impression given to the jury |
| 2:30PM | 15 | we're trying to hide this.  We're kind of coming forward and |
| 2:30PM | 16 | saying, "Hey, we'll let you have it."  I'm trying to think of |
| 2:30PM | 17 | the best way to do this in a way that makes sense. |
| 2:30PM | 18 | THE COURT:  That's the skill of a trial lawyer.  I |
| 2:31PM | 19 | mean it seems to me that if you were to put it in through Agent |
| 2:31PM | 20 | Callahan, you could thereafter explain, ask him the questions |
| 2:31PM | 21 | about recantation. |
| 2:31PM | 22 | MR. SCHOEN:  So as long as the record is clear that |
| 2:31PM | 23 | that is being done without the defense -- without any objection |
| 2:31PM | 24 | from the defense, and I don't want -- I don't want to have an |
| 2:31PM | 25 | appeal where I'm being attacked for putting in the letter. |

| | | |
|---|---|---|
| 2:31PM | 1 | **THE COURT:**  Sure.  So what I propose, Mr. Shahid, is |
| 2:31PM | 2 | when Mr. Schoen calls Agent Callahan, he's going to be -- he |
| 2:31PM | 3 | will -- he will put in that letter.  Okay?  That you want in. |
| 2:31PM | 4 | And then he will be allowed to go ahead and have Officer |
| 2:31PM | 5 | Callahan testify as to the circumstances of her recantation. |
| 2:31PM | 6 | Is that okay with you? |
| 2:31PM | 7 | **MR. SHAHID:**  So you're going to introduce the letter? |
| 2:31PM | 8 | **THE COURT:**  Yeah. |
| 2:31PM | 9 | **MR. SHAHID:**  And I think -- |
| 2:31PM | 10 | **THE COURT:**  Make it a Court's exhibit.  I don't care |
| 2:31PM | 11 | whose exhibit it is. |
| 2:31PM | 12 | **MR. SHAHID:**  We can make it a Court exhibit? |
| 2:31PM | 13 | **MR. SCHOEN:**  Sure.  That's great. |
| 2:31PM | 14 | **MR. SHAHID:**  Judge, I think the record is very clear |
| 2:31PM | 15 | about this, but prior to -- part of what we heard this morning |
| 2:32PM | 16 | is she is unavailable.  I think for the purposes of all of |
| 2:32PM | 17 | this, the reason we're going through this exercise is she is a |
| 2:32PM | 18 | co-defendant.  She's been indicted.  She's unavailable because |
| 2:32PM | 19 | of all of -- |
| 2:32PM | 20 | **THE COURT:**  I found based on the testimony this |
| 2:32PM | 21 | morning and Mr. Geel and based on the fact that she's still a |
| 2:32PM | 22 | potential defendant that she is not under -- could not be |
| 2:32PM | 23 | subpoenaed, and that she is therefore unavailable because she |
| 2:32PM | 24 | could not be subpoenaed, and if she were subpoenaed, she would |
| 2:32PM | 25 | take the Fifth Amendment, so she's unavailable. |

2:32PM   1         MR. SHAHID:  Do you want to go ahead and pre-mark

2:32PM   2   this now?

2:32PM   3         THE COURT:  We can make it Court's Exhibit 1.  Is

2:32PM   4   that okay?

2:32PM   5         MR. SCHOEN:  Sure.

2:32PM   6         THE COURT:  So that's what y'all want to do; is that

2:32PM   7   right, Mr. Schoen, Mr. Shahid?

2:32PM   8         MR. SHAHID:  That's -- that's good for me.

2:32PM   9         MR. SCHOEN:  And just to make the record clear, I'm

2:32PM  10   not going to run into a hearsay objection or any of those type

2:32PM  11   objections to the fact that I'm having Special Agent Callahan

2:33PM  12   summarize the situation with the Bersa for impeachment

2:33PM  13   purposes?  Again, we're not offering it against him.

2:33PM  14         THE COURT:  Just for impeachment of the statement

2:33PM  15   purposes, recantation.

2:33PM  16         MR. SHAHID:  And has nothing to do with

2:33PM  17   Mr. Fishburne?

2:33PM  18         THE COURT:  And if you want me to instruct the jury

2:33PM  19   at the time that you -- that they mention the Bersa that the

2:33PM  20   Bersa has nothing to do with Mr. Fishburne at all, I'd be glad

2:33PM  21   to do that.

2:33PM  22         MR. SHAHID:  I think we need that, Judge.

2:33PM  23         THE COURT:  Do you need it at the end, or do you need

2:33PM  24   it after this testimony?

2:33PM  25         MR. SCHOEN:  It can be done in the charge.  We'd ask

|        |    |                                                                      |
|--------|----|----------------------------------------------------------------------|
| 2:33PM | 1  | for instruction with that that it can be used to evaluate the        |
| 2:33PM | 2  | credibility of Ms. Ellison.                                          |
| 2:33PM | 3  | THE COURT: Right. All right. Okay. Is everybody                      |
| 2:33PM | 4  | back, Catina?                                                        |
| 2:33PM | 5  | COURTROOM DEPUTY: Yes.                                               |
| 2:33PM | 6  | THE COURT: Yes, sir?                                                 |
| 2:33PM | 7  | MR. SHAHID: And, Judge, just for the Court's                        |
| 2:33PM | 8  | records, because the copies don't show this, but it appears          |
| 2:33PM | 9  | that that statement was notarized. It has a notary seal on it,       |
| 2:33PM | 10 | so -- and the copies don't reflect that as well.                     |
| 2:33PM | 11 | THE COURT: I think everybody agrees that was a                      |
| 2:33PM | 12 | notarized statement.                                                |
| 2:34PM | 13 | MR. SHAHID: Yes, Your Honor.                                        |
| 2:34PM | 14 | THE COURT: So who's your next witness, Mr. Schoen?                  |
| 2:34PM | 15 | MR. SCHOEN: Special Agent Callahan.                                 |
| 2:34PM | 16 | THE COURT: Okay. So Special Agent Callahan is going                 |
| 2:34PM | 17 | to come up. He's going to testify. You're going to put              |
| 2:34PM | 18 | Court's Exhibit 1 into evidence, and then he's going to be           |
| 2:34PM | 19 | allowed to explain his conversation with the affiant and her         |
| 2:34PM | 20 | circumstances of her recanting that statement. Is that a fair        |
| 2:34PM | 21 | summary?                                                             |
| 2:34PM | 22 | MR. SHAHID: Yes, sir.                                               |
| 2:34PM | 23 | THE COURT: I can't hear you when you shake your head               |
| 2:34PM | 24 | from here. Next to you, I could.                                    |
| 2:34PM | 25 | MR. SHAHID: I'll back up. I can hear very well now.                 |

THE COURT: Okay.

MR. SHAHID: Judge, I had subpoenaed several witnesses based on your ruling earlier before our lunch break about -- those witnesses were going to talk about the checkpoint issue. The only other witness who does not fit into that category was the -- who we believe the other occupant of the car in 2014, and we're trying to run him down. We're going to run him down.

THE COURT: All right. So we'll go ahead and finish the Government's case today, and then we'll either -- you can start your case tomorrow morning if you run this person down, and then we can argue and charge tomorrow afterwards. How does that sound?

MR. SHAHID: And part of my proffer, Judge, would be that I could -- either I could list the names, but there's about nine witnesses who would -- I was going to call in furtherance of my question regarding the checkpoint and information along those lines.

THE COURT: What would they -- how about telling me what does that mean? Someone said they heard the checkpoint was illegal, or what is that?

MR. SHAHID: Well, some of them -- anticipate saying that they did not see the sign about the checkpoint ahead, and I was going to examine some of the law enforcement officers, particularly the Captain Stivender who was initially identified

as the person who gave the authorization, and the criminal

information officer, Miss Long, concerning how she came up with

the name that she was the person who gave the oral

authorization as well.

        THE COURT:  Okay.  I think that that's probably --

based on my ruling, I think all of that is irrelevant; is that

right?  And none of those people testified at the suppression

hearing except for the one officer; is that right?

        MR. SHAHID:  The -- that's correct except Officer

Sweat testified, but Captain Stivender didn't, Miss Long

didn't, and then the other witness -- some of them I've been

able to locate.  Some of them I have not been able to locate.

        THE COURT:  Okay.  All right.  We'll go from there

then, okay?  So what we'll do this afternoon is we'll finish up

the Government's case.  The Government can rest.  Then we'll

start you first thing in the morning, Mr. Shahid.  If you're

going to call witnesses, let us know.  If you're not going to

call any witnesses, let us know too, because we've got to give

you the charge and get it all typed up, and I'll need to find

out when the jury comes in.

        Now, is this a good time -- I guess this is as

good a time as any to ask Mr. Fishburne -- have you and

Mr. Fishburne talked about whether he wants to testify or not?

        MR. SHAHID:  We have discussed that, yes.

        THE COURT:  Okay.  Have you made a decision?  You

2:37PM  1    don't have to do it now.  You can do it in the morning.  I

2:37PM  2    don't care.  I'm just --

2:37PM  3              MR. SHAHID:  Can I just explain to him what we're

2:37PM  4    talking about, Judge?

2:37PM  5              THE COURT:  Okay.  Mr. Fishburne, do you understand

2:37PM  6    you have a right testify if you want to?

2:37PM  7              THE DEFENDANT:  Yes, sir.

2:37PM  8              THE COURT:  You understand you have a constitutional

2:37PM  9    right not to testify if you don't want to?

2:37PM  10             THE DEFENDANT:  Yes, sir.

2:37PM  11             THE COURT:  And you understand that if you chose not

2:37PM  12   to testify, the jury could not think that you were guilty based

2:37PM  13   on the fact that you had exercised your constitutional right

2:37PM  14   not to testify?

2:37PM  15             THE DEFENDANT:  Yes, sir.

2:37PM  16             THE COURT:  And as a matter of fact, this morning in

2:37PM  17   my opening charge, I told the jury that you have no -- you're

2:37PM  18   not -- you don't have the burden of proving any of this, that

2:37PM  19   you are presumed to be innocent, and the Government is required

2:37PM  20   to prove you guilty by competent evidence beyond a reasonable

2:38PM  21   doubt before a jury could find you guilty.  Do you remember me

2:38PM  22   talking about that this morning?

2:38PM  23             THE DEFENDANT:  Yes, sir.

2:38PM  24             THE COURT:  So sooner or later, you have to make a

2:38PM  25   decision on the record whether you want to testify and -- or

| | | |
|---|---|---|

2:38PM 1 whether you don't want to testify after you talk to your

2:38PM 2 lawyer.  So you don't have to do that right now.  We can do

2:38PM 3 that later on this afternoon or in the morning, so you think

2:38PM 4 about that, because we're going to need to have that issue

2:38PM 5 resolved, okay?

2:38PM 6         **THE DEFENDANT:**  Yes.

2:38PM 7         **THE COURT:**  Okay.  Good.  Thank you.

2:38PM 8         **MS. HENDERSON:**  In anticipation of preparing for

2:38PM 9 closing, will we have the charge emailed to us tonight so we

2:38PM 10 can incorporate --

2:38PM 11         **THE COURT:**  Yes.

2:38PM 12         **MS. HENDERSON:**  Thank you.

2:38PM 13         **THE COURT:**  You'll have charge with pages and lines

2:38PM 14 so you can tell -- so either side can say, "Judge Norton, on

2:38PM 15 page 16, line 21 is going to tell you this, and that's why it's

2:38PM 16 important."

2:38PM 17         **MS. HENDERSON:**  Thank you, Your Honor.

2:38PM 18         **THE COURT:**  And we looked at -- and the verdict form,

2:38PM 19 I would think Count 1, guilty, not guilty; Count 2 guilty, not

2:38PM 20 guilty; Count 4, whatever, the three counts.  Just a simple

2:38PM 21 verdict form.  Do you agree with that, Mr. Shahid?

2:39PM 22         **MR. SHAHID:**  (Nodding head affirmatively.)

2:39PM 23         **THE COURT:**  Okay.  Good.

2:39PM 24         **MR. SCHOEN:**  Yes, Your Honor.

2:39PM 25         **THE COURT:**  All righty.  Anything else?

| | | |
|---|---|---|
| 2:39PM | 1 | **MR. SCHOEN:** No, Judge. |
| 2:39PM | 2 | **THE COURT:** All right. Bring them. |
| | 3 | (Jury in at 2:39 p.m.) |
| 2:40PM | 4 | **THE COURT:** Hope everybody had a good lunch. We'll |
| 2:40PM | 5 | continue with the testimony in this case. Mr. Schoen, you want |
| 2:40PM | 6 | to call your next witness? |
| 2:40PM | 7 | **MR. SCHOEN:** Yes, Your Honor. The Government calls |
| 2:40PM | 8 | Special Agent Bobby Callahan. |
| 2:41PM | 9 | **COURTROOM DEPUTY:** Please place your left hand on the |
| 2:41PM | 10 | Bible and raise your right hand and be sworn. |
| 2:41PM | 11 | (Witness sworn.) |
| 2:41PM | 12 | **COURTROOM DEPUTY:** Thank you. |
| 2:41PM | 13 | **BOBBY CALLAHAN,** |
| 2:41PM | 14 | a witness called on behalf of the Government, being first duly |
| 2:41PM | 15 | sworn, was examined and testified as follows: |
| 2:41PM | 16 | DIRECT EXAMINATION |
| 2:41PM | 17 | BY MR. SCHOEN: |
| 2:41PM | 18 | Q. Good afternoon, Special Agent Callahan. |
| 2:41PM | 19 | A. Good afternoon. |
| 2:41PM | 20 | Q. Could you please tell the jury where you work? |
| 2:41PM | 21 | A. I am employed with the Bureau of Alcohol, Tobacco, |
| 2:41PM | 22 | Firearms, and Explosives, otherwise known as ATF. |
| 2:41PM | 23 | Q. How long have you been with ATF? |
| 2:41PM | 24 | A. For 11 years. |
| 2:41PM | 25 | Q. And what is your position with ATF? |

| | | |
|---|---|---|
| 2:41 PM | 1 | **A.**    I am a Special Agent. |
| 2:41 PM | 2 | **Q.**    And prior to joining ATF, tell us a little bit about your |
| 2:41 PM | 3 | background. |
| 2:41 PM | 4 | **A.**    So in 2007, I graduated from the University of South |
| 2:41 PM | 5 | Carolina with a criminal justice degree. After that, I |
| 2:41 PM | 6 | immediately applied for a position with ATF, and while going |
| 2:41 PM | 7 | through the hiring process for approximately a year and a half, |
| 2:42 PM | 8 | I began working as a contractor at the Passport Center here in |
| 2:42 PM | 9 | Charleston. |
| 2:42 PM | 10 | **Q.**    You've spent essentially your entire career with ATF? |
| 2:42 PM | 11 | **A.**    Correct. |
| 2:42 PM | 12 | **Q.**    Can you tell us about what type of specialized training |
| 2:42 PM | 13 | you receive as an ATF agent? |
| 2:42 PM | 14 | **A.**    Sure. So at the Academy, which is the Federal Law |
| 2:42 PM | 15 | Enforcement Training Center, which is in Georgia, we go through |
| 2:42 PM | 16 | a basic criminal investigator training program that teaches you |
| 2:42 PM | 17 | the basics of running criminal investigations, conducting |
| 2:42 PM | 18 | surveillances, interview techniques and those types of things, |
| 2:42 PM | 19 | and then after that, we go to the ATF add-on portion, which is |
| 2:42 PM | 20 | special agent basic training where we then learn about the |
| 2:42 PM | 21 | various laws that we'll be enforcing as ATF agents. |
| 2:42 PM | 22 | **Q.**    And what's the totality of the length of that training? |
| 2:42 PM | 23 | **A.**    Total, it's about six months altogether. |
| 2:42 PM | 24 | **Q.**    And do you live at the facility for those six months? |
| 2:42 PM | 25 | **A.**    Yes. You are allowed to leave on some weekends, if you |

2:42PM 1  choose to do so, but during the week, yes, you're there at the

2:43PM 2  Academy.

2:43PM 3  Q.  And can you tell us about any specialized training you've

2:43PM 4  received since you became a Special Agent?

2:43PM 5  A.  Sure.  We train regularly.  We attend various trainings

2:43PM 6  each year.  I've attended some firearms trafficking

2:43PM 7  investigations, some asset forfeiture and money laundering

2:43PM 8  trainings, and a lot of firearms-related courses.

2:43PM 9  Q.  Where do you -- where is your jurisdiction?

2:43PM 10  A.  So our office particularly, the ATF Charleston field

2:43PM 11  office, we cover the majority of the coastal counties, all the

2:43PM 12  way down south, Beaufort, Jasper, Hampton County, all the way

2:43PM 13  along the coastline up to Georgetown County and inland to

2:43PM 14  Clarendon.

2:43PM 15  Q.  Where do you do most of your work?

2:43PM 16  A.  I predominantly work in Colleton County.

2:43PM 17  Q.  I want to talk to you a little bit about the process that

2:43PM 18  is required when a purchase -- a person purchases a firearm.

2:44PM 19  What, if any, type of license do you need to be in the business

2:44PM 20  of selling firearms?

2:44PM 21  A.  If you want to be in the business of selling firearms,

2:44PM 22  you're required to obtain a federal firearms license from ATF,

2:44PM 23  and that generally requires -- in a nutshell, you can't be

2:44PM 24  prohibited from possessing firearms.  You have to be able to

2:44PM 25  pass a background check and have a premises to conduct the

2:44 PM 1    business.  There's a lot of paperwork that's required to be

2:44 PM 2    filled out.  That's submitted to ATF.  At that point they will

2:44 PM 3    review the paperwork, and an industry operations investigator

2:44 PM 4    will interview that individual and from that point make a

2:44 PM 5    recommendation on whether they should receive their license or

2:44 PM 6    not.

2:44 PM 7    Q.   To be clear, that's not required for, you know, me to sell

2:44 PM 8    a firearm to one of my friends, right?

2:44 PM 9    A.   No, that is just to be engaged in the business of dealing

2:44 PM 10   in firearms.

2:44 PM 11   Q.   Okay.  Now, if you are a federal firearms licensed -- if

2:44 PM 12   you receive one of these licenses, what requirements do you

2:45 PM 13   have to keep up with in order to maintain your license?

2:45 PM 14   A.   So one of those requirements is to have all purchasers

2:45 PM 15   fill out the mandatory -- what's called an ATF form 4473 or

2:45 PM 16   firearms transaction record that's required to be done every

2:45 PM 17   time an individual wants to purchase a firearm.

2:45 PM 18   Q.   What type of things are asked on a 4473 form?

2:45 PM 19   A.   So it starts with general biographical information on the

2:45 PM 20   purchaser, such as their name, address, date of birth, place of

2:45 PM 21   birth, Social Security number, sex, that type of thing.

2:45 PM 22        And then it asks a series of yes or no questions

2:45 PM 23   where the individual has to certify, you know, whether they are

2:45 PM 24   prohibited or not from possessing firearms, and they also

2:45 PM 25   indicate that they are the actual purchaser of the firearm, and

2:45 PM 1    after that, they sign the form indicating that their answers

2:45 PM 2    are true and correct.

2:45 PM 3            After that's done, the FFL will review their identity

2:46 PM 4    document to be certain that they are who they say they are, and

2:46 PM 5    then from there, the FFL will conduct a background check on the

2:46 PM 6    purchaser to see if they are able to possess the firearm.  That

2:46 PM 7    process is conducted by the National Instant Criminal

2:46 PM 8    Background Check System, which is abbreviated as NICS, and once

2:46 PM 9    they get the purchaser's information, they can either return

2:46 PM 10   one of three responses, the first one being a proceed response,

2:46 PM 11   which means they can go through with the firearms transaction;

2:46 PM 12   a delayed response, which means the firearm cannot be

2:46 PM 13   transferred right now because they need to do additional

2:46 PM 14   research.  However, there's a caveat to that, that if after

2:46 PM 15   three business days, the FFL has not received a response from

2:46 PM 16   the NICS branch, they could lawfully transfer the firearm.  And

2:46 PM 17   the third response would be a denied response, indicating that

2:46 PM 18   they are not allowed to transfer the firearm.

2:46 PM 19           So once the background check is done, that

2:46 PM 20   information is recorded on the form, the results of it, and

2:46 PM 21   then the firearm information is listed on the form -- make,

2:46 PM 22   model, caliber, serial number and the type of firearm -- and

2:47 PM 23   then the employee will sign the form as well, and the

2:47 PM 24   transaction is complete.

2:47 PM 25   Q.   Who is responsible for maintaining a 4473 form?

A.    The gun store is responsible for keeping those records

unless they go out of business or they've had the records for

more than 20 years, they can send those records to ATF.

Q.    Okay.  And where -- if a gun store does go out of

business, where are those forms kept?

A.    They're sent to the ATF out-of-business records.

Q.    Which is what?

A.    It's basically a building where they store all of these

paper records, and they actually go through the process of

making digital images of the records so that the original paper

copies can be destroyed.

Q.    Now, I want to talk a little bit about how firearms can be

traced.  What, if anything, can be done to trace a firearm?

A.    So firearms tracing is the tracking of the movement of a

firearm basically from when it was manufactured through the

distribution chain to the first retail purchaser, and the way

that law enforcement can trace these firearms is through a

system called eTrace, which is an online computerized system

where when law enforcement recovers a firearm, they can enter

the descriptors of the firearm -- make, model, caliber, serial

number -- into the eTrace system.  That information is then

sent to ATF's tracing center, where they can access the

manufacturer's records and determine to which wholesaler the

firearm went to, and then from there which actual retailer the

firearm went to.  At that point they'll reach out to the

2:48 PM 1 retailer, or the FFL that I spoke about previously, and they'll

2:48 PM 2 request that they provide the purchaser information.  So the

2:48 PM 3 FFL will then look through their ATF form 4473, either manually

2:48 PM 4 or in the computer, if they keep their records that way, and

2:48 PM 5 they will provide the purchaser's information to the tracing

2:49 PM 6 center, completing the trace.

2:49 PM 7 Q.   There's been a lot of talk about guns being titled to

2:49 PM 8 particular people or registered to particular people.  Are guns

2:49 PM 9 registered to particular individuals?

2:49 PM 10 A.   No, there's no requirement, in the state of South Carolina

2:49 PM 11 anyway, that firearms be registered.  In my experience, when

2:49 PM 12 somebody is talking about a gun being registered, they're

2:49 PM 13 usually referring to who the purchaser of that firearm was and

2:49 PM 14 who it was that actually filled out the paperwork to purchase

2:49 PM 15 the firearm.

2:49 PM 16 Q.   So to be clear, so I understand it, what you can tell is

2:49 PM 17 who bought the gun from the FFL, not, you know, everything

2:49 PM 18 that's happened to the gun since that time?

2:49 PM 19 A.   No.  When a firearm is traced, it will only show you the

2:49 PM 20 first retail purchaser of that firearm.  What happens to it

2:49 PM 21 after that is not indicated on that paperwork.

2:50 PM 22 Q.   Are you familiar with the Defendant, Quentin John

2:50 PM 23 Fishburne?

2:50 PM 24 A.   Yes.

2:50 PM 25 Q.   And do you see the Defendant in the courtroom today?

2:50PM  1    A.    I do.

2:50PM  2    Q.    Can you -- can you describe him, identify him using

2:50PM  3    clothing or accessories?

2:50PM  4    A.    Sure.  He's sitting over there behind you wearing a blue

2:50PM  5    collared button-up shirt, white T-shirt underneath, gold-rimmed

2:50PM  6    glasses.

2:50PM  7            MR. SCHOEN:  Let the record reflect that the witness

2:50PM  8    has accurately identified Mr. Fishburne.

2:50PM  9    BY MR. SCHOEN:

2:50PM  10   Q.    Are you familiar with a woman named Renata Shontel

2:50PM  11   Ellison?

2:50PM  12   A.    Yes, I am.

2:50PM  13   Q.    Are you aware of what, if any, relationship exists between

2:50PM  14   Mr. Fishburne and Ms. Ellison?

2:50PM  15   A.    I determined that they had been in a relationship since

2:50PM  16   2013.

2:50PM  17   Q.    What type of relationship?

2:50PM  18   A.    I would determine it to be an intimate relationship.

2:50PM  19   Q.    And on March 31st of 2018, based on your investigation,

2:50PM  20   were they still in an intimate relationship?

2:51PM  21   A.    I believe so, yes.

2:51PM  22   Q.    There's been a lot of discussion about some different

2:51PM  23   vehicles in this case.  As an ATF agent, do you have the

2:51PM  24   ability to search records to determine who a vehicle is

2:51PM  25   registered to?

2:51PM   1    A.    Yes, we do have access to the South Carolina Department of

2:51PM   2    Motor Vehicles and other state databases to do that.

2:51PM   3    Q.    Are those records public records?

2:51PM   4    A.    They are.

2:51PM   5    Q.    Is the database that you're using publicly available?

2:51PM   6    A.    No.   At least for us, we're required to have user names

2:51PM   7    and accounts to access that information.

2:51PM   8    Q.    Okay.  Did you -- were you able to determine who -- who

2:51PM   9    the registered owner of a Lincoln sedan bearing -- bearing

2:51PM   10   registration FLU998 was?

2:51PM   11   A.    Yes, the listed owner was Kenyetta Fishburne.

2:51PM   12   Q.    And who based on your investigation is Kenyetta Fishburne?

2:52PM   13   A.    That would be Mr. Fishburne's spouse.

2:52PM   14   Q.    Were you able to determine who the registered owner of a

2:52PM   15   Camaro bearing registration PFM377 was?

2:52PM   16   A.    Yes, the listed owner was a Kathy Pinckney.

2:52PM   17   Q.    And based on your investigation, who is Kathy Pinckney?

2:52PM   18   A.    That would be Mr. Fishburne's mother.

2:52PM   19   Q.    Were you able to determine whether any vehicles were

2:52PM   20   registered to Mr. Fishburne?

2:52PM   21   A.    The last time that I had checked the South Carolina

2:52PM   22   Department of Motor Vehicles' database, I did not see any

2:52PM   23   vehicles registered to Mr. Fishburne.

2:52PM   24   Q.    I want to talk a little bit about the various firearms in

2:52PM   25   this case.   Are you familiar with a Jimenez firearm that was

2:52 PM 1 recovered from Mr. Fishburne on May 2nd, 2014?

2:52 PM 2 A. Yes, I am.

2:53 PM 3     MR. SHAHID: Your Honor, object to the way the

2:53 PM 4 question was formed.

2:53 PM 5     MR. SCHOEN: I'm happy to rephrase.

2:53 PM 6     THE COURT: Okay. Go ahead.

2:53 PM 7 BY MR. SCHOEN:

2:53 PM 8 Q. Are you familiar with a Jimenez firearm that was recovered

2:53 PM 9 out of a vehicle that Quentin Fishburne was driving on May 2nd,

2:53 PM 10 2014?

2:53 PM 11 A. Yes, I am.

2:53 PM 12 Q. And when was that firearm purchased?

2:53 PM 13 A. March 8th of 2013.

2:53 PM 14     MR. SCHOEN: Your Honor, at this time I'd request

2:53 PM 15 permission to approach and ask -- retrieve evidence and present

2:53 PM 16 it to the agent?

2:53 PM 17     THE COURT: Sure.

2:53 PM 18     MR. SCHOEN: I'm approaching the witness with what's

2:53 PM 19 previously been marked as Government's Exhibit 9. This has

2:53 PM 20 already been admitted into evidence, but it hasn't been

2:53 PM 21 published.

2:53 PM 22     THE COURT: Okay.

2:53 PM 23     MR. SCHOEN: While I'm up here, I'd also like to hand

2:53 PM 24 Special Agent Callahan Government's Exhibit 3, which has also

2:54 PM 25 been admitted into evidence, and ask him some questions about

| | | |
|---|---|---|
| 2:54PM | 1 | these two exhibits. |
| 2:54PM | 2 | THE COURT: Sure. |
| 2:54PM | 3 | BY MR. SCHOEN: |
| 2:54PM | 4 | Q. Special Agent Callahan, can you tell us what Government's |
| 2:54PM | 5 | Exhibit 9 is? |
| 2:54PM | 6 | A. So Government's Exhibit 9 is the ATF form 4473 that I was |
| 2:54PM | 7 | describing earlier, and this was a form that was filled out by |
| 2:54PM | 8 | Renata Ellison, and this transaction occurred on March 8th, |
| 2:54PM | 9 | 2013 from the Silver Dollar Pawn Shop in Walterboro, and this |
| 2:54PM | 10 | purchase was of a Jimenez model JA Nine 9 millimeter pistol |
| 2:54PM | 11 | with serial number 239429. |
| 2:54PM | 12 | Q. Are you aware of what happened to this gun? |
| 2:54PM | 13 | A. I am. |
| 2:54PM | 14 | Q. What -- where was this gun recovered? |
| 2:54PM | 15 | A. This gun was recovered by the Colleton County Sheriff's |
| 2:54PM | 16 | Office on May 2nd, 2014. |
| 2:54PM | 17 | Q. And what happened to it after -- based on your |
| 2:55PM | 18 | investigation, what happened to it after it was recovered by |
| 2:55PM | 19 | the Colleton County Sheriff's Department? |
| 2:55PM | 20 | A. Ultimately on December 23rd of 2014, that Jimenez firearm |
| 2:55PM | 21 | was returned to Renata Ellison. |
| 2:55PM | 22 | Q. Can you look at Exhibit 3? Are you familiar with Exhibit |
| 2:55PM | 23 | 3? |
| 2:55PM | 24 | A. Yes, I am. |
| 2:55PM | 25 | Q. And what is Exhibit 3? |

160

CALLAHAN - DIRECT EXAMINATION

2:55PM 1  A.   Exhibit 3 is -- it looks like a receipt of some type from
2:55PM 2  the Colleton County Sheriff's Office indicating that on
2:55PM 3  December 23rd, 2014, Renata Ellison retrieved the Jimenez Arms
2:55PM 4  9 millimeter pistol from the Sheriff's Office.
2:55PM 5  Q.   Can you compare the serial number for the Jimenez Arms
2:55PM 6  that's referenced in the 4473 that she filled out with the
2:56PM 7  serial number on that property receipt returning the property
2:56PM 8  to her?
2:56PM 9  A.   Serial number is the same.
2:56PM 10  Q.   The serial numbers match?
2:56PM 11  A.   Yes.
2:56PM 12       MR. SCHOEN:   Permission to approach and retrieve
2:56PM 13  evidence?
2:56PM 14       THE COURT:   Sure.
2:56PM 15       MR. SCHOEN:   Permission to approach the witness with
2:56PM 16  Government's Exhibit 10 and Government's Exhibit 6?
2:56PM 17       THE COURT:   Sure.
2:56PM 18  BY MR. SCHOEN:
2:56PM 19  Q.   Special Agent Callahan, what is Government's Exhibit 10?
2:56PM 20  A.   Government's Exhibit 10 is another ATF form 4473 completed
2:56PM 21  by Renata Ellison.  This transaction occurred on September 5th,
2:57PM 22  2014, and this was at CMH Consulting LLC in Walterboro for a
2:57PM 23  Smith & Wesson model M&P Shield .40 caliber pistol with serial
2:57PM 24  number HSR7417.
2:57PM 25  Q.   Can you look at the -- or tell us what Government's

2:57PM 1  Exhibit 6 is?

2:57PM 2  A.     Government's Exhibit 6 is a Smith & Wesson M&P Shield .40

2:57PM 3  caliber pistol bearing the serial number HSR7417 with a

2:57PM 4  magazine.

2:57PM 5  Q.     Does that gun -- does the serial number on that gun match

2:57PM 6  the serial number on that form?

2:57PM 7  A.     Yes, they're the same.

2:57PM 8  Q.     I want you to hold onto the gun for a few minutes.  I'm

2:58PM 9  going to ask you a couple of questions about the gun.  Can you

2:58PM 10 tell us what -- what caliber is that gun?

2:58PM 11 A.     It's a .40 caliber.

2:58PM 12 Q.     And as a part of your experience with ATF, do you deal

2:58PM 13 with a lot of firearms?

2:58PM 14 A.     Correct.

2:58PM 15 Q.     As part of your experience with ATF, are you trained in

2:58PM 16 using firearms?

2:58PM 17 A.     Yes.

2:58PM 18 Q.     Do you do a lot of shooting?

2:58PM 19 A.     Yes.

2:58PM 20 Q.     Can you tell us, a .40 caliber, among the various calibers

2:58PM 21 that one can fire out of a handgun, common handgun caliber,

2:58PM 22 where does that fall on the spectrum?  Small or large or where

2:58PM 23 is it?

2:58PM 24 A.     As far as semiautomatic pistols go, .40 caliber, you're

2:58PM 25 trending towards the upper end of the larger calibers as far as

| | | |
|---|---|---|
| 2:58 PM | 1 | semiautomatic pistol. |
| 2:58 PM | 2 | Q.   What kind of caliber handgun are you issued as part of |
| 2:58 PM | 3 | ATF? |
| 2:58 PM | 4 | A.   We're issued 9 millimeters. |
| 2:58 PM | 5 | Q.   Is that gun larger or smaller than 9 millimeter? |
| 2:58 PM | 6 | A.   .40 caliber is larger than a 9 millimeter. |
| 2:58 PM | 7 | Q.   What affects the recoil -- |
| 2:58 PM | 8 |       MR. SHAHID:  Objection, Your Honor.  It's totally |
| 2:59 PM | 9 | irrelevant to the issue at hand here. |
| 2:59 PM | 10 |       THE COURT:  The first part is -- what do you mean, |
| 2:59 PM | 11 | "What affects the recoil?"  Get your question out, and then |
| 2:59 PM | 12 | I'll rule on it. |
| 2:59 PM | 13 |       MR. SCHOEN:  Yes, Your Honor. |
| 2:59 PM | 14 | BY MR. SCHOEN: |
| 2:59 PM | 15 | Q.   What are the various factors in terms of -- what various |
| 2:59 PM | 16 | factors affect how much recoil the gun will have? |
| 2:59 PM | 17 | A.   Recoil in a firearm is generally determined by a couple of |
| 2:59 PM | 18 | different things.  The mass of the firearm.  Generally a |
| 2:59 PM | 19 | heavier or larger firearm will have less-felt recoil.  The size |
| 2:59 PM | 20 | of the bullet.  Generally a larger bullet will generate more |
| 2:59 PM | 21 | recoil, and the speed of the bullet as well.  Generally a |
| 2:59 PM | 22 | faster bullet will have more felt recoil. |
| 2:59 PM | 23 | Q.   So as handguns go, is that a large or a small frame |
| 2:59 PM | 24 | handgun? |
| 2:59 PM | 25 | A.   That is small framed. |

2:59PM  1  Q.   So it has a higher caliber and a smaller frame.  How would

2:59PM  2  you expect the recoil on that gun to be?

2:59PM  3  A.   It would have a decent amount of recoil.

3:00PM  4  Q.   Special Agent Callahan, are you familiar with a shooting

3:00PM  5  that occurred on November 6th, 2015?

3:00PM  6  A.   Yes, I am.

3:00PM  7       MR. SCHOEN:  Your Honor, at this point I would

3:00PM  8  request permission to approach and to publish to the jury the

3:00PM  9  stipulation that the Government and the defense have reached,

3:00PM  10  Government stipulation -- or Government's Exhibit 14.

3:00PM  11       THE COURT:  Sure.

3:00PM  12       MR. SCHOEN:  Ladies and gentlemen, I'm going to read

3:00PM  13  you a stipulation that the Government and the defense have

3:00PM  14  reached.  This is Government's Exhibit 14.

3:00PM  15       There was a shooting in Colleton County on

3:00PM  16  November 6th, 2015 involving members or associates of a

3:00PM  17  criminal street gang named the Cowboys in which at least three

3:00PM  18  different firearms were used.  .380, .40 caliber and

3:00PM  19  .45 caliber shell casings were recovered from the scene.  The

3:01PM  20  three .40 caliber shell casings recovered are Exhibits 11, 12,

3:01PM  21  and 13 in this case.

3:01PM  22       Quentin Fishburne was convicted of a crime in

3:01PM  23  connection with the shooting.  He admitted that he was an

3:01PM  24  associate of the Cowboys, that he was present at the scene, and

3:01PM  25  that he drove another associate of the Cowboys away from the

3:01 PM 1    scene of the shooting.

3:01 PM 2                Authorities were not able to determine whether

3:01 PM 3    or not Mr. Fishburne fired any of the shots on November 6th,

3:01 PM 4    2015.

3:01 PM 5                Stipulation is signed by the Defendant and his

3:01 PM 6    attorney and the attorney for the Government.

3:01 PM 7    BY MR. SCHOEN:

3:02 PM 8    Q.   Special Agent Callahan, do you have the shell casings that

3:02 PM 9    are 11, 12 and 13?

3:02 PM 10           THE WITNESS:  Do I have permission to step down and

3:02 PM 11   get those for the --

3:02 PM 12           THE COURT:  Sure.

3:02 PM 13           MR. SCHOEN:  Thank you.

3:02 PM 14                          (Pause.)

3:02 PM 15           MR. SCHOEN:  Permission to approach the witness with

3:02 PM 16   Government's Exhibits 11, 12 and 13?

3:02 PM 17           THE COURT:  Sure.

3:02 PM 18   BY MR. SCHOEN:

3:03 PM 19   Q.   Special Agent Callahan, can you identify what I've just

3:03 PM 20   handed you?

3:03 PM 21   A.   Yes.  These are three .40 caliber spent shell casings that

3:03 PM 22   were recovered from a shooting that occurred on November 6th,

3:03 PM 23   2015 that was investigated and recovered by the Colleton County

3:03 PM 24   Sheriff's Office.

3:03 PM 25           MR. SCHOEN:  Your Honor, at this point the Government

| | | |
|---|---|---|
| 3:03 PM | 1 | would move Exhibits 11, 12 and 13 into evidence. |
| 3:03 PM | 2 | THE COURT:  Without objection? |
| 3:03 PM | 3 | MR. SHAHID:  Without objection. |
| 3:03 PM | 4 | THE COURT:  Okay.  In evidence. |
| 3:03 PM | 5 | BY MR. SCHOEN: |
| 3:03 PM | 6 | Q.   What is NIBIN? |
| 3:03 PM | 7 | A.   So NIBIN is an acronym for the National Integrated |
| 3:03 PM | 8 | Ballistic Information Network, and what that is is like |
| 3:04 PM | 9 | fingerprints but for guns.  So basically what we can do with |
| 3:04 PM | 10 | that is when law enforcement either recovers shell casings from |
| 3:04 PM | 11 | a crime scene or if they retrieve a gun in evidence, they can |
| 3:04 PM | 12 | test fire that gun, and they can take that test fired shell |
| 3:04 PM | 13 | casing or the shell casings that they recovered from a scene, |
| 3:04 PM | 14 | and they can have those shell casings entered into the NIBIN |
| 3:04 PM | 15 | database, and what that does is it takes basically pictures of |
| 3:04 PM | 16 | the shell casing, specifically of the firing pin and the |
| 3:04 PM | 17 | extractor, because those leave unique marks on the shell |
| 3:04 PM | 18 | casing, and they're identifiable to a particular firearm, much |
| 3:04 PM | 19 | like fingerprints are, and those images are uploaded into the |
| 3:04 PM | 20 | database and can be compared with all other shell casings that |
| 3:04 PM | 21 | have been put into the system and can generate leads for law |
| 3:04 PM | 22 | enforcement indicating that certain shell casings match other |
| 3:04 PM | 23 | shell casings that were recovered at a different time. |
| 3:04 PM | 24 | Q.   Can you tell us whether you requested any NIBIN |
| 3:05 PM | 25 | examination with regard to these shell casings? |

3:05PM 1    A.    I did.  The -- I recalled that when Mr. Fishburne was

3:05PM 2    found in possession of the Smith & Wesson .40 caliber pistol,

3:05PM 3    recalled that in reference to the 2015 shooting that was just

3:05PM 4    read to you, there were .40 caliber shell casings recovered

3:05PM 5    from that scene.  So I requested that the shell casings from

3:05PM 6    the 2015 shooting were entered into the database to see if they

3:05PM 7    matched particularly with the test fired cartridge from the

3:05PM 8    .40 caliber pistol recovered during the March 31st, 2018

3:05PM 9    traffic stop.

3:05PM 10   Q.    Did you request that the pistol be test fired?

3:05PM 11   A.    Yes.

3:05PM 12   Q.    I want to talk -- turn a little bit.  You talked -- you

3:05PM 13   mentioned fingerprints.  There's been a lot of talk about

3:05PM 14   fingerprints as well.  Why didn't you fingerprint the Jimenez

3:06PM 15   Arms gun?

3:06PM 16   A.    Well, for the Jimenez, my investigation into this matter

3:06PM 17   didn't -- didn't start back in 2014.  That case had been

3:06PM 18   resolved by the time I began looking into it.

3:06PM 19   Q.    And so where was the gun by the time you were looking into

3:06PM 20   the case?

3:06PM 21   A.    That firearm had been returned to Ms. Ellison.

3:06PM 22   Q.    Have you ever been able to recover that gun?

3:06PM 23   A.    I have not been able to, no.

3:06PM 24   Q.    Why didn't you have the Smith & Wesson M&P Shield

3:06PM 25   fingerprinted?

3:06 PM 1    A.    So with the M&P Shield, I reached out to the Walterboro

3:06 PM 2    Police Department and had requested that it be sent for

3:06 PM 3    fingerprints.  However, I was informed it had not been

3:06 PM 4    preserved for fingerprints and that it had already been sent

3:06 PM 5    for NIBIN analysis and test fired and handled, so it was not

3:06 PM 6    sent for any latent recovery.

3:06 PM 7    Q.    Have you ever requested fingerprints -- that guns be

3:07 PM 8    fingerprinted in any of your cases?

3:07 PM 9    A.    I have.

3:07 PM 10   Q.    How many times?

3:07 PM 11   A.    Dozens.

3:07 PM 12   Q.    Have you ever gotten a fingerprint off of a gun?

3:07 PM 13   A.    Not that I can think of offhand.

3:07 PM 14   Q.    After you took those cases to Charleston County -- those

3:07 PM 15   casings to Charleston County, what, if anything, else did you

3:07 PM 16   do with them?

3:07 PM 17   A.    Once I took them to Charleston County, I was informed by

3:07 PM 18   them that there was a presumptive lead --

3:07 PM 19          MR. SHAHID:  Objection to what someone is telling him

3:07 PM 20   from Charleston County, Your Honor.

3:07 PM 21          MR. SCHOEN:  Your Honor goes to his subsequent

3:07 PM 22   action.  He's going to testify that he took it to SLED.

3:07 PM 23          THE COURT:  How about, "As a result of what you heard

3:07 PM 24   from Charleston County" --

25

BY MR. SCHOEN:

Q.   As a result of what you heard from Charleston County, what did you do with it?

A.   I took the firearm and the shell casings to SLED for further analysis.

Q.   Were you present at a bond hearing for Quentin Fishburne in connection with the alleged possession of the M&P Shield on March 31st, 2018?

A.   Yes, I was.

     MR. SCHOEN:  Your Honor, at this time I would request permission to publish Court's Exhibit 1.

     THE COURT:  Okay.

     MR. SCHOEN:  Actually let me ask the agent about this real quick.  Permission to approach the agent --

     THE COURT:  Sure.

     MR. SCHOEN:  -- with Court's Exhibit 1?

BY MR. SCHOEN:

Q.   Do you recognize the contents of what I just handed you?

A.   Yes, I do.

Q.   How do you recognize it?

A.   I have seen this letter before, and it was -- at least part of it was summarized at that bond hearing that you referenced.

     MR. SCHOEN:  Permission to approach, retrieve, and publish to the jury?

3:09PM 1          **THE COURT:**  Sure.

3:09PM 2          **MR. SCHOEN:**  This is Court's Exhibit 1.

3:09PM 3      "On Saturday, March 31st, 2018, Quentin

3:09PM 4  Fishburne and I, Renata Ellison, were riding

3:09PM 5  together just prior to his arrest.  Quentin

3:09PM 6  picked me up from 103 Mincey Street.  Quentin

3:09PM 7  exited the car and walked around to the

3:09PM 8  passenger's side.  I proceeded to the driver's

3:09PM 9  side of the Camaro.  Once in the car, I placed

3:09PM 10  my firearm under the driver's seat.  Hence we

3:09PM 11  were supposed to have lunch at Golden Corral.

3:09PM 12  However, he received a call from another

3:09PM 13  female.  This prompted an argument between he

3:09PM 14  and I.  As a result, I drove back to Mincey

3:09PM 15  Street.  Still upset about the phone call, I

3:09PM 16  got out the -- and Quentin left.  Subsequently

3:09PM 17  I left my firearm under the driver's seat.

3:09PM 18  Quentin was unaware that my firearm was in the

3:09PM 19  car.  As follows, I contacted Officer Duboise

3:10PM 20  the next day to retrieve my firearm but was

3:10PM 21  unsuccessful.  I explained to Officer Duboise

3:10PM 22  that Quentin was unaware that the firearm was

3:10PM 23  in the car.  Officer Duboise said Quentin would

3:10PM 24  have to plead guilty before my firearm could be

3:10PM 25  released."  Signed, Renata Ellison.

3:10 PM 1        It is notarized, and the date of the notary --

3:10 PM 2    the date that the notary's certification expires is

3:10 PM 3    February 9th, 2028.

3:10 PM 4    **BY MR. SCHOEN:**

3:10 PM 5    **Q.**   Special Agent Callahan, what, if anything, did you do to

3:10 PM 6    investigate the claims made in that letter?

3:10 PM 7    **A.**   The first thing I did was check and see if Ms. Ellison had

3:10 PM 8    purchased any additional firearms, and if she had, what the

3:10 PM 9    disposition of those firearms was.  I wanted to interview her

3:10 PM 10   and also conduct the NIBIN activity.

3:10 PM 11   **Q.**   All right.  Let's start with the first part of that.

3:11 PM 12   What -- how many firearms were you able to determine that

3:11 PM 13   Ms. Ellison had purchased?

3:11 PM 14   **A.**   I was able to find three different firearms.

3:11 PM 15   **Q.**   And what were those firearms?

3:11 PM 16   **A.**   They were a Bersa Ultra Compact 9 millimeter, a Jimenez JA

3:11 PM 17   Nine 9 millimeter, and the Smith & Wesson M&P Shield

3:11 PM 18   .40 caliber.

3:11 PM 19   **Q.**   So prior to the gun that Mr. Fishburne was -- found most

3:11 PM 20   recently in the vehicle he was driving, there were two other

3:11 PM 21   guns that she had purchased?

3:11 PM 22   **A.**   Correct.

3:11 PM 23   **Q.**   Now, you mentioned the Jimenez.  Is that the same Jimenez

3:11 PM 24   that we've been talking about that was found in the vehicle he

3:11 PM 25   was driving on May 2nd, 2014?

A.   Yes, it is.

Q.   Okay.  Tell me about the Bersa.

A.   The Bersa was purchased in December of 2007, and in researching that firearm purchase, I was able to also find out from the Walterboro Police Department that that firearm was recovered by them on November 21st of 2012 during a foot pursuit with an individual.  That firearm had been discarded, and they found it in some bushes.

Q.   Okay.  So the Walterboro police were chasing somebody, and they found the firearm?

A.   Correct.

Q.   Were they able to determine who it was that they were chasing?

A.   They did not know for certain who it was that they were chasing after.

Q.   Did they have any description of the person?

A.   When I spoke with them, my understanding is that they thought it was a black male.

      MR. SHAHID:  This is hearsay.  He's saying what he talked to somebody about this --

      THE COURT:  You said did they have a description?  That seemed to be hearsay.  That's an out-of-court statement.

      MR. SCHOEN:  Yes, Your Honor, but my understanding regarding our previous stipulation -- can we have a sidebar?

      MR. SHAHID:  That's fine.

| | | |
|---|---|---|
| 3:12 PM | 1 | THE COURT: Okay. |
| 3:12 PM | 2 | MR. SHAHID: That's fine. |
| 3:12 PM | 3 | THE COURT: Thank you. |
| 3:12 PM | 4 | BY MR. SCHOEN: |
| 3:12 PM | 5 | Q. What was the description of the person that had the |
| 3:12 PM | 6 | firearm? |
| 3:12 PM | 7 | A. They believed to be a black male. |
| 3:12 PM | 8 | Q. Now, did they believe it to be Mr. Fishburne? |
| 3:13 PM | 9 | A. No, they did not. |
| 3:13 PM | 10 | Q. So an unidentified black male was running with this |
| 3:13 PM | 11 | firearm? |
| 3:13 PM | 12 | A. Correct. |
| 3:13 PM | 13 | Q. It was not Ms. Ellison? |
| 3:13 PM | 14 | A. Yes. |
| 3:13 PM | 15 | Q. And what, if anything, else were you able to determine |
| 3:13 PM | 16 | about this particular firearm? |
| 3:13 PM | 17 | A. I also was able to find some SLED laboratory reports that |
| 3:13 PM | 18 | indicated that that Bersa firearm that Ms. Ellison purchased |
| 3:13 PM | 19 | had been sent to SLED for analysis and was also test fired and |
| 3:13 PM | 20 | a casing entered into NIBIN, and the test fired casing from |
| 3:13 PM | 21 | that firearm matched shell casings that were recovered from a |
| 3:13 PM | 22 | 2011 shooting that occurred in Walterboro. |
| 3:13 PM | 23 | Q. Was Ms. Ellison a suspect in that 2011 shooting? |
| 3:13 PM | 24 | A. No, she was not. |
| 3:13 PM | 25 | Q. Were any relatives of Ms. Ellison a suspect in that 2011 |

3:13 PM 1    shooting?

3:13 PM 2    A.    Her husband at the time was.

3:13 PM 3    Q.    Who was her husband?

3:13 PM 4    A.    Moray Holmes.

3:13 PM 5    Q.    Where is Moray Holmes today?

3:13 PM 6    A.    He is deceased.

3:13 PM 7    Q.    So you indicated that she purchased the Bersa, she

3:14 PM 8    purchased the Jimenez, and she purchased the Smith & Wesson?

3:14 PM 9    A.    Correct.

3:14 PM 10    Q.    Would it be accurate to say that none of those guns were

3:14 PM 11    recovered in her possession?

3:14 PM 12    A.    They were not.

3:14 PM 13    Q.    All of those guns were recovered by the police?

3:14 PM 14    A.    Yes.

3:14 PM 15    Q.    Are you aware of any other firearms she purchased?

3:14 PM 16    A.    I am not.

3:14 PM 17    Q.    Let's talk about the next thing did you to investigate the

3:14 PM 18    claims in those letters, the interview. Tell us about that

3:14 PM 19    interview.

3:14 PM 20    A.    On July 10th of 2018, I went to her residence, or at least

3:14 PM 21    what was thought to be her residence. It was the address

3:14 PM 22    recorded on her driver's license at the time, where I met with

3:14 PM 23    her mother, and through the mother, we were able to coordinate

3:14 PM 24    me getting in contact with her, where she agreed to come to the

3:14 PM 25    residence to be interviewed, and at that time I had read her

3:14 PM  1   her Miranda rights, and she stated that she understood by

3:14 PM  2   signing a Miranda form, and I indicated to her that I wanted to

3:14 PM  3   ask her about her relationship with Mr. Fishburne and talk to

3:15 PM  4   her about the firearms that she had purchased.

3:15 PM  5   Q.   What, if anything, did you learn about the relationship

3:15 PM  6   she had with Mr. Fishburne?

3:15 PM  7   A.   She told me that they had been in a relationship since

3:15 PM  8   2013.

3:15 PM  9   Q.   What, if anything, did you learn about her -- her -- about

3:15 PM  10  what she knew about Mr. Fishburne's background?

3:15 PM  11  A.   She indicated that she knew that he had been convicted of

3:15 PM  12  a crime that was a felony.

3:15 PM  13  Q.   And what, if anything, did she say to you -- or what did

3:15 PM  14  you say to her, I guess I should say, about this pattern of

3:15 PM  15  activity?

3:15 PM  16  A.   So I told her that -- I referenced her statement that was

3:15 PM  17  read to y'all a little while ago, and I told her that to me

3:15 PM  18  it -- her statement did not make sense based on the pattern of

3:15 PM  19  activity that I had seen occur, and that she had purchased

3:15 PM  20  three firearms, and that all three of those firearms had been

3:15 PM  21  recovered in the possession of somebody else, on two occasions

3:15 PM  22  Mr. Fishburne, and those people that were in possession of them

3:16 PM  23  were in some way in a relationship with her.

3:16 PM  24  Q.   What did she say in response?

3:16 PM  25  A.   When I confronted her with that information, she asked me

3:16PM 1 if she could recant her statement that she previously provided.

3:16PM 2 Q.  What else did she say?

3:16PM 3 A.  She indicated to me that she wanted to provide truthful

3:16PM 4 information to me, but she was fearful that she -- she didn't

3:16PM 5 want to get in trouble for anything that Mr. Fishburne had

3:16PM 6 done, and she indicated that she wasn't comfortable moving

3:16PM 7 forward without having an attorney.  So at that point we

3:16PM 8 concluded the interview.

3:16PM 9         MR. SCHOEN:  Beg the Court's indulgence for just a

3:16PM 10 moment.

3:16PM 11                    (Pause.)

3:16PM 12         MR. SCHOEN:  No further questions at this time.

3:16PM 13 Please answer any questions from opposing counsel.

3:17PM 14         MR. SHAHID:  Do you have Exhibit 10?

3:17PM 15         THE WITNESS:  I have a couple of items up here if

3:17PM 16 you --

3:17PM 17         MR. SHAHID:  I just want number 10.

3:17PM 18                 CROSS-EXAMINATION

3:17PM 19                 BY MR. SHAHID:

3:17PM 20 Q.  Agent Callahan, you and I have previously met and talked;

3:17PM 21 haven't we?

3:17PM 22 A.  Yes, we have.

3:17PM 23 Q.  So I want to go over with you Government's Exhibit Number

3:17PM 24 9.  This is Number 9, and on the very top of the form of

3:18PM 25 Exhibit Number 9 is where the individual who wishes to purchase

3:18 PM  1  a firearm from a licensed firearm dealer provides their name,

3:18 PM  2  and you've got -- blacked out their address but -- their

3:18 PM  3  address, correct?

3:18 PM  4  A.   Yes, that's correct.

3:18 PM  5  Q.   And city, and some other information about their

3:18 PM  6  identifying characteristics, size, weight, things of that

3:18 PM  7  nature?

3:18 PM  8  A.   That's correct.

3:18 PM  9  Q.   And date of birth?

3:18 PM  10  A.   Yes.

3:18 PM  11  Q.   And then on the side here are the questions that are asked

3:18 PM  12  of that individual, including, "Are you the actual buyer of the

3:18 PM  13  gun?"

3:18 PM  14  A.   That is correct.

3:18 PM  15  Q.   If they check "No," they can't get the gun?

3:18 PM  16  A.   At that point the transaction should terminate.

3:18 PM  17  Q.   And then on -- the other pages of this provides the

3:18 PM  18  identifying information like the person's South Carolina

3:18 PM  19  driver's license?

3:19 PM  20  A.   Yes.

3:19 PM  21  Q.   And information about the driver's license, when it

3:19 PM  22  expires?

3:19 PM  23  A.   Correct.

3:19 PM  24  Q.   And then on the last page, it provides information as to

3:19 PM  25  the identity of the firearm, including the serial number?

3:19PM 1   A.   That's correct.

3:19PM 2   Q.   And same thing with Government's Exhibit Number 10.  That

3:19PM 3   has that same type of information --

3:19PM 4   A.   Yes.

3:19PM 5   Q.   -- correct?

3:19PM 6   A.   Yes, that's correct.

3:19PM 7   Q.   Now, in answer to a question by Government, I think you

3:19PM 8   said earlier that there is nothing that prevents anybody from

3:19PM 9   having a private transaction?

3:19PM 10  A.   The only thing is that you -- you can conduct a private

3:19PM 11  transaction with somebody as long as you don't believe them to

3:20PM 12  be prohibited from possessing firearms or to be a resident of

3:20PM 13  another state.

3:20PM 14  Q.   I can walk down the street, run into somebody who I think

3:20PM 15  has a gun for sale.  I can give that person cash.  That person

3:20PM 16  can give me the gun?

3:20PM 17  A.   Sure.

3:20PM 18  Q.   There's no record of that?

3:20PM 19  A.   No paperwork is required for that individual transaction.

3:20PM 20  Q.   And if you want to go back and trace that transaction,

3:20PM 21  you're not going to be able to do that.  There's no paperwork

3:20PM 22  on that?

3:20PM 23  A.   There -- no.  Like I said, the trace will tell you the

3:20PM 24  first original purchaser, and if you wanted to find out more

3:20PM 25  than that, you would have to go and speak to that individual,

3:20 PM 1   find out what they did with the gun, and follow the chain, so

3:20 PM 2   on and so forth.

3:20 PM 3   Q.   And that chain could go down from the manufacturer to the

3:20 PM 4   licensed firearm dealer to the purchaser.  Then it can go on

3:21 PM 5   for whatever our imagination leads us to of how many

3:21 PM 6   transactions that can -- can transpire.  It could be one.  It

3:21 PM 7   could be a dozen.  It could be a hundred?

3:21 PM 8   A.   That's possible, yes.

3:21 PM 9   Q.   That's all very possible.  And the purposes of this form

3:21 PM 10  4473 that we're going over and talking about was to allow you

3:21 PM 11  to do your job, which is to trace back a firearm?

3:21 PM 12  A.   That's -- that's a secondary purpose of it.  The main

3:21 PM 13  purpose is to determine whether the individual that's buying

3:21 PM 14  the gun is lawfully allowed to, but, yes, those forms are used

3:21 PM 15  to help us complete that firearms trace process.

3:21 PM 16  Q.   Trace process.  So if for some reason you needed to find

3:21 PM 17  out information about a gun for whatever reason that you need

3:21 PM 18  to, filling out that form from a licensed firearm dealer

3:21 PM 19  creates a record?

3:21 PM 20  A.   Yes.

3:21 PM 21  Q.   Okay.  And if I wanted you not to find out that I bought a

3:21 PM 22  gun from a licensed firearm dealer, I could do what's called a

3:22 PM 23  street transaction?

3:22 PM 24  A.   An individual sale?

3:22 PM 25  Q.   Yeah, an individual sale.

A.    Sure.

Q.    Okay.  And so what a person is doing, for lack of a better way of categorizing this, is they are legitimizing the process. They're giving you the opportunity to go back and say, "I'm the true purchaser, and here's the information so that if you need to come run me down, you got my address.  You got my driver's license information.  You got my date of birth.  You got the serial number on the gun."  You can do that because there's a record of it?

A.    Yes, the paperwork does make that process easier for us.

Q.    And absent that paperwork, you don't have the person's identity, right?

A.    Correct.

Q.    You don't have their driver's license, correct?

A.    That's correct.

Q.    You don't have their date of birth, correct?

A.    Correct.

Q.    And you don't have that serial number?

A.    Correct.

Q.    So the right way of doing it is what's shown on Exhibit Number 9 and Number 10, the two forms?

A.    It's one way.  I wouldn't say it's the right way, because there's other lawful ways to do it, but filling out the paperwork at a gun store is certainly one way to do the transaction.

3:23 PM 1   Q.   Unless I do a personal bill of sale, you're not going to

3:23 PM 2   have a record of transaction of that?

3:23 PM 3   A.   In most cases, no.

3:23 PM 4   Q.   So if I want to hide and try to avoid you making a

3:23 PM 5   detection of the trace of that gun, I wouldn't go through that

3:23 PM 6   process.  I would make it more difficult for you; wouldn't I?

3:23 PM 7   A.   It would make it more difficult, yes.

3:23 PM 8   Q.   Almost to the point where your investigation would run

3:23 PM 9   cold?

3:23 PM 10   A.   I couldn't say.  It would depend on other factors involved

3:23 PM 11   as well.

3:23 PM 12   Q.   And I think you testified earlier that to become a

3:24 PM 13   licensed dealer, you got to go through this routine of being

3:24 PM 14   checked out and making sure you are qualified to be a licensed

3:24 PM 15   dealer, and before I walk out the store -- when I make the

3:24 PM 16   purchase, I make the application for the purchase, there's a

3:24 PM 17   waiting period as well, that you do a background check for that

3:24 PM 18   person, make sure they're okay to have the gun, right?

3:24 PM 19   A.   It's not waiting period per se.  There's no waiting period

3:24 PM 20   in South Carolina.  What I'd indicated is that if there is a

3:24 PM 21   delayed response to the background check, then that will

3:24 PM 22   postpone the sale at that time, but if an individual passes a

3:24 PM 23   background check right away and there's a proceed response,

3:24 PM 24   then the individual can walk out of the gun store right then

3:24 PM 25   and there with the gun.

| | | |
|---|---|---|
| 3:24 PM | 1 | Q.   I mean, you still got to go through the background check? |
| 3:24 PM | 2 | A.   Yes. |
| 3:24 PM | 3 | Q.   No matter what the wait is, there's got to be some kind of |
| 3:24 PM | 4 | verification that the person is legitimate? |
| 3:24 PM | 5 | A.   Yes. |
| 3:24 PM | 6 | Q.   And there's no question that the firearm that's referenced |
| 3:25 PM | 7 | in Exhibit Number 9, the Jimenez firearm, was returned to |
| 3:25 PM | 8 | Ms. Ellison? |
| 3:25 PM | 9 | A.   Yes, it was returned to her based on the paperwork. |
| 3:25 PM | 10 | Q.   And we know from the paperwork information that from |
| 3:25 PM | 11 | the -- the recovery of the gun in May of 2014 through December |
| 3:25 PM | 12 | of 2014, it was in police custody? |
| 3:25 PM | 13 | A.   As far as I've been able to tell.  I don't think I've seen |
| 3:25 PM | 14 | any documentation that would show that it was elsewhere. |
| 3:26 PM | 15 | Q.   Let me have these other exhibits.  Now, so in Exhibit |
| 3:26 PM | 16 | Number -- |
| 3:26 PM | 17 | A.   It might be inside the envelope. |
| 3:26 PM | 18 | Q.   The shell casings?  Which is 11, 12 and 13.  These are |
| 3:26 PM | 19 | what you call spent shell casings, right? |
| 3:26 PM | 20 | A.   That's correct. |
| 3:26 PM | 21 | Q.   In other words, they've been discharged? |
| 3:26 PM | 22 | A.   Yes. |
| 3:26 PM | 23 | Q.   All right.  And when you load a firearm, you're going to |
| 3:26 PM | 24 | pick up -- before the spent shell, it's got the bullet in it |
| 3:26 PM | 25 | still? |

| | | |
|---|---|---|
| 3:26PM | 1 | **A.**    Correct. |
| 3:26PM | 2 | **Q.**    And you're going to put it in the magazine, so you're |
| 3:26PM | 3 | touching it? |
| 3:26PM | 4 | **A.**    Yes. |
| 3:26PM | 5 | **Q.**    And if you're handling the firearm and you're handling the |
| 3:27PM | 6 | clip, you're touching it? |
| 3:27PM | 7 | **A.**    Generally, yes. |
| 3:27PM | 8 | **Q.**    And when you're doing that, you can pick up fingerprints |
| 3:27PM | 9 | from that? |
| 3:27PM | 10 | **A.**    Sometimes it's possible.  Sometimes it's not there. |
| 3:27PM | 11 | **Q.**    And I think what you testified earlier that by the time |
| 3:27PM | 12 | you got involved in all of this, one gun was already returned |
| 3:27PM | 13 | back to Ms. Ellison, and the other gun was spoiled.  I think |
| 3:27PM | 14 | you used the word "spoiled" or "not preserved", I think was the |
| 3:27PM | 15 | words that you used, to make a determination from your |
| 3:27PM | 16 | examination of fingerprint analysis; is that correct? |
| 3:27PM | 17 | **A.**    That's correct. |
| 3:27PM | 18 | **Q.**    When you went to interview Ms. Ellison in 2018, that was |
| 3:28PM | 19 | April or May of 2018? |
| 3:28PM | 20 | **A.**    I interviewed her July 10th of 2018. |
| 3:28PM | 21 | **Q.**    I'm sorry.  July 10th, 2018.  She voluntarily agreed to |
| 3:28PM | 22 | meet with you? |
| 3:28PM | 23 | **A.**    Yes, she did. |
| 3:28PM | 24 | **Q.**    You identified yourself as a law enforcement officer? |
| 3:28PM | 25 | **A.**    Yes. |

| | | |
|---|---|---|
| 3:28PM | 1 | **Q.** And she was there without a lawyer? |
| 3:28PM | 2 | **A.** Correct. |
| 3:28PM | 3 | **Q.** And you read her her Miranda rights? |
| 3:28PM | 4 | **A.** I did. |
| 3:28PM | 5 | **Q.** Even though she may not have been in custody, you advised |
| 3:28PM | 6 | her of her Miranda rights? |
| 3:28PM | 7 | **A.** That's correct. |
| 3:28PM | 8 | **Q.** And at some point in time she wanted to terminate the |
| 3:28PM | 9 | conversation without talking to a lawyer? |
| 3:28PM | 10 | **A.** That's correct. |
| 3:28PM | 11 | **Q.** But she did it voluntarily? |
| 3:28PM | 12 | **A.** Yes. |
| 3:28PM | 13 | **Q.** She was not under a subpoena of any sort? |
| 3:28PM | 14 | **A.** No. |
| 3:28PM | 15 | **Q.** Or forced to meet with you? |
| 3:28PM | 16 | **A.** No. |
| 3:29PM | 17 | MR. SHAHID: Give me just one second. |
| 3:29PM | 18 | THE COURT: Sure. |
| 3:29PM | 19 | (Pause.) |
| 3:29PM | 20 | MR. SHAHID: Thank you. That's all the questions I |
| 3:29PM | 21 | have. |
| 3:29PM | 22 | THE WITNESS: Thank you. |
| 3:29PM | 23 | MR. SCHOEN: Brief redirect? |
| 3:29PM | 24 | THE COURT: Sure. |
| 3:29PM | 25 | |

| | | |
|---|---|---|
| 3:29 PM | 1 | **REDIRECT EXAMINATION** |
| 3:29 PM | 2 | **BY MR. SCHOEN:** |
| 3:29 PM | 3 | **Q.**   Mr. Shahid asked you some questions about firearms |
| 3:29 PM | 4 | transactions that are conducted without the background forms. |
| 3:29 PM | 5 | He's calling them street transactions.  As he pointed out, |
| 3:29 PM | 6 | there's no way to get those -- no records of those that exist, |
| 3:29 PM | 7 | so is it possible that Ms. Ellison has purchased additional |
| 3:29 PM | 8 | guns? |
| 3:29 PM | 9 | **A.**   Yes, it is possible. |
| 3:30 PM | 10 | **Q.**   It was suggested that you wouldn't have any way to |
| 3:30 PM | 11 | investigate a private sale.  How do you go about |
| 3:30 PM | 12 | investigating -- if you get a gun, and there's -- you find a |
| 3:30 PM | 13 | gun at a crime scene or a gun comes back as a match for a crime |
| 3:30 PM | 14 | scene, how do you go about investigating whether or not -- |
| 3:30 PM | 15 | trying to figure out who has that gun based on these records? |
| 3:30 PM | 16 | **A.**   It all goes back to the firearms trace, to that original |
| 3:30 PM | 17 | purchaser and starting there; finding out what they did with |
| 3:30 PM | 18 | the gun, going and talking to the next person, seeing what they |
| 3:30 PM | 19 | did with it, and hopefully it leads us back to the crime scene. |
| 3:30 PM | 20 | **Q.**   So just because you don't have a record of every single |
| 3:30 PM | 21 | transaction doesn't prohibit you from following that trail and |
| 3:30 PM | 22 | trying to figure out who purchased the gun? |
| 3:30 PM | 23 | **A.**   No, it doesn't. |
| 3:31 PM | 24 | **MR. SCHOEN:**  Court's indulgence? |
| 3:31 PM | 25 | **THE COURT:**  Sure. |

3:31PM  1                        (Pause.)

3:31PM  2            MR. SCHOEN:  No further questions.

3:31PM  3                  **RECROSS-EXAMINATION**

3:31PM  4                  **BY MR. SHAHID:**

3:31PM  5  Q.   Did you have an opportunity, Agent Callahan, to interview

3:31PM  6  the licensed firearm dealers about these transactions?

3:31PM  7  A.   I don't think that I interviewed them per se.  I just -- I

3:31PM  8  spoke with them in reference to obtaining the records.

3:31PM  9  Q.   But nothing detailed about investigation concerning the

3:31PM 10  transaction with Ms. Ellison and what transpired between the

3:31PM 11  seller and the buyer of those two particular firearms?

3:31PM 12  A.   No, I don't believe so.

3:31PM 13            MR. SHAHID:  Okay.  Thank you.

3:31PM 14            THE COURT:  Thank you, Special Agent.

3:31PM 15                 (Witness excused.)

3:32PM 16            MR. SCHOEN:  Your Honor, the Government calls Chad

3:32PM 17  Smith.

3:34PM 18            MS. HENDERSON:  Your Honor, we're going to figure out

3:34PM 19  what's going on.

3:34PM 20            THE COURT:  All right.  Why don't you go back to your

3:34PM 21  jury room while they try to find their witness?  It's more

3:34PM 22  comfortable in there than it is in here.

       23                 (Jury out at 3:34 p.m.)

3:35PM 24            MS. HENDERSON:  I think he was in the restroom.

3:35PM 25            THE MARSHAL:  They got him.

THE COURT: Okay.

MR. SHAHID: Good timing for a mid afternoon break.

THE COURT: Why don't we just take five minutes anyway? Just relax. Is this your last witness?

MS. HENDERSON: Yes, Your Honor.

THE COURT: Then you're going rest, and then we'll quit for the day? All right.

(Recess from 3:35 p.m. to 3:44 p.m.)

THE COURT: Take your seat. Thanks. All right. So we have our greatly-relieved witness here?

MR. SCHOEN: Yes, Your Honor.

THE COURT: Okay. All right. Bring them in.

(Jury in at 3:44 p.m.)

THE COURT: Yes, sir?

MR. SCHOEN: The Government calls Chad Smith.

COURTROOM DEPUTY: Please stop right here and be sworn for me. Place your left hand on the Bible and raise your right hand.

(Witness sworn.)

COURTROOM DEPUTY: Thank you. You may have a seat.

CHAD SMITH,

a witness called on behalf of the Government, being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. SCHOEN:

| | | |
|---|---|---|
| 3:47PM | 1 | **Q.**  Good afternoon, Mr. Smith. |
| 3:47PM | 2 | **A.**  Good afternoon. |
| 3:47PM | 3 | **Q.**  Can you please tell the jury where you're employed? |
| 3:47PM | 4 | **A.**  I'm employed with the South Carolina Law Enforcement |
| 3:47PM | 5 | Division, which is commonly known as SLED. |
| 3:47PM | 6 | **Q.**  What's your position with SLED? |
| 3:47PM | 7 | **A.**  I'm a forensic scientist in the firearms department at |
| 3:47PM | 8 | SLED's forensic services laboratory in Columbia. |
| 3:47PM | 9 | **Q.**  How long have you been employed by SLED? |
| 3:47PM | 10 | **A.**  It's 11 years and a few months now. |
| 3:47PM | 11 | **Q.**  Can you tell us about your education? |
| 3:47PM | 12 | **A.**  I attended Clemson University, where I earned a bachelor |
| 3:47PM | 13 | of science degree in biological sciences. |
| 3:47PM | 14 | **Q.**  What type of training do you need to become a firearms |
| 3:47PM | 15 | examiner? |
| 3:47PM | 16 | **A.**  Well, all the training that we do at SLED is supervised |
| 3:47PM | 17 | and taught in-house.  There's a training program that lasts |
| 3:47PM | 18 | between three to five years.  It involves extensive reading and |
| 3:47PM | 19 | studying.  There are multiple examinations and tests given |
| 3:48PM | 20 | during that time.  Also attended various classes and seminars. |
| 3:48PM | 21 | Later in my training, I helped the other examiners prepare |
| 3:48PM | 22 | their casework, and at the end of my training period, I |
| 3:48PM | 23 | received a comprehensive multipart examination which I |
| 3:48PM | 24 | successfully completed, and then I began to receive my |
| 3:48PM | 25 | casework. |

3:48PM 1    Q.   Are you part of any professional associations?

3:48PM 2    A.   Yes, sir, I am.

3:48PM 3    Q.   What professional association?

3:48PM 4    A.   I'm a member of AFTE, A-F-T-E, Association of Firearm and

3:48PM 5    Toolmark Examiners.  It's worldwide organization whose purpose

3:48PM 6    is to further the advancement of the field.

3:48PM 7    Q.   How many firearms -- roughly how many firearms

3:48PM 8    examinations have you conducted over the course of your career?

3:48PM 9    A.   Just looking at various guns and cartridge cases and

3:48PM 10   bullets, I would say in the thousands, if you compare, you

3:48PM 11   know, samples one-to-one.

3:48PM 12   Q.   Have you been admitted as an expert in firearms

3:48PM 13   identification to testify in court before?

3:49PM 14   A.   Yes, sir.

3:49PM 15   Q.   How many times approximately?

3:49PM 16   A.   Over 70 times.

3:49PM 17   Q.   Have you ever not been admitted as an expert?

3:49PM 18   A.   No, sir.

3:49PM 19        MR. SCHOEN:  Your Honor, at this point the Government

3:49PM 20   would move to admit Chad Smith as an expert in the field of

3:49PM 21   firearms identification.

3:49PM 22        MR. SHAHID:  No objection.

3:49PM 23        THE COURT:  Okay.  Go ahead.

3:49PM 24   BY MR. SCHOEN:

3:49PM 25   Q.   I want to start out by approaching you with what's

3:49PM  1    previously been marked as Government's Exhibit 6.  Can you tell

3:49PM  2    us what that is?

3:49PM  3    A.   Ladies and gentlemen, if it hasn't been said before, this

3:49PM  4    firearm is safe to handle.  I can see that there's no

3:49PM  5    ammunition in the gun, and it has a cable lock going through

3:49PM  6    it, so it can't be loaded or fired.

3:49PM  7            Yes, this is a Smith & Wesson brand pistol that I

3:49PM  8    received for examination.

3:50PM  9    Q.   And as an expert in firearms identification, can you just

3:50PM  10   tell us a little bit about how that pistol works?

3:50PM  11   A.   Well, this is a semiautomatic pistol, as compared to a

3:50PM  12   revolver.  Those are two main types of handguns we receive for

3:50PM  13   examination and that we see in our casework.  In this

3:50PM  14   particular instance, a semiautomatic pistol, it uses a

3:50PM  15   detachable box magazine.  So you put the cartridges or rounds

3:50PM  16   of ammunition in the magazine, and then you would load the

3:50PM  17   handgun by putting the magazine into the grip area.  Then you

3:50PM  18   would -- this portion here is called the slide.  You have to

3:50PM  19   retract the slide.  It's under spring tension.  Let the slide

3:50PM  20   go, and then a round is chambered from the magazine into the

3:50PM  21   chamber which is the rearward portion of the barrel, and then

3:50PM  22   it's ready for firing.

3:50PM  23           So at that point you could pull the trigger.  The

3:50PM  24   striker or firing pin would strike the rear of the cartridge.

3:51PM  25   It's the primer portion of the cartridge which ignites the

3:51 PM 1    cartridge. It strikes that primer. Gas builds up inside the
3:51 PM 2    cartridge case, because once the primer is ignited, it ignites
3:51 PM 3    the gunpowder inside the cartridge. That creates a volume of
3:51 PM 4    gas. That pressure forces the bullet out of the cartridge --
3:51 PM 5    out of the cartridge case, excuse me, down the barrel, and then
3:51 PM 6    the cartridge case is pressed rearward up against this portion
3:51 PM 7    here of the slide which is called the breach face. So in that
3:51 PM 8    cycling action, it pushes the slide rearward. The fired
3:51 PM 9    cartridge case is then extracted, ejected out of the firearm.
3:51 PM 10    Again, it's under spring tension, so when the slide comes
3:51 PM 11    forward again, it takes another round from the magazine, puts
3:51 PM 12    it in the chamber, and again it's ready for firing.
3:51 PM 13    Q. Thank you. I want to talk a little bit about the science
3:51 PM 14    behind your field. What is firearms identification generally?
3:52 PM 15    A. Firearms identification is an area of forensic science in
3:52 PM 16    which we try to determine if a specific ammunition component,
3:52 PM 17    like a bullet or a cartridge case, was fired by a particular
3:52 PM 18    firearm. How we're able to do that is during the manufacturing
3:52 PM 19    of a firearm, all the various pieces that are -- that form the
3:52 PM 20    firearm itself are marked by the tooling and other finishing
3:52 PM 21    steps to create those parts, machining, things like that, and
3:52 PM 22    it's basically the machines and other finishing that are
3:52 PM 23    marking those parts, totally random in nature. They're just
3:52 PM 24    basically microscopic defects that are placed on there. The
3:52 PM 25    manufacturer doesn't call for these microscopic defects or

3:52 PM 1   anything like that.  It's just created during the manufacturing

3:52 PM 2   itself.

3:52 PM 3           So when a firearm is assembled and then goes on to

3:52 PM 4   the owner, when it's fired, the parts of the firearm that come

3:53 PM 5   in contact with the cartridge, whether it be the cartridge case

3:53 PM 6   itself or the bullet, can impart those marks onto the cartridge

3:53 PM 7   case or the bullet.  Again, it's at a microscopic level.  We

3:53 PM 8   use -- it's called a comparison microscope to do our

3:53 PM 9   microscopic examinations, and then we can try to determine --

3:53 PM 10  by test firing a firearm, compare those test fires with

3:53 PM 11  submitted evidence, whether it be a cartridge case or a bullet,

3:53 PM 12  to determine if it was fired by a specific gun or that

3:53 PM 13  particular gun.

3:53 PM 14  Q.   So at the microscopic level, are firearms unique?

3:53 PM 15  A.   Yes, they can be.  Now, not all marks that are created are

3:53 PM 16  unique, so we have to through experience and training kind of

3:53 PM 17  learn to look at the -- what we think are unique individual

3:53 PM 18  characteristics.  Again, not all of the marks have to be

3:54 PM 19  individual, but that's what we're looking at at the microscopic

3:54 PM 20  level.

3:54 PM 21  Q.   Have you ever seen two different guns produce shell

3:54 PM 22  casings that look identical, exactly the same?

3:54 PM 23  A.   Exactly the same, no, I haven't.

3:54 PM 24  Q.   How long has this field been around for?

3:54 PM 25  A.   Well over a hundred years.  The basic science and

3:54 PM   1   foundations have been well over a hundred years.  Now, the
3:54 PM   2   technology has gotten better, again with -- the microscopes and
3:54 PM   3   other tools that we use have gotten much better, but the field
3:54 PM   4   has been around for a long time.
3:54 PM   5   Q.   What checks are in place to ensure that your conclusions
3:54 PM   6   are reliable?
3:54 PM   7   A.   We have a peer-review process in our laboratory.  So after
3:54 PM   8   I look at evidence, test fire guns, compare test fires and
3:54 PM   9   evidence and formulate my own results, then I have another
3:54 PM   10  qualified examiner come back behind me, look at the evidence
3:54 PM   11  themselves, formulate their own opinions, and then when they're
3:55 PM   12  ready to look at my results, they can look at my results, and
3:55 PM   13  if they agree with me, then they sign off on the form.  If
3:55 PM   14  there's some discrepancy, then we can get a third party
3:55 PM   15  involved, another examiner to try to -- to try to reach a
3:55 PM   16  conclusion, but in my experience that hasn't happened, but we
3:55 PM   17  have another examiner come back to check our work just to make
3:55 PM   18  sure that our opinions and conclusions would be correct.
3:55 PM   19  Q.   Are the methods that you are relying on generally accepted
3:55 PM   20  by experts in your field?
3:55 PM   21  A.   Yes, sir.
3:55 PM   22  Q.   I want to -- there's been a little bit of discussion about
3:55 PM   23  NIBIN.  Can you tell us what NIBIN is?
3:55 PM   24  A.   NIBIN is the National Integrated Ballistics Information
3:55 PM   25  Network.  That is a network all across the country that I

3:55 PM 1  believe was started by the ATF, and what that does is we have a

3:55 PM 2  machine.  It's called the IBIS machine in our particular lab,

3:56 PM 3  and there's some other agencies throughout the state that have

3:56 PM 4  their own IBIS machines as well.  IBIS is Integrated Ballistics

3:56 PM 5  Identification System.  So that's actually the computer system

3:56 PM 6  that's located out of agency.  What we can do is we put

3:56 PM 7  cartridge cases into the system.  It scans it.  It takes

3:56 PM 8  basically digital images of the rear part of the cartridge

3:56 PM 9  case, again the part that would contact the breach face here

3:56 PM 10  during firing.  It takes pictures of the firing pin impression

3:56 PM 11  left on the cartridge case as well, and then it stores it, and

3:56 PM 12  so what it can do is it can search other images that are in the

3:56 PM 13  system to see if there's any correlations between entries.

3:56 PM 14      And then so an IBIS technician can go back, look at

3:56 PM 15  correlations.  IBIS can bring back a certain amount, top 20

3:57 PM 16  let's say, what it thinks looks the best, and then a technician

3:57 PM 17  would go back, look at these images and say, yes, if the images

3:57 PM 18  look good enough, they would submit the specimens to SLED to be

3:57 PM 19  confirmed if they were fired by the same gun.

3:57 PM 20  Q.   Would it be fair in some ways to analogize to like a

3:57 PM 21  fingerprint database or a DNA database where a sample is put in

3:57 PM 22  input, and you can search to see if there's matches?

3:57 PM 23  A.   Right. that's exactly right.  So we're just comparing

3:57 PM 24  other images that are in the system to see if there's any link

3:57 PM 25  to possible crimes.

| | | |
|---|---|---|
| 3:57PM | 1 | **Q.** So if there is a link, is that the end of the process? |
| 3:57PM | 2 | **A.** No. Again, that's just -- that could be just the |
| 3:57PM | 3 | screening tool itself. So once they find the lead, they would |
| 3:57PM | 4 | submit us -- to us the evidence specimens, and then we would |
| 3:57PM | 5 | have to confirm whether a particular gun was fired by -- or |
| 3:57PM | 6 | excuse me, a particular cartridge case was fired by a |
| 3:58PM | 7 | particular gun. |
| 3:58PM | 8 | **Q.** Did you have an IBIS lead in this case? |
| 3:58PM | 9 | **A.** Yes, sir, I did. |
| 3:58PM | 10 | **Q.** Okay. Let me approach with what's previously been marked |
| 3:58PM | 11 | as Government's Exhibits 11, 12 and 13. Do you recognize |
| 3:58PM | 12 | Government's Exhibits 11, 12 and 13? |
| 3:58PM | 13 | **A.** Yes, sir. These are three cartridge cases that were |
| 3:58PM | 14 | submitted for examination and comparison with the gun. |
| 3:58PM | 15 | **Q.** What caliber are those cartridge cases? |
| 3:58PM | 16 | **A.** .40 Smith & Wesson caliber. |
| 3:58PM | 17 | **Q.** Is that the caliber of ammunition you fire out of that |
| 3:58PM | 18 | gun? |
| 3:58PM | 19 | **A.** Correct. |
| 3:58PM | 20 | **Q.** And what, if any, conclusions did you draw about the |
| 3:58PM | 21 | firearm that fired those three cartridges? |
| 3:58PM | 22 | **A.** Well, I was able to determine -- first of all, what I |
| 3:58PM | 23 | would do is compare these three cartridge cases with each other |
| 3:58PM | 24 | to confirm that they were fired by the same gun, which they |
| 3:58PM | 25 | were. I concluded they were fired by the same gun, and then I |

3:59 PM 1  would test fire this particular gun, and the way we do that is
3:59 PM 2  in our laboratory we have a vertical water tank. We shoot into
3:59 PM 3  the water tank. The water slows down the bullet, and we can
3:59 PM 4  retrieve the bullet by basically -- it's just a cup on a chain
3:59 PM 5  that we just pull up from the bottom of the tank, and then the
3:59 PM 6  cartridge cases go into a little box, a little plastic box that
3:59 PM 7  we have set up. So it ejects into the box so we have our
3:59 PM 8  samples, test fires that we can compare with each other.
3:59 PM 9        So test fire the firearm. The firearm functioned
3:59 PM 10 properly, and then I compared those test fires using our
3:59 PM 11 comparison microscope, and the comparison microscope is
3:59 PM 12 basically two microscopes that's connected by an optical bridge
3:59 PM 13 system. So we can compare two samples simultaneously, looking
3:59 PM 14 for those marks that we feel are individual in nature, and so
3:59 PM 15 compare the test fires with each other, and then I compare the
3:59 PM 16 test fires with the cartridge cases that are submitted as
3:59 PM 17 evidence.
4:00 PM 18       Then I was able to determine that the firearm that
4:00 PM 19 was submitted, Government Exhibit 6, did fire these three
4:00 PM 20 cartridge cases, Government Exhibits 11 through 13.
4:00 PM 21 Q.   Did you reach that conclusion to a reasonable degree of
4:00 PM 22 scientific certainty.
4:00 PM 23 A.   Yes, sir.
4:00 PM 24 Q.   Did you prepare a report summarizing your conclusions?
4:00 PM 25 A.   I did.

4:00 PM  1       **MR. SCHOEN:**  Your Honor, permission to approach the

4:00 PM  2   witness with what's been previously marked as Government's

4:00 PM  3   Exhibit 15?

4:00 PM  4       **THE COURT:**  Sure.

4:00 PM  5   **BY MR. SCHOEN:**

4:00 PM  6   **Q.**   Can you identify Government's Exhibit 15?

4:00 PM  7   **A.**   Yes, sir.  This is a copy of the report I issued.

4:00 PM  8   **Q.**   Is it a fair and accurate copy of your report?

4:00 PM  9   **A.**   I'm just comparing it quickly with a copy that I have here

4:00 PM  10  myself, just to make sure it's all in there.

4:01 PM  11                       (Pause.)

4:01 PM  12  **A.**   Yes, this is an accurate copy of my report.

4:01 PM  13      **MR. SCHOEN:**  Government would move Exhibit 15 into

4:01 PM  14  evidence.

4:01 PM  15      **MR. SHAHID:**  Subject to my prior objection, Your

4:01 PM  16  Honor.

4:01 PM  17      **THE COURT:**  Sure.  In evidence.

4:01 PM  18      **MR. SCHOEN:**  Permission to publish to the jury?

4:01 PM  19      **THE COURT:**  Sure.

4:01 PM  20  **BY MR. SCHOEN:**

4:01 PM  21  **Q.**   If you look towards the bottom of that report, Mr. Smith,

4:01 PM  22  it references items 6 through 8.  Can you tell us what are

4:02 PM  23  items 6 through 8 in this case?  So you have -- you had items

4:02 PM  24  marked as 6 through 8.  What exhibit numbers did those items

4:02 PM  25  have in this case?

4:02 PM 1   **A.**   Items 6 through 8 were the SLED lab item numbers, so when

4:02 PM 2   an agency submits items of evidence to SLED, we give it its own

4:02 PM 3   item number, so usually it's different from what a submitting

4:02 PM 4   agency would be, just so we can keep track internally of what

4:02 PM 5   items we have, but in this particular case, items 6 through 8

4:02 PM 6   were the same items as Government Exhibits 11 through 13.

4:02 PM 7   **Q.**   And what's item 1?

4:02 PM 8   **A.**   Item 1 is this firearm here, State -- or excuse me,

4:02 PM 9   Government Exhibit 6.

4:02 PM 10   **Q.**   And what's item 1.1?

4:02 PM 11   **A.**   Item 1.1 are test specimens that I created myself. So

4:03 PM 12   again, those are the test specimens that I fired out of this

4:03 PM 13   particular gun, and then I gave them item 1.1.

4:03 PM 14   **Q.**   And does item 1.1 match items 6 through 8 in your report?

4:03 PM 15   **A.**   Correct. I would have used those test specimens to

4:03 PM 16   compare with items 6 through 8, and again I concluded that that

4:03 PM 17   particular firearm did fire three cartridge cases that were

4:03 PM 18   submitted.

4:03 PM 19         **MR. SCHOEN:**  Brief indulgence, Your Honor.

4:03 PM 20         **THE COURT:**  Sure.

4:03 PM 21         **MR. SCHOEN:**  No further questions for this witness at

4:03 PM 22   this time. Mr. Smith, please answer any questions of opposing

4:03 PM 23   counsel.

4:03 PM 24         **THE WITNESS:**  Yes, sir.

4:03 PM 25                **CROSS-EXAMINATION**

| | | |
|---|---|---|
| 4:03 PM | 1 | **BY MR. SHAHID:** |
| 4:03 PM | 2 | **Q.** Mr. Smith, I'm Peter Shahid. I represent Mr. Fishburne. |
| 4:03 PM | 3 | Are Exhibits 1.1 with us today? |
| 4:03 PM | 4 | **A.** No, sir. 1.1 we retained at SLED for a period of time. |
| 4:04 PM | 5 | Then we return those test specimens at a later date to the |
| 4:04 PM | 6 | submitting agency. |
| 4:04 PM | 7 | **Q.** And so -- make sure we're clear on what we're doing here, |
| 4:04 PM | 8 | you received Exhibits 11, 12, and 13? |
| 4:04 PM | 9 | **A.** Correct. |
| 4:04 PM | 10 | **Q.** You created your own exhibits, Exhibit 1.1 in your report, |
| 4:04 PM | 11 | and those were test fired using that gun, Government's Exhibit |
| 4:04 PM | 12 | Number 6, but we don't have those samples with us today? |
| 4:04 PM | 13 | **A.** No, sir. Again, we retain those at SLED. That's partly |
| 4:04 PM | 14 | in -- due to the fact that we can use those test specimens |
| 4:04 PM | 15 | again in case we need them later on, if we get another IBIS hit |
| 4:04 PM | 16 | or a lead. Then if we don't have the gun itself, we can use |
| 4:04 PM | 17 | test specimens fired from that gun. |
| 4:04 PM | 18 | **Q.** As you were going through the examination of Exhibit |
| 4:04 PM | 19 | Number 6 and how this was -- this thing operated, you held the |
| 4:05 PM | 20 | gun in your hand, correct? |
| 4:05 PM | 21 | **A.** Yes, sir. |
| 4:05 PM | 22 | **Q.** And this metal piece is a clip? |
| 4:05 PM | 23 | **A.** Magazine, yes, sir. |
| 4:05 PM | 24 | **Q.** The magazine, and that magazine goes in here? |
| 4:05 PM | 25 | **A.** Correct. |

4:05PM  1   Q.   Is that right?

4:05PM  2   A.   That is correct.

4:05PM  3   Q.   And to load this, you've got to take this metal thing

4:05PM  4   right here in my hand, this magazine or a clip, and that's

4:05PM  5   where you put the bullets in here?

4:05PM  6   A.   Correct.  The cartridges are inserted one at a time in the

4:05PM  7   magazine.

4:05PM  8   Q.   Like a little spring into here that pushes down as you

4:05PM  9   load, is it?

4:05PM  10  A.   That's correct.

4:05PM  11  Q.   And you would take bullets, something like this, and have

4:05PM  12  to hold them and handle them to stick them into this cartridge?

4:05PM  13  A.   Correct.

4:05PM  14  Q.   Or magazine, or whatever?

4:05PM  15  A.   Magazine is the proper term.

4:05PM  16  Q.   Magazine, proper term.  And so when you're doing that,

4:05PM  17  you're handling all of that.  You're handling the gun.  You're

4:05PM  18  handling this item, and then you're handling the actual bullets

4:06PM  19  as well?

4:06PM  20  A.   Yes, sir.

4:06PM  21  Q.   And as I understand your testimony, your involvement with

4:06PM  22  all of this is just to have tested those cartridges, Exhibit

4:06PM  23  11, 12, and 13?

4:06PM  24  A.   Correct.  I was asked to examine the firearm and to see if

4:06PM  25  they -- see if it had possibly fired the cartridge cases, and

4:06PM 1  it was based on the IBIS lead that was generated previously.

4:06PM 2  Q.    And what you're doing with this, as I understand as well,

4:06PM 3  is that you're doing a physical eye examination through use of

4:06PM 4  a microscope to help to assist you look at those small markings

4:06PM 5  on there?

4:06PM 6  A.    Correct.

4:06PM 7  Q.    And as you said earlier, some of those markings may be

4:06PM 8  unique to that particular firearm because of the markings it

4:06PM 9  makes on the strike part of the gun?

4:06PM 10 A.    Right.

4:06PM 11 Q.    So it is possible that similar markings could be made from

4:06PM 12 different guns that you could compare; is that a fair

4:07PM 13 statement?

4:07PM 14 A.    If you have more than one of the same type of gun, there

4:07PM 15 may be similar markings.  Again, we're looking for markings

4:07PM 16 that we believe are the individual markings unique to a

4:07PM 17 particular firearm, so you may have some marks that could carry

4:07PM 18 over from one gun to the next, but we're looking for the

4:07PM 19 individual marks.

4:07PM 20 Q.    And you're not videotaping or recording how you're doing

4:07PM 21 this testing?  This is just how you operate in your lab at SLED

4:07PM 22 without any other type of visual aid for the jury to be looking

4:07PM 23 at as you're going through this process; is that a fair

4:07PM 24 statement?

4:07PM 25 A.    Right.  We don't videotape any of the analysis.

4:07PM  1          MR. SHAHID:  Give me one second.

4:07PM  2                        (Pause.)

4:08PM  3          MR. SHAHID:  Nothing further.  Thank you.

4:08PM  4          MR. SCHOEN:  No redirect, Your Honor.

4:08PM  5          THE COURT:  You can go back to Columbia if you want

4:08PM  6  to.

4:08PM  7          THE WITNESS:  Yes, sir.

4:08PM  8                        (Witness excused.)

4:08PM  9          THE COURT:  Yes, sir?

4:08PM  10         MR. SCHOEN:  Your Honor, the Government rests.

4:08PM  11         THE COURT:  Okay.  Ladies and gentlemen of the jury,

4:08PM  12  we've gone a lot faster than we thought we were going to go, so

4:08PM  13  we're going to quit for the day early so you can beat the

4:08PM  14  traffic on this side rather than the backside.  I think we're

4:09PM  15  going to be able to finish this case tomorrow, have arguments

4:09PM  16  by the lawyers -- the rest of the evidence, arguments by the

4:09PM  17  lawyers, and my charge on the law, and that takes a while to

4:09PM  18  get together.  I give it to the lawyers.  They make additions

4:09PM  19  or corrections.  Then I have to redo it.  Then I have to make

4:09PM  20  13 copies of it, and, of course, when I make the 13 copies, the

4:09PM  21  Government copier always breaks, so it takes a while.  So why

4:09PM  22  don't y'all come in at 10:30 tomorrow morning rather than 9:30,

4:09PM  23  and we'll start again with the trial, and I'm sure it'll be to

4:09PM  24  you tomorrow afternoon, okay?  And if -- we'll start, and then

4:09PM  25  I'll buy you lunch.  They'll have it back there.  So we'll see

| | | |
|---|---|---|
| 4:09 PM | 1 | you tomorrow. |
| 4:09 PM | 2 | Don't discuss the case among yourselves. Don't |
| 4:09 PM | 3 | let anyone discuss it with you. Don't make any decision until |
| 4:09 PM | 4 | you've heard all the evidence in the case plus my final charge |
| 4:09 PM | 5 | and the lawyers' final arguments. We'll see you tomorrow. |
| 4:09 PM | 6 | Thank you. |
| | 7 | (Jury out at 4:09 p.m.) |
| 4:10 PM | 8 | THE COURT: Okay. Everything else -- you said you |
| 4:10 PM | 9 | wanted to go over some charges that you may want added? |
| 4:10 PM | 10 | MR. SCHOEN: Yes, Your Honor. The Government |
| 4:10 PM | 11 | identified a number of charges, and I don't actually have the |
| 4:10 PM | 12 | charges pulled up, and I'm happy to try to locate them and |
| 4:10 PM | 13 | email them -- |
| 4:10 PM | 14 | THE COURT: Okay. |
| 4:10 PM | 15 | MR. SCHOEN: -- to your clerk, but basically the four |
| 4:10 PM | 16 | we can think of that are maybe not always in the standard |
| 4:10 PM | 17 | charges are a specific technique charge. |
| 4:11 PM | 18 | THE COURT: We did that one, because I just told him |
| 4:11 PM | 19 | while I was sitting up here. |
| 4:11 PM | 20 | MR. SCHOEN: All right. That one. Joint possession. |
| 4:11 PM | 21 | THE COURT: Probably not, but we'll -- |
| 4:11 PM | 22 | MR. SCHOEN: Joint possession charge. A charge |
| 4:11 PM | 23 | regarding flight as consciousness of guilt. |
| 4:11 PM | 24 | THE COURT: I'll see whether the -- okay. |
| 4:11 PM | 25 | MR. SCHOEN: And also a charge regarding obstruction |

or other evidence to cover up a crime, meaning consciousness of
guilt can be considered as substantive evidence of a crime.

THE COURT:  I can understand the factual basis for
the first three.  What's the factual basis for the fourth?

MR. SCHOEN:  Your Honor, we would just ask that the
jury be allowed to consider the fact that Ms. Ellison was
trying to cover up -- she offered this statement and then
recanted this statement -- as affirmative evidence of a
conspiracy.

THE COURT:  You're talking about Ms. Ellison and
not --

MR. SCHOEN:  Certainly, but just to establish the
existence of the conspiracy.  We have to show that he's a part
of it, but to establish the existence, I think it's fair game
for that.

THE COURT:  Okay.  Yes, sir?

MR. SHAHID:  Well, certainly the very last thing
about an obstruction, this doesn't rise to the level of
obstruction.  I mean, that's pretty much a stretch.

THE COURT:  Of course, lying to the police is
probably obstruction, at least under the sentencing guidelines.

MR. SHAHID:  It could if she's lying to the police.

THE COURT:  Okay.

MR. SHAHID:  But she's --

THE COURT:  How about to the Court?  That would be

even worse.

MR. SHAHID: Lying to the Court would be even worse, but it hasn't established that she was lying. She got nervous and wanted, by his testimony, to recant some of her testimony.

THE COURT: If that's the factual basis, I'll evaluate that when I get the charges and see if it's applicable, but it looks like the first three are going to come in. Are you going to have problems with the first three?

MR. SHAHID: Well, of course I do, but I don't know if I have an objection to them. Yes, I have a problem with them.

THE COURT: Okay. It's the law. Unfortunately, you get to take the bitter with the sweet, right? Anything else?

MR. SHAHID: Probably not until I see what you have.

THE COURT: Now, I understand that you may have one witness in the morning if you can find him?

MR. SHAHID: I've been checking on the status of that.

THE COURT: Okay.

MR. SHAHID: And see if there's any update.

THE COURT: Have you and your client made a decision whether or not he wants to testify?

MR. SHAHID: Well, we have previously talked about that, but let me just double-check with him.

THE COURT: And, of course, we can go over this in

| | |
|---|---|
| 4:13 PM | 1 |
| 4:13 PM | 2 |
| 4:13 PM | 3 |
| 4:13 PM | 4 |
| 4:13 PM | 5 |
| 4:13 PM | 6 |
| 4:13 PM | 7 |
| 4:13 PM | 8 |
| 4:13 PM | 9 |
| 4:13 PM | 10 |
| 4:13 PM | 11 |
| 4:14 PM | 12 |

1   the morning too.  I just wanted to find out --

2                              (Pause.)

3          **MR. SHAHID:**  He's going to sleep on it.

4          **THE COURT:**  Okay.  That's a good idea, okay?  All

5   right.  So we'll see y'all at 9:30 tomorrow morning, and we'll

6   go -- we'll get the charges to you and get back any criticism

7   that y'all have, additions or corrections, okay?

8          **MR. SHAHID:**  So we're expected to get these sometime

9   tonight, you say?

10          **THE COURT:**  You'll get those before suppertime.

11  Thank you.

12                          (End of proceedings.)

```
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH CAROLINA


REPORTER TRANSCRIPT CERTIFICATE

        I, Tana J. Hess, Official Court Reporter for the United States District Court, Middle District of Florida, certify, pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcription of the stenographic notes taken by the undersigned in the above-entitled matter (Pages 1 through 206 inclusive) and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States of America.


_____
Tana J. Hess, CRR, RMR, FCRR
Official Court Reporter
United States District Court
Middle District of Florida
Tampa Division
Date:  February 16, 2022